**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | NO. 5:25-CR-00127-GFVT-MAS-6 |
| ) | |
| DEANGELO MONTAVIOUS ) | |
| BOONE, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION & ORDER**

The detention motion before the Court asks whether the Court detain a defendant pretrial if the defendant was an active member of a dangerous street gang and is alleged to have brokered a murder-for-hire plot that resulted in the death of a federal witness, but has since left that life behind? Unfortunately, a person's past choices and associations will follow him. Even the passage of a couple years' time is insufficient to show that a defendant who was complicit in repeated gang violence and allegedly helped orchestrate a murder can be released under the Bail Reform Act rubric. For the reasons that follow, the Court will grant the United States's motion for pretrial detention.

**I. ANALYSIS**

Boone is charged with use of interstate commerce in the commission of murder for hire, conspiracy to commit the same, and conspiracy to use a firearm in a crime of

violence. [DE 1]. At the initial appearance, the United States moved for pretrial detention pursuant to 18 U.S.C. § 3142(f)(1)(A), (B), and (E). The Court conducted a detention hearing on October 20, 2025.

**A.    LEGAL STANDARD**

The Court afforded both sides all procedural rights outlined in the Bail Reform Act ("BRA"). The United States bears the burden to prove a defendant should be detained pretrial. Detention premised on nonappearance requires preponderant evidence. *See, e.g.*, *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Curry*, No. 6:06-CR-82-DCR, 2006 WL 2037406, at *6 (E.D. Ky. Jul. 18, 2006). Danger-based detention, however, demands clear and convincing evidence that no combination of conditions will reasonably ensure community safety. 18 U.S.C. § 3142(f). The analyses are distinct. Conditions that sufficiently target nonappearance risk may not adequately address danger potential. *See United States v. Mercedes*, 254 F.3d 433, 436-37 (2nd Cir. 2001). Further, condition effectiveness inherently hinges on a defendant's predicted good faith compliance. *See United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) (characterizing predicted compliance as critical release component); *United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008) (noting the "critical flaw" in a set of proposed release conditions: "In order to be effective, they depend on [the defendant's] good faith compliance."); *id.* at 1093 n.13 (observing that, barring a "replica detention facilit[y]," the success of any condition combination necessarily "hinge[s] on [the defendant's] good faith compliance").

Evidence rules do not apply in the detention hearing context. 18 U.S.C. § 3142(f). The key is simply evidentiary reliability and accuracy. *See, e.g.*, *United*

*States v. Webb*, 149 F.3d 1185 (Table), No. 98-1291, 1998 WL 381686, at *1 (6th Cir. June 22, 1998). The Court properly considers a wide range of proof. The nature and quality of proof, though, impacts its probative value and weight in the detention calculus.

### B.   BOONE'S DANGER TO THE COMMUNITY

The § 3142(g) factors drive the analysis. Specifically, the Court must consider the history and characteristics of the defendant, the nature and circumstances of the offense charged, the weight of the evidence against the person, and the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *See* 18 U.S.C. § 3142(g).

#### 1.   Boone's History and Characteristics

The Court must consider many aspects of Boone's background in making the decision to release or detain him. Specifically, the BRA requires courts to "take into account the available information concerning— [ . . . ] the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation[.]" 18 U.S.C. § 3142(g)(3).

Boone is a 26-year-old Lexington, Kentucky native. Boone lived in Lexington until February 2024, when he moved to Louisville with Tamerra Macklin, his partner. [Pretrial Services Report at 1]. Boone and Macklin share twin, 15-month-old children and live together in a mobile home owned by Macklin's stepfather. [Pretrial Services

Report at 2]. If released, Boone would return to that residence. Between February 2024 and his arrest, Boone also lived with his mother in Charlotte, North Carolina, for approximately six months. Boone has two brothers in Charlotte, North Carolina, and one brother in Lexington, with whom he has contact. [Pretrial Services Report at 1-2].

Until his arrest, Boone has worked at Aramark Services for the past two years, stationed at the Ford Motor Company. [Pretrial Services Report at 2]. Boone works at least 40 hours per week, but sometimes up to 60 or 70 hours per week. Boone proffered he believes he can return to that position if released. Boone did not report any mental or physical ailments. He reported occasional use of cannabinoids. [Pretrial Services Report at 3].

Macklin testified on Boone's behalf. She described him as "very active" with their children. Macklin works PRN as a certified nursing assistant, which allowed her to alternate her schedule with Boone's for childcare purposes. Macklin testified she met Boone through a friend who knew Chance Gist, a friend of Boone discussed in further detail below. She has attempted to pull Boone away from the people he associated with in the past because he is a father now, and she would like him to be home with his children. She testified that, most days, Boone fills his time with work and caring for their children. She noted he likes to gamble on video games, and that hobby has caused friction between them. Macklin testified she would agree to make sure Boone complied with release conditions if released, and, further, that there are no firearms, alcohol, or drugs at their home.

According to FBI Special Agent Isaac Robison, Boone is a member of Hot Boyz, a criminal street gang in Lexington, Kentucky, that is responsible for shootings, drug trafficking, homicides, robberies, and other crimes. The United States introduced a glut of evidence proving that Boone is a member of Hot Boyz and has frequent contact with the other members of Hot Boyz. Robison testified Hot Boyz has the following self-identified members: Boone, Daquis Sharp, Jatiece Parks, Desmond Bellomy, William Dixon, Zalan Dulin, and Chance Gist. Hot Boyz frequently feuds with rival gangs. These feuds have often resulted in violence and death. Sharp, Bellomy, Parks, and Dixon are codefendants in this case while most of the remaining members are facing separate, unrelated federal charges.

The United States produced photographs of Boone with other Hot Boyz members in which they were displaying Hot Boyz gang signs or slogans. The United States also produced excerpts of a group chat text chain that included Boone, Dixon, Gist, Bellomy, and Sharp. The texts were retrieved from Dixon and Gist's cell phones. The United States introduced several text messages from this group chat suggesting perpetrating violence generally. For example:

- Dixon: "Aye gang everybody bout to start moving in 2z when we go out like OT an shit. We da MOB on mama." (August 19, 2023).
- Sharp: "Nigga if dev and kanan wasn't with me I woulda boxed both em niggas." To which Dixon replied: "Dats wat I'm sayin I wish I was there." (August 19, 2023).
- Sharp: "Hy niggas bitches imma kil em watch." (August 19, 2023).

- Gist: "Niggas gone die on everything we need stolly gone smoke et nigga downtown." (August 21, 2023).

- Sharp: "It's just so comedy hoes don't ever play w us how they do these Niggas." To which Gist responded: "Man they know we rec we don't give no fucks, we gone smoke a bitch she play too." (August 21, 2023).

Robison discussed other evidence of the Hot Boyz's propensity for violence, such as a video Sharp posted on his Instagram account in which he said, "I get away with murder." Robison testified a large portion of this group chat was devoted to the video game NBA 2K. The group played the game, and Boone was known to gamble heavily on video games. A picture of the video game screen in the group chat showed that one of the screen names was "HotBoyz_Doja." "Doja" was known to be Boone's nickname or alias. This was another piece of evidence the United States pointed to showing that Boone self-identified with the Hot Boyz.

Despite his affiliation with the Hot Boyz, Boone has little criminal history outside of traffic offenses. He has never been convicted of a felony. He was charged with receiving stolen property greater than $10,000 in 2017, but the disposition of that case is unknown. Boone had an interpersonal protective order against him from January 6, 2021, until May 18, 2023. The United States emphasized Boone's alleged role in four other criminal incidents connected to the Hot Boyz that predated the conspiracy to murder Kristopher Lewis, as testified to by Robison. Only one of these four resulted in criminal charges against Boone.

### a. Attempted Shooting of T.F.

In April 2020, Boone and Sharp arrived at the home of victim T.F. Both were armed. Sharp attempted to discharge his weapon in the direction of T.F.; however, the weapon did not fire. T.F. got in her vehicle and fled, at which time Sharp was able to get several rounds fired off towards the victim. T.F. positively identified the perpetrators as Boone and Sharp. Sharp was criminally charged in state court; Boone was never charged with anything related to this incident. T.F. told law enforcement she did not believe Boone fired his weapon, which she described as a "long gun."

### b. Murder of Ja'Quis Ray

On December 28, 2020, Ja'Quis Ray, the brother of Daquis Sharp, was murdered on Woodhill Drive in Lexington. Law enforcement was separately called to North Mt. Tabor Road; upon arriving, they recognized an individual described as being at the scene of the Woodhill Drive shooting. The individual, Quincy Gay, appeared to have a firearm in his shirt. He entered a vehicle that Boone was driving. Law enforcement attempted to traffic stop the vehicle. However, the vehicle fled, hit a curb, and the occupants, including Boone and Sharp, exited and fled on foot. Boone and Sharp were ultimately found in an office building where they hid in the ceiling of a doctor's office. Law enforcement surrounded the building and eventually took Boone and Sharp into custody. Officers retrieved an AR15 pistol, a small AK-47, and a Glock 26 from the vehicle Boone was driving. This incident resulted in state charges against Boone for fleeing/evading on foot, fleeing/evading in a motor vehicle, burglary in the 3rd degree, leaving the scene of an accident, possession of marijuana, failure

to maintain insurance, and operating on a suspended license. These charges are still pending. [Pretrial Services Report at 4-5].

### c. Protective Order Incident

On January 2, 2021, Boone and Sharp are alleged to have possessed firearms and been "involved in" a sexual assault. The alleged assault did not result in criminal charges against Boone or Sharp but did result in an interpersonal protective order by the victim against Boone that did not expire until May 2023. [Pretrial Services Report at 7].

### d. Radcliff Road Shooting

On January 3, 2021, there was a shooting on Radcliff Road in Lexington. The shooting occurred at the residence of a member of the Sleet family. Hot Boyz and the Sleet family have a known gang rivalry that has resulted in several murders. In the police report, a witness inside the Radcliff Road residence said that they believed Boone was responsible for the shooting. However, the United States could not produce any evidence to support that allegation. Without more to connect Boone to this shooting, the Court highly discounts this incident in its analysis. To the extent it provides any information at all, it simply supports the United States's contention that Boone is involved in Hot Boyz and violence to a degree that the victim of a rival gang shooting would lay the blame on Boone, either in retaliation or out of a true belief that Boone could have perpetrated the crime.

Although Boone has few criminal convictions, and no felony convictions, the above events indicate that throughout 2020 and 2021, Boone was repeatedly in

imprudent situations that involved violence and firearms. While he has seemingly been living the life of a hard-working family man since the birth of his children, the Court cannot discount those prior incidents.

C. **THE NATURE AND CIRCUMSTANCES OF THE OFFENSE CHARGED**

The BRA requires Courts to consider the "nature and circumstances of the offense charged, including whether the offense is a crime of violence[.]" 18 U.S.C. § 3142(g)(1). Robison testified at great length about the nature and circumstances of the murder at the heart of this case and Boone's alleged involvement in it. His testimony is summarized below.

1. **Lewis Murder**

In 2022, Rollie Lamar and Kristopher Lewis were indicted in 5:22-CR-50-GFVT-MAS, for offenses including conspiracy to distribute marijuana and conspiracy to commit money laundering. In early 2023, Lewis pled guilty to the charges and agreed to cooperate with law enforcement. Lewis testified before the grand jury in July 2023, which led to a superseding indictment against Lamar. Lewis's sentencing, scheduled for July 2023, was continued until after Lamar's trial because Lewis was scheduled to testify at Lamar's trial. This fact, in combination with discovery provided to Lamar, revealed to Lamar that Lewis was cooperating against him. On the morning of September 29, 2023, Lewis was gunned down in the parking lot of Koch Air as he reported to work.

Lewis's fiancée identified Lewis at the murder scene and told law enforcement she believed Lamar was responsible due to Lewis's cooperation in Lamar's upcoming trial. Initially, law enforcement matched spent shell casings from the Lewis murder

scene to shell casings found at a shooting that occurred in March 2023 on Race Street in Lexington, and in September 2022 on Charles Avenue in Lexington. A black Acura served as the getaway vehicle in the Lewis murder, as was also seen on video at the Race Street and Charles Avenue shootings. Those shootings were linked to the Hot Boyz and Sharp was known to law enforcement to drive a black Acura matching the vehicle seen at all three incidents.

Through various investigatory means, law enforcement came to believe the Hot Boyz were responsible for Lewis's murder at the direction of Lamar. Robison testified at length regarding cell site location evidence that strongly suggests members of the Hot Boyz (though notably, not Boone) were conducting surveillance on Lewis in the days just prior to his homicide. Robison detailed text messages between members of Hot Boyz discussing the surveillance. The cell site location evidence suggested Dixon and Lamar were in a nearby area of Louisville just days before the murder. On September 28, 2023, the afternoon prior to Lewis's murder, Dixon sent a message to the group chat that read "bcg252." This turned out to be Lewis's license plate number. The next message after the license plate text was four hours later from Boone, who stated: "Who's tryna to run the k?" Robison testified he believed this was not a response to the license plate text, but rather, a message about the NBA 2K game. Regardless, Boone was part of a text thread that allegedly included conversations about a pending assassination for money.

Law enforcement believes Parks, Bellomy, Sharp, and Dixon were at the scene of the murder, and based on witness statements, that two or three of them fired the

killing shots at Lewis. The vehicle used as the getaway car from the murder scene was known to be driven by Sharp and was later found abandoned. The Indictment in this case is based on allegations that Lamar paid Parks, Bellomy, Sharp, and Dixon to murder Lewis, and that those four paid Boone and Quincino Waide, Jr. for smaller roles in the conspiracy.

### 2. Boone's Role

Robison discussed text messages between Dixon and Sharp, extracted from Dixon's phone, from the night of Lewis's murder. The text conversation, in most pertinent part, was as follows:

> Sharp: "We gonna give Fred [Waide] prob 100 each"
>
> Dixon: "Yup an Doja [Boone] said give him 5"
>
> Sharp: "Bet cause he was talkin bou a band but either way it was 250 each from the 4 of us"
>
> Dixon: "Yeah it don't matter to me, he just got in the car and said y'all just give me 5 but Watchu wanna give em $1000"

[Government Exhibit 23]. There was no overt mention of Lewis's murder in the text messages. The United States alleges this discussion refers to how much Boone and Waide were to be paid for their minor roles in the Lewis murder. The United States specifically alleges that Boone brokered the payment from Lamar to the Hot Boyz after Lewis was killed. Boone argued the texts were ambiguous. As Boone repeatedly pointed out, there is no direct evidence of his involvement in the planning of the Lewis murder. The United States relied on the fact that Boone was a member of the group chat where the Hot Boyz appeared to discuss plans for the murder, including sending Lewis's license plate.

The United States further connected Boone to the murders by call records. Robison testified Boone was one of the only contacts that both Lamar and Dixon had in common. "Meaning that Mr. Boone was one of the only people that, when we reviewed the call detail reports, that was in contact with Mr. Lamar and was in contact with Mr. Dixon." [Transcript, DE 72 at Page ID# 359]. This evidence gave weight to the United States's narrative that Boone was the broker or go-between connecting Lamar and the Hot Boyz.

Finally, the United States introduced text messages between Boone and Dixon in early- to mid-October 2023, in which Boone and Dixon appear to be talking about getting payment from someone they refer to as "dude" over text. [Government Exhibit 28a-b]. During these text conversations, at several points, Boone and Dixon place calls to Lamar. The context of the conversation certainly suggests they discussed obtaining payment they were owed from Lamar and then reaching out to Lamar. Boone does not deny this but proffered that Lamar owed him gambling debts that he intended to collect. Boone proffered he and Lamar were friendly and frequently bet on video games together.

Overall, the alleged crime is one of extreme danger ending the life of another. The Court cannot fathom a greater danger to another person or the community. Boone asked countless, effective questions about the validity of some of the government's proof against him, arguing he was innocent. 18 U.S.C. § 3142(j) ("Nothing in [the BRA] shall be construed as modifying or limiting the presumption of innocence."). The BRA, however, requires the Court to consider all allegations,

both proven and unproven, in its calculus of the defendant's dangerousness. "[T]he § 3142(g) analysis is concerned with a practical assessment of the defendant's dangerousness, rather than an adjudication of guilt for a particular offense." *United States v. Tolbert*, 2017 WL 6003075, at *5 (E.D. Tenn. Dec. 4, 2017) (citing *Stone*, 608 F.3d at 948). This factor weighs heavily in favor of detention.

D.  **THE WEIGHT OF THE EVIDENCE OF DANGEROUSNESS**

This BRA factor is somewhat duplicative of the first and third because, in considering a defendant's overall dangerousness, the Court must consider the facts of the crime alleged as well as evidence that the defendant has been dangerous in the past, such as criminal history and a history of violent behavior. The United States most heavily stressed Boone's involvement in the Hot Boyz, the gang wars, and the Lewis murder.

However, not all that evidence pertains to Boone. Rather, the focus for Boone are the following issues: (1) he was involved in several firearms incidents, one of which resulted in fleeing police and state charges, another which resulted in a protective order against him for more than two years; (2) Boone generally associates and promotes individuals loosely tied to numerous murders and shootings; (3) Boone has a demonstrated history of possessing firearms in and around other criminal activity (his own or others'); (4) Boone continued to associate with a group—including in their group chat—that openly discussed violent crimes; and (5) there is strong, circumstantial evidence suggesting Boone played a role in the murder of Kristopher Lewis. Boone's connection to these issues, in some instances, is clear, while in others it is muddy, to say the least. However, one conclusion is clear: Boone's associations

are steeped in violence and homicides. Although gang affiliation without evidence of any link to "gang fratricide or violence" is often considered a limited danger factor, association itself weighs in favor of detention. *See United States v. Salgado*, No. 20-53JJM, 2020 WL 4747931, at *7 (D.R.I. Aug. 17, 2020) (collecting cases discussing affiliations with gangs and their import as to violence under the BRA).

E. THE NATURE AND SERIOUSNESS OF DANGER POSED BY RELEASE

The Court must weigh "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). As discussed above, the United States presented ample evidence that Boone has connections to gang members and criminal activity.

Boone has engaged in specific instances of violence that posed a risk of danger to another person or the community. First, Boone has a history of possessing firearms while allegedly committing other crimes and of assault allegations that led to a protective order. Second, Boone's association with the Hot Boyz has resulted in consistently troubling conduct. Finally, the United States provided compelling evidence that, at a minimum, Boone was in contact with Rollie Lamar, William Dixon, and Daquis Sharp during the same narrow window of time that Lamar allegedly hired Dixon, Sharp, and others to murder Kristopher Lewis. While Boone attempted to explain away these contacts, the circumstantial and coincidental nature of the contacts raises many concerns for the Court.

The United States stressed that the nature of the danger to another person and the community is serious, if not life-threatening, particularly to any witnesses involved in this case. In a successful murder-for-hire scheme in the Western District

of Michigan, the Court considered the safety of the government's witnesses and "reach[ed] the obvious conclusion that a person capable of one contract murder would be capable of another." *United States v. Ross*, 2007 WL 1295995, at *5 (W.D. Mich. April 6, 2007). "The risk of danger to the community as to [the defendant] is clearly supported by his own conduct demonstrating violence by critically aiding in the Murder–For–Hire . . . ." *United States v. Ferrer-Sosa*, 28 F. Supp. 3d 122, 130 (D.P.R. 2014). The danger here is even more obvious and heightened where the allegation at issue is that a witness was murdered, Boone has a history of firearms and violent allegations, and Boone has significant contacts with other individuals allegedly willing to commit murder-for-hire.

The Court would be remiss not to mention Boone's current circumstances, however. In the two years since Lewis's death, Boone appears to have extricated himself from criminal activity and proximity to the Hot Boyz. He has been living in Louisville, more than an hour removed from the rest of the Hot Boyz. He has worked full-time and crated a stable family life. Further, as both parties acknowledged, most or all of Boone's criminal associates are incarcerated or deceased.

Weighing all the totality of the evidence before it, the Court finds there simply too much violence in Boone's history to release him. The Court relies heavily on the allegations in this case, which, if true, suggest Boone poses a life-threatening danger to witnesses or others involved in this case. The risks Boone poses, including directly or indirectly inflicting violence on witnesses or rival gang members, cannot be mitigated with conditions such as home detention or GPS monitoring, particularly

where it appears Boone committed many of the acts alleged in this Indictment via the telephone.

**F.    NONAPPEARANCE**

The United States did not address whether Boone is a risk of nonappearance, and, thus, did not carry its burden to prove by a preponderance of the evidence that he poses a risk of not appearing for future court dates.

## II.    CONCLUSION

The United States presented largely circumstantial evidence of Boone's prior criminal conduct and connection to the Lewis homicide. The evidence, though circumstantial, is convincing. Boone was identified as being armed and with Sharp when Sharp shot at victim T.F. Boone was identified as being armed and with Sharp when they allegedly committed a sexual assault resulting in a protective order against Boone. Boone was identified as a possible shooter at Radcliff Road, even if for no other reason than his association with the Hot Boyz. Boone was with Sharp, armed and fleeing police on the day Sharp's brother was killed. Boone was privy to a group chat that, for several months in 2023, discussed their willingness to kill their enemies, girlfriends, and, seemingly, the murder of Lewis. In a case where the stakes are life-or-death, Boone has demonstrated a capacity to tolerate and participate in violence. There are no conditions that will mitigate the very serious danger he poses to the community.

On balance, the Court finds that the BRA demands pretrial detention in this case. As to the risk of nonappearance, the United States did not demonstrate by a preponderance of the evidence that Boone is unlikely to appear as required.

The Court also finds that the United States did show by clear and convincing evidence that Boone is an unmitigable danger to the community or others.

Accordingly, **IT IS ORDERED** that the United States' oral motion for detention is **GRANTED** and directs that Boone be detained pending resolution of the allegations against him.

The parties may appeal this Order under the terms of 18 U.S.C. § 3145(a).

Signed this the 30th of October, 2025.

MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY