# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# CENTRAL DIVISION
# LEXINGTON

| UNITED STATES OF AMERICA, | ) |
|---|---|
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) NO. 5:25-CR-00127-GFVT-MAS-7 |
| | ) |
| CASEY ALLISON MORRIS, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION & ORDER

The United States seeks the detention of Defendant Casey Morris, allegedly a very minor participant in a very major crime. Outside of the charge, however, Morris has no criminal history and strong family ties to the community. Nevertheless, the United States argues detention is necessary considering a long list of obstructive acts by Morris. However, upon closer inspection, the list is often more smoke and inuendo than it is fire. The list demonstrates that Morris either does not follow through on her discussions of obstruction or is terrible in her execution. In fact, Morris has neither been charged nor does the United States allege any charges based upon obstruction are imminent. Under the factors of the Bail Reform Act, the Court must release her.

#### I. ANALYSIS

**A. PROCEDURAL HISTORY**

On November 25, 2025, the Court conducted a detention hearing in this matter and determined that Defendant Casey Allison Morris could be released pretrial with a combination of conditions that included location monitoring and a third-party custodian. Her third-party custodian was Kelvin Alexander, her brother-in-law and an officer with the Richmond Police Department. On December 8, 2025, Morris moved to modify the conditions of her bond because Richmond Police Department policy does not permit Alexander to live with a person under indictment. [DE 163]. The Court conducted a hearing on the motion to modify the release conditions. The Court allowed the United States to reopen the detention hearing pursuant to 18 U.S.C. § 3142(f) due the new and material evidence of Alexander not being available to serve as a third-party custodian. [DE 185].

**B. LEGAL STANDARD**

Morris is charged with the use of interstate commerce in the commission of murder for hire, conspiracy to commit the same, and conspiracy to use a firearm in a crime of violence. [DE 87]. At the initial appearance, the United States moved for pretrial detention pursuant to 18 U.S.C. § 3142(f)(1)(A), (B), and (E) and (f)(2)(B).

At both the original and re-opened hearing, the Court afforded both sides all procedural rights outlined in the Bail Reform Act ("BRA"). The United States bears the burden to prove a defendant should be detained pretrial. Detention premised on nonappearance requires preponderant evidence. *See, e.g.*, *United States v. Patriarca*,

948 F.2d 789, 793 (1st Cir. 1991); *United States v. Curry*, No. 6:06-CR-82-DCR, 2006 WL 2037406, at *6 (E.D. Ky. July 18, 2006). Danger-based detention demands clear and convincing evidence that no combination of conditions will reasonably ensure community safety. 18 U.S.C. § 3142(f).

In making its decision, the Court relies on the facts and law cited in its previous Memorandum Opinion and Order at DE 154, as well as the facts from both the detention hearing on November 25, 2025, and the re-opened hearing conducted on December 17, 2025.

### C. MORRIS'S DANGER TO THE COMMUNITY

The § 3142(g) factors drive the Court's analysis. In making this decision, the Court considered the history and characteristics of the defendant, the nature and circumstances of the offense charged, the weight of the evidence against the person, and the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *See* 18 U.S.C. § 3142(g).

#### 1. Morris's History and Characteristics

The BRA requires courts to "take into account the available information concerning— [ . . . ] the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation[.]" 18 U.S.C. § 3142(g)(3).

Morris is 29 years old.  She did not report any mental or physical ailments.  [Pretrial Services Report at 4].  She reported prior daily use of cannabinoids, though she told USPO she last used drugs in August 2024.  [Pretrial Services Report at 4].  Through testimony at the first and second detention hearings, Morris has demonstrated close relationships with her mother, sister, and brother-in-law.  At the time of the original hearing, Morris lived with her sister, Genna Alexander, and brother-in-law, Richmond police officer Kelvin Alexander, in Lancaster, Kentucky.  She has resided with them since April 2025 and has resided in central Kentucky most of her life.  [Pretrial Services Report at 2].  If the Court continues Morris on release, however, she will have to move to her mother's home because of the Richmond Police Department's policies.  Her mother, Deania Hall, offered to replace Officer Alexander as a third-party custodian, an offer that the United States vehemently objected to, as discussed below.

Morris is not employed, but cares for her eight-year-old child as well as her sister's child.  [Pretrial Services Report at 2].  Morris is currently taking online classes at Somerset Community College.  Morris has no criminal history.

The facts above drive a clear conclusion towards release as to this factor.  Setting aside the allegations in this Indictment that are captured in the 3142(g)(1) and (2) factors, there is little in Morris's history and characteristics to suggest she poses any danger to the community.

Rather, Morris's primary consideration of danger stems from her relationship with Desmond Bellomy, her boyfriend, her co-defendant, and a member of the Hot

Boyz, a criminal street gang that law enforcement believes is responsible for the murder of a federal witness.[1]

### a. Allegations of Aiding or Facilitating Bellomy

Per FBI Special Agent Isaac Robison's testimony, there were text messages from Morris's phone (some of which had been deleted prior to law enforcement's seizure of the phone) in which Morris discussed buying "another gun" for Bellomy in September and October 2023. [DE 180, Ex. 10-14]. There is no evidence Morris actually purchased a firearm for Bellomy, as "another gun" could mean she previously bought a gun or simply that he already owned a gun. In texts from February 2024, Morris references turning over Bellomy's stolen gun to the police, indicating she may have possessed the stolen firearm arm. She also arranged for him to shoot firearms at her friends' house in mid-September 2023, when it is abundantly clear she knew Bellomy was prohibited from possessing firearms. Of all the narratives advanced by the United States, facilitating Bellomy's possession of firearms is the most concerning narrative, considering that Bellomy is alleged in this case to have shot and killed a federal witness. In contrast to the obstruction allegations around Morris, providing a firearm to a known violent felon is dangerous – if it happened. The United States presented no evidence that Morris ever purchased a firearm for Bellomy, only that she talked about it. The Court does not discount the dangerousness of Morris

---

[1] The Court has previously detailed the Hot Boyz activity. [*See* DE 76]. The self-identified members of the Hot Boyz are Deangelo Boone, Daquis Sharp, Jatiece Parks, Desmond Bellomy, William Dixon, Zalan Dulin, and Chance Gist. [DE 76].

potentially possessing Bellomy's stolen gun and arranging for him to go to target practice, even if the target practice never happened.

      *b.*      *Obstructive Concerns*

The driving focus for the United States, and the focus of its evidence at both hearings, is a concern that Morris will obstruct the investigation and prosecution of this case. Over the course of two detention hearings, Robison described several circumstances in which Morris is alleged to have attempted to obstruct justice.[2] The United States provided two categories of conduct.

First, the United States lists three incidents where there was a specter that Morris would engage in obstructive conduct. Yet, with each incident, there is no evidence she took action towards any obstructive ends. In other words, the United States and Morris both talk a big game but do not deliver.

For example, Morris has a brother-in-law who works for the Richmond Police Department. Morris has bragged to others that she could somehow use her brother-in-law for information or an advantage in criminal proceedings. To prove her intent to do so, the United States introduced text messages where Morris asked her sister about the investigation into a robbery (discussed below) Bellomy is alleged to have

---

[2] During the December 17, 2025, detention hearing, defense counsel agreed to allow counsel for the United States to reference the exhibits in the record at DE 180 without re-admitting them into the record. Counsel for the United States did so and the Court relies on those exhibits herein. The Court overruled DE 180 during the second detention hearing because re-opening the hearing for new evidence procedurally mooted the United States' objections to Morris's release.

committed,[3] and her sister told her the names of the robbery victims that she learned from her husband. The Court cannot discern whether this was an obstructionist act, or even whether it was inappropriate for Morris to know the names of the victims, which is frequently public information found in police reports. What obstructionist acts is Morris taking with knowledge of victims of the crime after the crime? In the end, Morris seems to be a braggart who has gained zero criminal advantage from her brother-in-law.

Another example was that convicted murderer Joshua Brown wrote Morris a letter from prison in 2021 requesting that she sign an affidavit attempting to exculpate him in the shooting that resulted in his murder conviction. Morris responded indicating she was considering the request, later writing to Brown, "I wanna write you that letter," which is a possible reference to the affidavit. [DE 180, Ex. 4]. Yet, to date, Morris has taken no further action. Again, Morris talks a big game with little in the way of actual action.

A final example in this first category is conversations Morris has had with various inmates. The United States provided clear evidence that Morris was passing information back and forth between inmates in a state case unrelated to this one. But the United States did not describe with any specificity whether or how Morris was obstructing justice by doing so. The Court could make some logical assumptions, but the burden is on the United States to present evidence. Failing that, the Court

---

[3] As also discussed herein, Morris is alleged to have lied to police in a "cover up of the cover up" of the robbery and identity of the getaway car.

is left guessing at the details of this allegation. To the extent there was any specter of danger in these conversations, Morris has mitigated such risks by deleting her account with the jail messaging service.

In short, this first category of allegations seems to be some "smoke with no fire." The Court struggles to center a holding of clear and convincing evidence of danger on such vague and unfulfilled allegations.

In the second category of information, the United States presented "fire" by way of incidents where Morris lied to law enforcement to impede their investigations of criminal activity.

On July 23, 2023, Shyla Lyvers was at Morris's house when she called police to report her vehicle stolen. In truth, Lyvers was allegedly covering for the three men who were committing a robbery at the time – Desmond Bellomy, William Dixon[4] (another co-defendant in this case), and Stephan Fisher (an associate of Bellomy and Dixon). When police responded to Morris's house regarding the stolen vehicle, the United States demonstrated through body worn camera footage that Morris plainly misled police and provided false information.

The next example relates to Bellomy's separate indictment for unrelated firearm charges in this court. [*United States v. Bellomy, et al.*, 3:24-CR-00012-GFVT-MAS]. Robison testified Morris attempted to claim ownership of firearms found in a

---

[4] The United States introduced evidence at the detention hearing about William Dixon, the codefendant in this case, and Nashiem Dixon, another associate of Morris and Bellomy. The former is referred to herein as "Dixon" while the latter is referred to as "Nashiem."

vehicle Bellomy was driving on November 7, 2023. Bellomy is a convicted felon and therefore prohibited from possessing firearms. In short, Morris took efforts to claim ownership for the firearms to somehow sabotage the charges against Bellomy. Morris presented a sworn affidavit to the Commonwealth Attorney's office stating that the two firearms in the vehicle were hers. Law enforcement conducted an interview of Morris on May 21, 2024, captured on body worn camera footage played for the Court. Morris told the officers the firearms were hers. [DE 147, Ex. 10]. However, she was unable to describe the firearms and said she did not recognize at least one of the photographs. Morris's story was plainly false, filled with countless holes and lies. The proof is strong that Morris took steps to obstruct the investigation into Bellomy's possession of firearms.

   c.  *Summary*

The Court is confronted with a person whose personal history and characteristics is contrasted with the good—her lack of criminal history, strong family connections, no substance use, no history of violence, etc.—and the bad—Morris's acts of obstruction that range from the speculative to the poorly executed to outright lying to law enforcement. On balance, the Court finds that Morris's history, though pockmarked with uncharged obstructionist acts, warrants release.

**D.** **THE NATURE AND CIRCUMSTANCES OF THE OFFENSE CHARGED**

The BRA requires courts to consider the "nature and circumstances of the offense charged, including whether the offense is a crime of violence[.]" 18 U.S.C. § 3142(g)(1). At the first detention hearing, Robison testified at length about the

nature and circumstances of Morris's role in this case. His testimony is summarized below.

Law enforcement believes Morris's codefendants Parks, Bellomy, Sharp, and Dixon were hired by codefendant Lamar to murder Kristopher Lewis so that Lewis could not testify at Lamar's trial in case number 5:22-CR-50-GFVT-MAS. Lewis was shot and killed outside his workplace on September 29, 2023.

Robison discussed text messages between Morris and Bellomy on September 27, 28, and 29, 2023, as well as messages between Bellomy and Dixon on September 27, 2023, and between Morris and Lyvers on September 30, 2023. [DE 147, Ex. 1-6]. On the evening of September 27, 2023, Dixon texted Bellomy that they were "bou go get dat mu'fucka" and asked him "[i]s it a go." [DE 147, Ex. 1]. Bellomy responded "ya bet" and that "she good wit it." [DE 147, Ex. 1]. Robison testified law enforcement believes "she" is Morris. The men then discuss obtaining a "dirty" license plate. Minutes prior to these texts between Bellomy and Dixon, Morris's phone had received a text that said, "hey quick serious question[.]" Minutes after the texts between Bellomy and Dixon, Morris's phone received a text that said that the sender did not want "it" to be something she was doing for the sender and that "it" would be for "both" of them. Morris deleted these texts from her phone; therefore it is unclear who sent them. Robison testified he believed it was Bellomy.

The United States introduced text messages between Bellomy and Morris on September 28, 2023. Morris had deleted these messages, but had also screen captured them, which was how law enforcement ultimately obtained them. The

messages reflect Morris asking for her car back from Bellomy. The conversation makes clear that Bellomy had Morris's car the entire evening and night of September 27th and still possessed it throughout the day of September 28th. Morris repeatedly requested he return her vehicle. At one point, Bellomy refuses to return her car, telling her that he was not on the way to her house, he was instead "goin back to sit in this house for rn[.]" Morris asks why and he responds, "gotta learn his schedule need this money[.]" [DE 147, Ex. 4].

Robison testified that the vehicle connected to the Lewis murder was not Morris's vehicle. He stated, based on review of her text messages, it appears Morris revoked her consent for Bellomy to use her car on September 28, 2023, and did not allow him to use it the following day. Law enforcement recovered text messages from Morris's phone that Morris sent on September 30, 2023, stating, "I wish I wouldn't have said nun low key I wish I woulda gave em my car n let em come back n them me just take him back home and leave him on silent." [DE 147, Ex. 6]. Robison explained that law enforcement believe Morris was expressing regret to a friend that she did not allow Bellomy to use her vehicle for the Lewis murder. While this is one possible interpretation of the text, the context of the message is far from clear.

The alleged crime of this conspiracy is, essentially, obstruction of justice by *murder*. The Court cannot fathom a greater danger to another person, the community, or the judicial process. The nature of the crime is danger to the maximum degree. However, Morris's role in this conspiracy, if any, is exceedingly minor. The text messages imply that she may have known of the murder plot before

it occurred. The text messages imply she may have regretted not allowing her car to be used as the getaway car. And there is strong evidence that she was attempting to hide *something* when she deleted text messages between herself and Dixon and Bellomy around the time of the murder. The Court considers all of these facts in calculating Morris's overall dangerousness; however, the nature of this violent crime still weighs in favor of detention.

### E. THE WEIGHT OF THE EVIDENCE OF DANGEROUSNESS

This BRA factor is somewhat duplicative of the first and third because, in considering a defendant's overall dangerousness, the Court must consider the facts of the crime alleged as well as evidence that the defendant has been dangerous in the past, such as criminal history and a history of violent or obstructive behavior.

The United States heavily stressed the several instances of alleged obstruction Morris has engaged in since 2021. Obstruction of justice is a specific subcategory of the risk of danger the BRA addresses. The risk of obstruction is serious in this matter, considering both the charges that relate to obstructing a court proceeding by killing a witness, as well as Morris's personal history of apparently attempting to interfere with criminal investigations.

The overall weight of Morris's danger to the community, though, is light because of her lack of criminal charges (much less convictions), violent behavior, drug use or drug trafficking. The primary participation she is alleged to have had in this case is *considering* to loan her car for the murder but later *revoking* that permission. There is evidence Morris readily lied to law enforcement to cover for Bellomy as

related to his firearm charge and at the time of the burglary. Even taking the government's evidence in the light most negative to Morris, there is no evidence she has personally ever participated in any violent acts. The Court does not view obstruction of justice flippantly (especially in a case where a federal witness was murdered) but does view Morris's *particular* actions as less dangerous than participating in crimes that directly threaten the physical safety of the community, such as violence or drug trafficking. Throughout the evidence presented at both hearings, it became clear that either the United States does not have direct evidence of Morris committing other crimes, or Morris is "all talk" and little "action," making empty promises to purchase firearms or loan her car for criminal activity but not following through on those promises.

The Court finds that these facts mandate the conclusion that the weight of Morris's danger to the community is far from clear and convincing.

### F. THE NATURE AND SERIOUSNESS OF DANGER POSED BY RELEASE

The Court must weigh "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). As discussed above, the United States presented evidence that Morris has obstructed, attempted to obstruct, and considered obstructing legal proceedings in the past.

The United States argued that the nature of the danger to the community is serious, if not life-threatening, particularly to any witnesses involved in this case, and that Morris poses a threat to the integrity of the judicial process. Morris's

history, nonetheless, raises serious concerns that she may attempt to interfere with the judicial process in this case. The United States proffered at the first detention hearing that Morris had, up to that time, continued contact with known associates of the Hot Boyz, as well as her codefendants. There was no evidence at the second detention hearing that Morris had violated her bond conditions by having contact with her codefendants since her release.[5]

In a District Court case from Puerto Rico that the undersigned has already cited in a codefendant's detention decision, the Court there found that "[t]he risk of danger to the community as to [the defendant] is clearly supported by his own conduct demonstrating violence by *critically aiding* in the Murder–For–Hire . . . ." *United States v. Ferrer-Sosa*, 28 F. Supp. 3d 122, 130 (D.P.R. 2014) (emphasis added). See DE 76, Order of Detention for codefendant Deangalo Boone. The Court can easily distinguish the Puerto Rico case, or Boone's case, from Morris's. Based on the information presented at the detention hearing, Morris did not critically aid in the murder of Lewis. In fact, Morris demanded Bellomy return her car on September 28, 2023, which, according to the United States' proffer, caused the Hot Boyz to be angry with Morris for the inconvenience of not being able to use her vehicle on the date of the murder. Further, the evidence is inconclusive as to how much Morris knew about the murder plot, both before and after it occurred. The Court concludes that with

---

[5] The United States relied on Morris's reading of Nashiem Dixon's "happy Thanksgiving" message on the jail texting system as indicia of her willingness and ability to interact with Hot Boyz associates and persons subject to criminal charges. Even if this is true, Morris deleted her jail messaging account and mitigated that risk.

Bellomy and other Hot Boyz either incarcerated or deceased, and considering Morris's lack of criminal or violent history, the nature and seriousness of any danger she poses to the community is low.

G.     **AVAILABILITY OF CONDITIONS**

The question presented is whether, absent the Alexanders' residence and Officer Alexander's custodianship, the Court can craft conditions to adequately mitigate the risk that Morris may interfere with the progression of this case. The Court initially relied heavily on the stability of the Alexanders' home and, specifically, Officer Alexander's fitness to be a third-party custodian, considering his position in law enforcement. With that off the table, the Court must take a hard look at Morris's proposed new living situation and at Hall's suitability as a third-party custodian.

The United States presented significant evidence and testimony arguing that Morris and Hall have a strained relationship and Hall is an emotionally unstable and unfit third-party custodian. Robison testified that upon her arrest, Morris asked to telephone her mother so that she could make childcare arrangements. Morris called her mother on speakerphone. Hall was "devastated" upon hearing Morris had been arrested and demanded Morris tell her what the charge was. Morris, still in the presence of Robison, told her mother she could not talk about specifics until she had a lawyer with her. Hall became even more upset, at which point Morris handed the phone to Robison. According to the testimony of both Robison and Hall, Hall demanded Robison tell her what the charges were. Robison responded that Morris was an adult and he did not have to tell her mother anything. An overwrought Hall

shouted at Robison, "you'd better fucking hope that you have something because you are holding her from her daughter." Robison testified he had "never" been spoken to by an arrestee's family member in this manner.

Morris was held at Woodford County Detention Center until her initial appearance in this court. Robison and Hall also testified about their respective conversations with WCDC Jailer Michelle Rankin. According to both Robison and Hall, Hall called WCDC in the early morning on the day of Morris's initial appearance trying to ascertain the time of her court appearance. When no jail employee would tell Hall what time the court appearance was, and said they did not know, Hall was again verklempt. Hall acknowledged she became "upset" with Jailer Rankin on the phone during this incident. Robison's description of the incident, as told to him by Rankin, was couched in stronger terms. He stated Rankin told him Hall called Rankin multiple times (which Hall admitted) and "cussed her out" (which Hall contests).

The United States introduced jail phone calls between Morris and her brother (on her father's side) and her cousin (on her father's side) in which Morris and these men call Hall "crazy," a "nut," imply she takes Xanax and it makes her forgetful, and generally describe Hall as emotionally unstable. Morris's brother told Morris that Hall was not doing well before Morris's arrest but was a "basket case" since her arrest. Morris noted that both men are related to her father, not her mother, that her parents have been estranged for a long time, and neither men knows Hall well. However, Morris herself described her mother as "looney tunes" on one of these jail calls.

Certainly, Hall's admitted outbursts with Robison and Rankin indicate she has a hot temper, and Hall acknowledged being distraught over finding out Morris was arrested.

Finally, the United States introduced several text messages from 2022 through 2024 in which Morris discusses purchasing marijuana for her mother. Hall testified she has smoked marijuana in the past, but that she has not done so in several years. She testified she proactively submitted to a drug screen on December 16, 2025, to assuage any concerns that she uses drugs, and offered to submit the results to the Court to prove her fitness as a third-party custodian.

Morris asks to live with her mother, her mother's husband, and her child. Hall has been assisting in the care of Morris's child while Morris is subject to home incarceration. Hall's only criminal record is a shoplifting charge from 1987. There is no evidence she has a history of diagnosed mental health problems or substance use. Hall lives in a two-bedroom apartment with her husband and delivers groceries part time. If Morris was released to Hall's custody, Morris would share a bedroom with her child and live under Hall's supervision. The arrangement will still include babysitting her nephew in her mother's home as a form of employment. Hall testified she would ensure Morris attended court as required and otherwise abided by the terms of her release conditions.

Hall may not be a law enforcement officer like Officer Alexander, but under questioning by the Court, and in the Affidavit she submitted, she proved herself to be a feasible alternative. It is not unusual for children to complain to their siblings or

cousins that their mother is "crazy." Hall was inappropriately overcome with emotion when she yelled and cursed at Robison and Rankin. Absent any criminal history (other than a nearly 40-year-old shoplifting charge) or violent history, these incidents appear to be aberrations from Hall's typical demeanor. The United States did not point to anything else that could lead the Court to conclude Hall is emotionally or mentally unwell or unfit to be a third-party custodian.

Weighing each of the 3142(g) factors, the Court finds there are conditions that will adequately mitigate the risk of danger Morris poses to the community—the risk, primarily, that she will obstruct justice in this case. As with the Alexanders' residence, Morris has little reason to leave her mother's home; and considering the risks of obstruction presented, home incarceration is appropriate. Home incarceration will be advanced by location monitoring as directed by USPO. Morris must have no contact whatsoever with any codefendants, witnesses, or victims in this case. The Court cannot realistically prohibit Morris from contacting each and every person the United States finds objectionable. The protective order already in place requires that Morris be supervised any time she is reviewing the discovery in this matter. The Court cautions Morris that her circle of friends and associates landed her under indictment, possibly facing the death penalty, in federal court. The slightest suggestion that she has contacted anyone involved in this case without her lawyer present or acted in an obstructionist manner will almost certainly result in bond revocation.

### H. NONAPPEARANCE

The United States did not address whether Morris is a risk of nonappearance at either detention hearing, and, thus, did not carry its burden to prove by a preponderance of the evidence that she poses a risk of not appearing for future court dates.

### II. CONCLUSION

Having no criminal record, history of violence, or any other worrisome factors, the Court is solely concerned with the risk that Morris may obstruct justice in this case. With the above conditions in place, the Court can adequately mitigate that risk.

On balance, even with the heinous allegations in this case, the Court finds, for the second time, that Morris's alleged minor role and lack of criminal history require pretrial release under the BRA. The United States did not show by clear and convincing evidence that Morris is an unmitigable danger to the community or others. As to the risk of nonappearance, the United States did not demonstrate by a preponderance of the evidence that Morris is unlikely to appear as required.

Accordingly, **IT IS ORDERED** that Morris's Motion to Modify Release Conditions is **GRANTED** and the United States' oral motion for detention is **DENIED** and directs that Morris be released pursuant to the Order Setting Conditions of Release at DE 148, with the modification that Deania Hall be substituted as the third-party custodian, pursuant to her agreement to do so at DE 163-2.

The parties may appeal this Order under the terms of 18 U.S.C. § 3145(a).

Signed this the 22nd of December, 2025.

MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY