UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CRIMINAL CASE NO. 25-CR-127-GFVT-MAS

UNITED STATES OF AMERICA                                           PLAINTIFF

v.         **UNITED STATES' OBJECTION TO THE MAGISTRATE'S DECEMBER 22, 2025, MEMORANDUM OPNION AND ORDER CONCERNING CASEY MORRIS'S RELEASE**

CASEY ALLISON MORRIS                                      DEFENDANT

\* \* \* \* \*

On September 27, 2023, Casey Morris, who had a history of allowing Desmond Bellomy to use her vehicle for criminal activity,[1] agreed to allow him to again use her vehicle.[2] Morris and Bellomy's conversations on September 28, 2023, demonstrate that Morris knew her vehicle was being used for a murder plot.[3] Text messages from that day also clearly indicate that Bellomy was in possession of Morris's car.[4]

While using Morris's vehicle, Kristopher Lewis's would-be assassins surveilled him at his home and workplace to learn his schedule and, in turn, plan the time and place of the

---

[1] *See* R. 180-3, p. 1228 ("Friday night he said police was hot…"); p. 1229 ("baby I might kome back to lexington tn it might be some money on the floor…").

[2] *See* Morris Detention Hearing Exhibit 1.

[3] *See* Morris Detention Hearing Exhibit 4.

[4] *See* Morris Detention Hearing Exhibits 3-5.

1

murder.[5] While at Lewis's workplace, in Morris's vehicle, William Dixon identified Lewis's vehicle, collecting Lewis's license plate number and sharing it with other members of the Hot Boyz.[6] Less than 24 hours later, Dixon, Bellomy, Daquis Sharp, and Jatiece Parks, lied in wait in the parking lot of Lewis's workplace (workplace discovered through surveillance) before Lewis's shift (schedule discovered via surveillance), waited for the arrival of Lewis's vehicle (identification of vehicle also obtained from surveillance), gunned Lewis down after he exited his vehicle, and quickly fled[7]—a plan that would have been impossible without the surveillance conducted using Morris's car.

If surveillance was not important to the crime, the assailants would not have spent multiple hours over the course of two days doing it.[8] Also, Bellomy himself affirmed the importance of this pre-planning to Morris, stating "*gotta learn his schedule*[,] need this money."[9] Morris, who emphasized and responded to that message,[10] was not an unwary facilitator of Lewis's murder.

There are many dangerous defendants who come before this Court and are detained, including those who traffic dangerous substances, possess and traffic firearms, and harm children. While each of those offenders inflict societal harms and pose their own unique

---

[5] *See e.g.,* Boone Detention Hearing Exhibits 15-16, 18.

[6] *See* Boone Detention Hearing Exhibit 17.

[7] *See e.g.,* Boone Detention Hearing Exhibit 5.

[8] *See e.g.,* Boone Detention Hearing Exhibits 15-18.

[9] *See* Morris Detention Hearing Exhibit 4.

[10] *See id.*

danger if released pending trial, only a small percentage of them have knowingly entered a conspiracy in which the end result is the intentional loss of human life. Although murder for hire is (bizarrely) not a presumption offense, society considers murder to be the most heinous crime, carrying the highest penalties, for a reason: it is particularly dangerous, particularly destabilizing to society, and particularly depraved. The for-hire nature of a murder is also aggravating under federal law for a reason:[11] human life is not a commodity; and, if a person will kill, or assist with a killing, for money, that person may cut down another human being for any selfish reason that slightly improves her personal circumstances. Therefore, even amongst federal defendants, Morris is uniquely dangerous.[12]

By allowing the imposition of death for an individual who "intentionally participated in an act, contemplating that the life of a person would be taken…,"[13] federal death penalty provisions implicitly recognize that there are no minor roles for individuals who intentionally assist with the loss of human life. Correspondingly, the United States rejects the notion that there is any level of knowing participation in a murder plot that deems someone safe for society.

---

[11] *See* 18 U.S.C. § 3592(c)(8).

[12] The seriousness of this murder seems to continue to evade Morris. While detained at Woodford County Detention Center, on November 9, 2025, Morris told someone that "the real crime here" was law enforcement's seizure of her phones.

[13] *See* 18 U.S.C. § 3591(a)(2)(C).

Beyond the facts of this case, Morris's history contains multiple red flags for release, including her history of obstructive conduct[14] and her continued contact with gang members and drug dealers,[15] including but not limited to Bellomy.

Far from separating herself from Bellomy and the Hot Boyz, Morris quickly rekindled a romance with Bellomy after the murder,[16] entertained the idea of buying him another firearm,[17] bragged about him helping her start a business,[18] allowed him to possess another firearm that she previously purchased,[19] lied about her ownership of firearms in a Shelby County prosecution against Bellomy,[20] and held a stolen firearm for him.[21]

---

[14] *See* R. 180, p. 1187-88 (discussion of Morris's willingness to provide a false affidavit for Joshua Brown); p. 1189-90 (discussing false statements to police following home invasion); p. 1192-94 (discussion of false affidavit in firearm case); p. 1194 (discussion of deletion of messages from phone following interview with FBI); p. 1195 (discussion of messages between Nasheim Dixon and Stephan Fisher). *See also* R. 180-1, p. 1207 ("file the affidavit and drop the EPO"); p. 1208 (messages with Aretha Fisher re FBI interview); Morris Detention Exhibits 7-8 ("[i]t's gunna make a better case for him…"); Morris Detention Exhibit 12 (video visit discussing passing messages between co-defendants); Morris Detention Exhibit 9 (false affidavit); R. 180-4, p. 1240 (email from Commonwealth Attorney's Office discussing affidavit); Morris Second Detention Hearing Exhibit 6 (BWC showing Morris's evolving story about Shylah Lyvers' car and Morris's false statement that she does not know Lyvers' boyfriend).

[15] *See* R. 180-2 (messages with Justin Ison re delivery of packages); R. 180-4, p. 1242-44 (June 2025 messages with Bellomy); Morris Detention Exhibit 12 (August 2025 video visit with Bellomy, discussing messages between Nasheim Dixon and Stephan Fisher).

[16] *See* R. 180-3, p. 1226 ("[a]ye fr tho I feel like we had one of the best nights Thursday").

[17] *See* R. 180-3, p. 1226 ("you gonna order the piece darling?").

[18] *See* R. 160: SA Robison, TR (Detention Hearing) at 1046.

[19] *See* R. 180, p. 1192-94 (discussion of firearm case).

[20] *See Id. See also* Morris Detention Exhibit 9 (affidavit); R. 180-4, p. 1240 (email from Commonwealth Attorney's Office discussing affidavit).

[21] *See* R. 180-3, p. 1227 ("[a]nd I'll hand this gun over to em too that he stole from somebody").

4

Morris's past obstructive conduct has largely been facilitated by a smartphone,[22] meaning that Morris's ankle monitor does little to curb possible collusion or intimidation.[23]

Morris's mother, Deania Hall ("Hall"), who works outside the home and lacks the technological knowledge to ensure that Morris is not communicating with witnesses,[24] cannot mitigate this danger.[25]

Hall also lacks the demeanor, and potentially the integrity,[26] to act as a third-party

---

[22] *See e.g.,* R. 180-1, p. 1207 ("file the affidavit and drop the EPO"); p. 1208 (messages with Aretha Fisher re FBI interview); Morris Detention Exhibits 7-8 ("[i]t's gunna make a better case for him…"); Morris Detention Exhibit 12 (video visit discussing passing messages between co-defendants).

[23] Morris logged onto Fayette County Detention Center's communication platform shortly after her release in November 2025. *See* Morris Second Detention Hearing Exhibits 5a-5c. Morris has since deactivated her account to that single messaging platform. However, other jails use other communication platforms. Moreover, a person is not required to have an account to engage in phone calls with an inmate at any facility. More importantly, Morris has no restrictions from communicating with other individuals involved in the case, such as William Dixon's mother, with whom Morris has colluded in the past. *See, e.g.,* R. 180-1, p. 1208 (messages discussing FBI interview with Aretha Fisher). Morris also communicated with Fisher about the affidavit and anticipated testimony in the Shelby County case.

[24] The transcript of the second detention hearing is not yet available.

[25] *See e.g., United States v. Otunyo*, No. 18-251 (BAH), 2020 U.S. Dist. LEXIS 74321, at *26-27 (D.D.C. Apr. 28, 2020) ("defendant's sister is not in a position to monitor defendant on a continuous basis and ensure against him either fleeing or recidivating"); *United States v. Atkins*, Crim. No. 15-87, 2015 U.S. Dist. LEXIS 108862, 2015 WL 4920831, at *6 (W.D. Pa. Aug. 18, 2015) (proposed custodian's work and childcare role made her unavailable to serve in that role for significant portions of time).

[26] Morris's mother, who had a single arrest on her NCIC report, told the United States Probation Office ("USPO") that she had been fingerprinted for driving on a suspended license. The United States presented evidence that Hall had been arrested for shoplifting (Morris Second Detention Hearing Exhibit 3), which Morris's defense initially denied, claiming that Hall was not the person listed on the NCIC report. Hall eventually admitted that she had been arrested for the offense but said that it had never come up in past background checks. As noted by the United States during the hearing, it would be understandable for someone to incorrectly remember the reason for an arrest if they had been arrested multiple times. Hall, however, has only been arrested once. She admitted to the arrest only after being confronted with evidence at the hearing (though Morris's counsel, at that point, incorrectly said that Hall was a minor at the time of the arrest). From this chain of events, it appears that Hall withheld the information from USPO, instead providing USPO a less unflattering reason for fingerprinting, like driving on a suspended license.

custodian. Morris and those close to her describe her mother as crazy;[27] Hall cussed out the Woodford County Jailer and FBI Special Agent Robison; and Hall had several outbursts in Court.

**Procedural History and Incorporation of Arguments from Previous Pleadings**

United States Magistrate Judge Matthew Stinnett ("Judge Stinnett") held a detention hearing on November 24, 2025, and released Morris to her brother-in-law as a third-party custodian. Judge Stinnett issued a memorandum opinion and order on December 1, 2025.

On December 8, 2025, Morris moved to modify her bond conditions, noting her brother-in-law could no longer serve as custodian. [R. 163: Motion.] The United States responded on December 11, 2025. [R. 172: Response.]

The United States objected to Judge Stinnett's December 1st release order on December 15, 2025. [R. 180: Objection.]

Judge Stinnett scheduled a hearing on Morris's motion to modify bond conditions for December 17, 2025. [R. 175: Order; R. 177: Order.] At the hearing, Judge Stinnett advised that he was reopening the question of detention. During the hearing, the United

---

The United States also greatly contests Hall's characterization of the phone call between Hall and SA Robison. SA Robison did not yell at Hall. Morris's retelling of the events on recorded jail calls corroborates SA Robison's account. Morris never described a two-way yelling match; rather, she said her mother cussed out the fed. *See* Morris Second Detention Hearing Exhibit 1a-1b. In Exhibit 1a, Morris even said that she apologized to SA Robison for her mother's behavior. Hall was under oath when she falsely claimed that SA Robison yelled at her.

[27] Morris's defense claimed that individuals beyond Morris who described Hall as crazy do not know her. However, Tayden Morris said in one of the calls with Morris that he had just been on the phone with Hall for an hour. *See* Second Morris Detention Hearing Exhibit 1b.

6

States presented some of the additional evidence discussed in R. 180. The parties also discussed Hall's fitness as a custodian. The transcript for the hearing is not yet available.

For the purposes of this objection, the United States incorporates R. 180, "United States' Objection to the Magistrate's December 1, 2025, Memorandum Opinion and Order…," Because the United States' arguments in R. 180 centered on Morris's history as opposed to her brother-in-law's fitness as a third-party custodian (indeed, at the time of filing, it had already become clear that Morris's brother-in-law could not serve as a third-party custodian), the most recent proceedings have little impact on the arguments made therein. The United States also incorporates herein the arguments made in R. 172, "Response to Modify Conditions of Release," and oral arguments at both detention proceedings.

## **Conclusion**

The United States continues to object to Morris's release, particularly now that Hall serves as a custodian because (1) Morris's knowledge and assistance to Lewis's murder plot is shown in black and white from electronic evidence collected from more than one source;[28] (2) Morris has demonstrated a pattern of obstructive conduct,[29] including

---

[28] *E.g.*, "she good wit it," "its gonna be for both of us…," "gotta learn his schedule need this money," "I wish I woulda gave em my car"—evidence for which there is only one non-fantastical interpretation. *See* Morris Detention Hearing Exhibits 1, 2, 4, 6.

[29] *See* R. 180, p. 1187-88 (discussion of Morris's willingness to provide a false affidavit for Joshua Brown); p. 1189-90 (discussing false statements to police following home invasion); p. 1192-94 (discussion of false affidavit in firearm case); p. 1194 (discussion of deletion of messages from phone following interview with FBI); p. 1195 (discussion of messages between Nasheim Dixon and Stephan Fisher). *See also* R. 180-1, p. 1207 ("file the affidavit and drop the EPO"); p. 1208 (messages with Aretha Fisher re FBI interview); Morris Detention Exhibits 7-8 ("[i]t's gunna make a better case for him…"); Morris Detention Exhibit 12 (video visit discussing passing messages between co-defendants); Morris Detention Exhibit 9 (false affidavit); R. 180-4, p. 1240 (email from Commonwealth Attorney's Office

7

obstructive conduct in the investigation of this case;[30] and (3) Morris's lack of criminal convictions fails to equate to lack of criminal conduct.[31] The United States believes that there are no conditions of release that can protect society or the integrity of this case from Morris.

Morris's release not only endangers society and this prosecution, her release establishes a precedent that someone can aid gang activity, participate in a heinous crime, lie to police, destroy evidence, and otherwise collude with co-conspirators and *not* be considered a danger by clear and convincing evidence.

If "even non-violent threats to the judicial process may constitute a sufficient danger in the BRA context"[32] and "even a single incident of witness tampering has been a traditional ground for pretrial detention by the courts,"[33] surely lying to police,[34] providing

---

discussing affidavit); Morris Second Detention Hearing Exhibit 6 (BWC showing Morris's evolving story about Shylah Lyvers' car and Morris's false statement that she does not know Lyvers' boyfriend).

[30] *See e.g.,* R. 160: SA Robison, TR (Detention Hearing) at 993, 1007, 1009, 1037 (deleting messages from phone).

[31] R. 180, p. 1188 (discussion of assistance to drug trafficking); 1189-1192 (discussion of home invasion); R. 180, p. 1178, note 20 (discussion of straw purchases and/or facilitation of firearm activity by Bellomy).

[32] *See United States v. Comberger*, No. 5:21-mj-05138-MAS-1, 2021 U.S. Dist. LEXIS 83204, at *14-15 (E.D. Ky. Apr. 29, 2021).

[33] *See United States v. Epstein*, 425 F. Supp. 3d 306, 318 (S.D.N.Y. 2019).

[34] *See* Morris Detention Hearing Exhibit 10; Morris Second Detention Hearing Exhibit 6.

false testimony to help someone escape prosecution,[35] destroying evidence,[36] intimidating a participant in the legal process,[37] and fishing for information from one's cop brother-in-law[38] is enough.

                                        Respectfully submitted,

                                        PAUL C. McCAFFREY
                                        FIRST ASSISTANT U.S. ATTORNEY

                        By:    s/ Mary L. Melton
                                        Assistant United States Attorney
                                        260 W. Vine Street, Suite 300
                                        Lexington, Kentucky 40507-1612
                                        (859) 685-49802
                                        Mary.Melton@usdoj.gov

CERTIFICATE OF SERVICE

      On January 5, 2025, I electronically filed this document through the CM/ECF system, which will send the notice of electronic filing to counsel of record.

                                          s/Mary L. Melton
                                          Assistant United States Attorney

---

[35] *See* Morris Detention Exhibit 9 (false affidavit); R. 180-4, p. 1240 (email from Commonwealth Attorney's Office discussing affidavit). In *United States v. Govoni*, No. 8:25-cr-299-VMC-NHA, 2025 U.S. Dist. LEXIS 137025, at *20-22 (M.D. Fla. July 18, 2025), the court said that "Mr. Govoni's conduct in the Bankruptcy Court really overshadows anything positive that could be gleaned from the history and characteristics of Mr. Govoni." The United States contends that, like Govoni's failure to follow orders by a bankruptcy court, Morris's obstruction in the Shelby County firearm case—which is an actual prosecution that has now been adopted federally—shows that she has zero respect for the judicial process and should weigh heavily in favor of her detention.

[36] *See e.g.,* R. 160: SA Robison, TR (Detention Hearing) at 993, 1007, 1009, 1037 (deleting messages from phone).

[37] *See* R. 180-1, p. 1207 ("file the affidavit and drop the EPO").

[38] *See* R. 180-4, p. 1236-1238 (questions for brother-in-law re home invasion).