1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON
- - -

UNITED STATES OF AMERICA,    : Docket No. 5:25-cr-127-7
                             :
                Plaintiff,   : Lexington, Kentucky
                             : Wednesday, December 17, 2025
                             : 9:00 a.m.
v.                           :
                             :
CASEY ALLISON MORRIS,        :    **Via Electronic Recording**
                             :
                Defendant.   :

- - -
TRANSCRIPT OF MOTION HEARING
BEFORE MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
- - -

APPEARANCES:

For the United States:    MARY LAUREN MELTON, ESQ.
                          U.S. Attorney's Office
                          260 W. Vine Street
                          Suite 300
                          Lexington, Kentucky 40507

For the Defendant:        EDWARD L. METZGER, III, ESQ.
                          Omega Law, PLLC
                          P.O. Box 559
                          Union, Kentucky 41091

Transcriber:              ELAINE S. HABERER, RPR, FCRR
                          Official Court Reporter
                          101 Barr Street
                          Lexington, Kentucky 40507
                          (859) 469-7456

        Proceedings recorded digitally, transcript produced by computer.

2

(Proceedings commenced in open court at 9:05 a.m.)

THE COURT:  Thank you, sir.

Madam Clerk, please call the 9:00 matter.

COURTROOM DEPUTY:  Yes, Your Honor.

Lexington Criminal Action Number 25-127, United States of America versus Casey Allison Morris, called for motion hearing.

THE COURT:  Thank you.  And counsel, please state their appearances.

Ms. Melton.

MS. MELTON:  Yes, Your Honor.  Mary Melton on behalf of the United States.

THE COURT:  Thank you.

Mr. Metzger.

MR. METZGER:  Morning, Your Honor.  Lee Metzger for Ms. Morris, who is seated to my right.  We're both wearing masks because her daughter has got the flu and we don't want to get anybody sick.

THE COURT:  Understood.

Good morning, Ms. Morris.  Nice to see you again.

THE DEFENDANT:  Good morning.

THE COURT:  So, counsel, we're here on what has initially been framed as a motion to modify the conditions of release, considering Ms. Morris's brother-in-law can no longer serve as third-party custodian per policies of the Richmond

3

Police Department, I believe.

Mr. Metzger, you'd agree with me that at the time of our original hearing, I know that was kind of possibly bantered about, but that is new information.

MR. METZGER:  That's correct, Your Honor.  I didn't realize at the time of the hearing that the policies would have precluded her from living there, nor did Mr. Alexander.

THE COURT:  All right.  And the Court will certainly find that that information is -- Mr. Alexander's role here is material to the Court's decision to release.

So, just cutting off the process here a little bit, Ms. Melton, given that we have new material evidence, do I have a motion from the United States to reopen the hearing?

MS. MELTON:  Yes, Your Honor.

THE COURT:  Because, process-wise, even if I -- we're going to end up there anyway, because even if I disagree -- I'm not saying I do -- if I disagree to modify the conditions, then there would be a possible violation, a bond violation, if she left her brother-in-law's residence.

And so it would just be easier to reopen and have the whole conversation, I think, procedurally, but I need a motion from you to do so.  So I just want --

MS. MELTON:  Yes, Your Honor.  And I just want to note for the Court that we sort of anticipated this issue before the detention hearing.  You know, because we're in law

4

enforcement and we understand that, you know, our liberties are somewhat curtailed in terms of who we're allowed to associate with and live with. So I called the only person that I know at Richmond PD and said Ms. Morris has reported to the probation office that she plans to live with Kelvin Alexander, does that sound like it would be okay to you? And that person said, I don't believe those living arrangements will be available to her.

So I called the probation office to tell them that. The probation office called Mr. Alexander and he assured the probation office that it was okay. So I understand this is very inconvenient for the Court. I tried to prevent the situation like this before we got here, and so I just apologize.

THE COURT: But it is new.

MS. MELTON: It is new.

THE COURT: Okay. Let's not change that, Ms. Melton. I need it to be new, and it is material. So I have a motion from the United States to reopen under 3142(f).

MS. MELTON: Yes, Your Honor.

THE COURT: All right. So we will hear -- here's what I'll do procedurally is I will grant Docket Entry 179 for the motion for leave for the United States to exceed the page limits.

As to the objection, I will moot out that objection to

5

the original opinion, because we're going to have a whole new opinion following this hearing today.  Large parts of it will be similar to what we did previously, but obviously, the conclusion may change depending on what we do today and how this all pans out.

And so we come to the issue here, then, of the issue of release or detention for Ms. Morris.  The burden still rests with the United States.  I think both sides can assume here the Court obviously still is very keenly aware of all the evidence we talked about last time.

Really, the issue here comes down to:  Could Ms. Morris's mother possibly serve as a third-party custodian, or could she live with her mother.

I don't know if Mr. Metzger is going to offer up as a full third-party custodian, or what's going to happen here, as well as any kind of new information that was suggested, and possibly the objections that have come to light since the prior hearing.  But all those things are on the table.  Just please assume I do have all the evidence we've discussed previously.  I understand all that, and I've got all that.

And so I start with you, Ms. Melton.  Proffer of fact or witnesses here to address the change in information, what we have before us.

MS. MELTON:  Yes, Your Honor.  The United States calls Special Agent Robison.

6

I will note that in terms of the exhibits that we plan to present, those are mostly relevant to this issue of Ms. Hall as the third-party custodian. I have not prepared the exhibits that I added to the objection to present to the Court today because I didn't really realize the full scope of today's hearing.

THE COURT: I'm happy, at some point, if we need to take a recess, if Mr. Metzger -- I'm sorry this -- procedurally, I didn't see a way forward here on a motion to modify the conditions, which I certainly can do under 3142, but if I -- again, this is just hypothetically, if I disagree with Mr. Metzger's motion and chose not to modify, then where are we?

I'm just letting Ms. Morris basically just commit a bond violation here the second I make that ruling, and then you would have to make a motion for bond revocation. But I'm just procedurally trying to cut off all the instances here and just give everyone an equal playing field where we just put on the evidence.

If you need some more time to have that conversation, if we need to recess or whatever, I'm happy to do that. Whatever you guys want to do.

Mr. Metzger, do you want to jump in here?

MR. METZGER: I don't have a problem with the Court considering the exhibits that are attached to her objection.

7

I think that this is a more relaxed proceeding in terms of bond.  The rules of evidence don't apply strictly as they would in other circumstances.

She's filed it in the record; if the Court wants to consider that, that's fine.

THE COURT:  Okay.  Ms. Melton, you can proceed however you want, or you can use those exhibits during argument, or if you want to talk about that with Agent Robison, if you want to recess to kind of prepare some issues and questions for Agent Robison, however you want to proceed, it's totally up to you.  I'm happy to do whatever counsel, and as well as Mr. Metzger, want to do here.  You know I'm flexible as can be.

But anyway, the floor is yours, ma'am.  How would you like to proceed?

MS. MELTON:  The United States calls Special Agent Robison.

THE COURT:  Agent Robison.

ISAACC ROBISON, GOVERNMENT'S WITNESS, SWORN

THE COURT:  Agent Robison, at this point, old hat, sir, you know the drill.

Ms. Melton.

MS. MELTON:  Thanks, Your Honor.

///

///

*Robison - Direct* 8

DIRECT EXAMINATION

BY MS. MELTON:

Q.   Special Agent Robison, you are the primary case agent on this matter against William Dixon, Desmond Bellomy, and others, including Casey Morris, correct?

A.   That is correct.

Q.   When was Casey Morris arrested?

A.   Ms. Morris was arrested on November 7th, 2025.

Q.   Did you communicate with Morris's mother on that day?

A.   Yes, I did.

Q.   Tell us about that.

A.   After Ms. Morris was arrested, she was taken back to the FBI office for holding pending when she was going to have her initial appearance in front of the Court.

During that time, Ms. Morris requested if she could contact her mother to ensure that her daughter had proper child care that day.  I allowed Ms. Morris to contact her mother.  I asked Ms. Morris to make that call on speaker phone to ensure that there was no inappropriate conversations that were going on.

During that conversation, Ms. Morris's mother became very animated and began yelling.  Ms. Morris became upset and gave the phone back to me, and told me to talk to her mother.

During that conversation, Ms. Morris's mother began to become very upset and yell on the phone with me, and said

*Robison - Direct*                                                                9

something to the effect of that I better fucking know what I'm doing, and then hung up the phone on me.

Q.   Do you frequently interact with defendants' family members for similar things?

A.   Yes.

Q.   How often is it that those family members yell at you in that manner?

A.   I can't say that's ever happened before.

Q.   Where was Morris held between her arrest and her release on November 24th?

A.   Woodford County Detention Center.

Q.   Have you received any information from Woodford County Detention Center staff about their interactions with Morris's mother?

A.   Yes.

Q.   Tell us about that.

A.   I spoke with the jailer there, and she made some comments that she had had interactions with Ms. Morris's mother in which Ms. Morris's mother, Ms. Hall, became very upset and yell and scream with her as well.

Q.   How often do you communicate with the jailer over at Woodford County Detention Center?

A.   Any time that we have, say, another inmate there.  So I would guess every other month, around that time frame.

Q.   How often has she reported incidents like that to you?

*Robison - Direct*                                                      10

A.   Incidents similar to this, I know that there are people that become very upset with her on occasion, but based on my conversation with her, she made it sound like it was not a frequent conversation where family members of inmates that she had there became very upset that way with her.

Q.   Have you reviewed any of Ms. Morris's communications while in Woodford County Detention Center?

A.   Yes, I have.

Q.   Are any of those communications relevant to the proceedings today?

A.   Yes.

Q.   Specifically relevant to Ms. Hall?

A.   Yes.

Q.   Can you give us an overview of those communications?

A.   There were a few communications that Ms. Morris had with different family members where she discussed the mental state of her mother, Ms. Hall, and in those conversations, they discussed that they feared that Ms. Hall was, quote, crazy, or nuts, or going through a very unstable time.

Q.   Who were the family members that Ms. Morris was speaking with?

A.   The calls were with a Tayden Morris and a Joshua Dansby.

Q.   And what were the approximate dates of those calls?

A.   The calls were shortly after Ms. Morris had been arrested.  They were on November 8th, November 9th, and

*Robison - Direct*                                                          11

November 12th of 2025.

Q.   I'm going to show you a couple of items on your screen here and see if you recognize those.  So these have been premarked Government Exhibit 1-A, 1-B, and 1-C.

Do you recognize those items?

A.   Those appear to be the calls that I just referenced.

MS. MELTON:  Your Honor, the government moves to admit Government Exhibits 1-A through 1-C.

THE COURT:  Any objection, Mr. Metzger?

MR. METZGER:  No, Your Honor.

THE COURT:  Thank you, sir.  So admitted.

BY MS. MELTON:

Q.   Special Agent Robison, starting with Government Exhibit 1-A, we see a file name there.  What can you tell us about this call before you play it -- or before we play it?

A.   This is a call from November 8th.  I believe this is a call with a Tayden Morris.

Q.   I'm going to go ahead and play this, and then after I play it, I'm going to ask you to summarize it for our written record.

(Playing audio.)

Q.   Can you summarize for our written record what was discussed there?

A.   Yeah, Mr. Tayden Morris explained that he had spoken with Ms. Hall and that she was very upset, and that she was -- and

*Robison - Direct*                                                          12

then Ms. Morris explained that Ms. Hall had cussed out the fed, which I believe she was referencing to my conversation with Ms. Hall.

Q.   All right.  Moving on to Government Exhibit 1-B.  On what date did this call occur, and with who -- who was Ms. Morris speaking to during this call?

A.   This is November 9th, 2025, and I believe, again, this was with Tayden Morris.

Q.   I'm going to play a clip of this call and then I'll ask you to summarize it.

     (Playing audio.)

Q.   That clip was a little longer, Special Agent Robison, but can you summarize it for our written record?

A.   Tayden Morris appears to be concerned about Ms. Hall's mental state as he says that she repeats herself often, forgets that she's told him things.  At times she's screaming and yelling and then shortly thereafter she's laughing.  And Ms, Morris again references our phone -- my phone conversation with Ms. Hall where she says that she cussed me out.

Q.   And Tayden also asks Ms. Morris if her mother is on Xanax because she repeats herself so often, correct?

A.   That is correct.

Q.   And then, there at the end of the call, what did Ms. Morris say about her mother?

A.   I do not recall what she said there at the end.

*Robison - Direct*                                                            13

Q.   Did you hear her say that her mother was a nut case?

A.   Oh, yes.

Q.   Moving on to Government Exhibit 1-C.  Tell us about this call before we play it.

A.   This call took place on November 12th, 2025, and I believe this call took place with Ms. Morris's brother, Joshua Dansby.

     (Playing audio.)

Q.   Can you summarize that clip for our written record?

A.   Yes.  Ms. Morris, again, in referencing her mother, Ms. Hall, refers to her as nuts.  I believe the quote was that, She's fucking looney tunes, and that, She's lost her marbles.

     Mr. Dansby also says that she is a basket case, and since Ms. Morris has been arrested, she's become more of a basket case.

Q.   Were there any Chirps or text messages at Woodford County Detention Center relating to Ms. Hall?

A.   Yes.

Q.   Just give us an overview of those, please.

A.   Again, Ms. Morris had some Chirp messages, more messages with Tayden Morris, who she had the phone calls that we listened to just recently, as well as some messages with her sister, Genna Alexander.

Q.   I'm going to show you what's been premarked Government

*Robison - Direct*                                                          14

Exhibit 2.  Do you recognize these messages?

A.   Yes, these are the messages I was just referencing.

Q.   And what we have on the screen here, this is a compilation, correct?  So the message up top did not immediately precede the messages on the bottom, correct?

A.   That is correct.

MS. MELTON:  Government moves to admit Government Exhibit 2, Your Honor.

MR. METZGER:  There's no objection.

THE COURT:  So admitted.

BY MS. MELTON:

Q.   Special Agent Robison, I want to start with the messages on the bottom because they are earlier in time chronologically.  Who are those two messages on the bottom from?

A.   They are from Ms. Morris.

Q.   And who were they to?

A.   Her sister, Genna Alexander.

Q.   Can you read those messages for us?

A.   Yes.  The first message that was sent at 10:00 on November 12, 2025, says, "Out:  Calling this jail getting nasty with people is only going to make things harder for me."

And then the next message, or excuse me, the first message was, "Okay.  I can probably write one and take it to court with me, and give it to my lawyer to give to him.  Also,

*Robison - Direct*                                                    15

if you have a moment, can you call mom and tell her to chill TF?"

And then the next message is where she picked that message -- that message picked up, "Out:  Calling this jail getting nasty with people is only going to make things harder for me."

Q.   And then the message on top, who is that message from?

A.   I believe that message is from Tayden Morris.

Q.   What was the date and time of that message?

A.   November 12th, 2025, at 7:55 p.m.

Q.   Who -- can you read that message for us?

A.   It says, "Why does your mom think your sister and brother-in-law set you up, bro, she's on one."

Q.   What does that mean, if you know?

A.   I do not know exactly what he is referencing in terms of setting her up, but when he says that she's on one, meaning that he does not think she's in her -- a good state of mind.

Q.   Have you performed any checks on Ms. Hall relevant to these proceedings?

A.   Yes, I have.

Q.   Tell us about that.

A.   I ran Ms. Hall's criminal history.

Q.   Did Ms. Hall have any arrests?

A.   Yes, she did.

Q.   How many?

*Robison - Direct*                                                        16

A.   One.

Q.   And what was that arrest for?

A.   A felony shoplifting.

Q.   Do you know what Ms. Hall told the probation office she had been arrested for?

A.   I believe Ms. Hall said -- only referenced that she had been arrested for a failure to pay some speeding tickets, but I did not see that on her criminal history.

Q.   I'm going to show you what's been premarked Government Exhibit 3.  Do you recognize this?

A.   Yes, I do.

Q.   What is it?

A.   This is a portion of the criminal history from her NCIC report.

Q.   And this is the NCIC report that you pulled -- correct? -- or at least a portion of it?

A.   Yes, that is correct.

          MS. MELTON:  Government moves to admit Government Exhibit 3, Your Honor.

          MR. METZGER:  We object to this one, Your Honor. It's not accurate.  So we would object to the admission of this document.

          THE COURT:  What's the concern as to accuracy here, Mr. Metzger?

          MR. METZGER:  She's never been arrested for a felony,

*Robison - Direct*                                                    17

Your Honor.  It's just not true.

THE COURT:  Ms. Melton.

MS. MELTON:  Your Honor, the full NCIC report shows her date of birth and social security number for a Deania Ann Flannery, and that's the same social security number and date of birth associated with that 1987 arrest.  So I did not include the social and date of birth here to, you know, prevent the need to redact items, but I'm happy to submit the full report into the record.

THE COURT:  Here's what I'll do:  I'll admit it.  I recognize, Mr. Metzger, that you contest it, and will certainly keep that in mind, and will allow you to certainly argue and attack this as you see fit.

Ms. Melton, please proceed.

BY MS. MELTON:

Q.   So, Special Agent Robison, we do see a different name on this item, Government Exhibit 3.  What is the name there?

A.   Deania Stone.

Q.   And the middle initial A, correct?

A.   That is correct.

Q.   In the NCIC report, did this arrest have Ms. Hall's social security number and date of birth associated with it?

A.   Yes.

Q.   I understand that law enforcement has performed a search on Casey Morris's phone, at least the one that she had in May

*Robison - Direct*                                                    18

2024; is that right?

A.   That is correct.

Q.   Has law enforcement seen any information on that phone relating to any illegal activity by Ms. Morris's mother?

A.   Yes.

Q.   Tell us about that.

A.   In messages that Ms. Morris had with Justin Ison, there were references to purchasing marijuana on behalf of Ms. Hall or providing that marijuana to Ms. Hall.

Q.   I'm going to show you what's been premarked Government Exhibit 4.  What is this?

A.   These are the messages that I was just referencing from Ms. Morris's phone.

Q.   And again, this is a compilation of different examples, correct?  These are not all sequential; is that right?

A.   That is correct.

Q.   And you said these came from Ms. Morris's phone, and they were with Justin Ison?

A.   That is correct.

Q.   Is Justin Ison "Dale" in Ms. Morris's phone?

A.   Yes, that is how she has the contact saved.

          MS. MELTON:  Government moves to admit Government Exhibit 4, Your Honor.

          THE COURT:  Any objection?

          MR. METZGER:  No, Your Honor.

*Robison - Direct*                                                    19

THE COURT:  So admitted.

BY MS. MELTON:

Q.   All right.  Special Agent Robison, if you could walk us through the relevant portions of these messages, starting with the ones at the top.

A.   The very top message was sent to Mr. Ison on September 18, 2022, approximately 8:34 p.m.  The message from Ms. Morris says, "My mom wanting some more bud."  "Bud" is often used as a slang term for marijuana.

And then she says, "I gave her some of mine last time, but I ain't got enough to do it this time, LOL."  And Mr. Ison responded, "I gotchu.  We can figure it out tomorrow."

Q.   All right.  Moving on to the messages in November 2022.

A.   The next messages were sent from Ms. Morris to Mr. Ison on November 12th, 2022.  She says, "My mom bugging about that bud, LMAO.  She want to know if she can meet you in a lil while or something, 'cause I'm working."

Q.   And then moving on to the messages in February 2024, can you walk us through those?

A.   Yes.  The next messages were on February 8th and February 9th of 2024.  Again, these are messages between Ms. Morris and Mr. Ison.  Ms. Morris sends a message to Mr. Ison and says, "Is there any way you could get my mom some tomorrow?  Alysann has changed her mind.  She's going with me, LMAO."

*Robison - Direct*                                                              20

And then Mr. Ison says, "Good.  She needs to, LOL." Ms. Morris responds, "Facts."  And then said, "Kelvin is going to call me later with the details on big boy."  And then Mr. Ison says, "Nashville will be lit, and I really need to know the prostitution charge."

And then Ms. Morris says, "Yes, it will be.  And me too, I needs to know.  He said it could be that he traded drugs for sex, but he will LMK," let me know, "tonight when he gets on duty, he'll look at the report."

And then Mr. Ison said, "He probably did give a girl something for sex."  And Ms. Morris responds, "Probably."  And then Mr. Ison says, "Probably best chance he has, honestly, LOL."

To which Ms. Morris then responded, "I mean, yeah, probably.  And my mom wants to know if you don't get to me before I leave, if you could bring it to her house because she's going to have Tans and doesn't want to drive with it and her in the car."

Q.   So the messages about Ms. Morris's mother, she says that she's wondering if her mom can get something, and whatever that something is, Ms. Morris's mother does not want to have it in the car, correct?

A.   That is correct.

Q.   In discussing the -- I want to discuss the messages in the middle a little bit.  Kelvin is Kelvin Alexander,

*Robison - Direct*                                                    21

Ms. Morris's third -- previous third-party custodian, correct?

A.   That is correct.

Q.   And so, here again, Ms. Morris is talking about Mr. Alexander giving her information about a Richmond Police Department case, correct?

A.   It appears so, yes.

Q.   Since Ms. Morris was released on November 24th, has she been in contact with any of the individuals that we discussed during that first detention hearing?

A.   Yes.

Q.   Tell us about that.

A.   When we reviewed Ms. Morris's account on the Fayette County Detention Center website, we noticed that she logged in and read a message that she had received from Nasheim Dixon.

Q.   Remind us who Nasheim Dixon is.

A.   In the previous detention hearing, we discussed Nasheim Dixon is a relative of William Dixon, one of the charged defendants in this case.  Nasheim Dixon is currently incarcerated in the Fayette County Detention Center, and Ms. Morris assisted Nasheim Dixon pass messages to his co-defendant, Stephan Fisher, and also from Stephan Fisher back to Nasheim Dixon to make sure they were telling the same story to the police and to the Court.

Q.   I'm going to show you what's been premarked Government Exhibit 5-A through 5-C.  If you could just initially glance

*Robison - Direct*                                                    22

at these and let me know if you recognize those items.

A.   Yes, I do.

Q.   What are they?

A.   These are screen captures taken from the Fayette County Detention Center jail communications website, and it is for the user information for Casey Morris.

MS. MELTON:   The government moves to admit Government Exhibit 5-A through 5-C, Your Honor.

MR. METZGER:   No objection.

THE COURT:   So admitted.

BY MS. MELTON:

Q.   So, starting with Government Exhibit 5-A, Special Agent Robison, what does it say there under user information that tells us that this is Casey Morris's account?

A.   Under the user information, it has Ms. Morris's first and last name, her date of birth, her address, her phone number, her email address, the date that the user account was created, and then also the last known login.

Q.   What was the last known login?

A.   November 28th, 2025, at 3:03 p.m.

Q.   And then similarly, the last action is November 28th, 2025, at 3:03 p.m., correct?

A.   That is correct.

Q.   Moving on to Government Exhibit 5-B.   What are we looking at here?

*Robison - Direct*                                               23

A.   This shows for the account when the last times that the account was accessed and how it was accessed.  All of the previous accesses to the website were from an iPhone, but the last one that was accessed on November 28th it says is from a Macintosh, which appears to be a Mac computer.

Q.   And then moving on to Government Exhibit 5-C.  What is this?

A.   This is the message that was sent from Nasheim Dixon to Ms. Casey Morris on November 27th, 2025, at 8:09 p.m.  The status of the message says, "recipient read," meaning that Ms. Morris has read this message.

Q.   Have Nasheim Dixon and Casey Morris ever discussed Lewis's homicide in the past, to your knowledge?

A.   Yes.

Q.   Tell us about that.

A.   In review of Nasheim Dixon's phone, there were conversations between Mr. Dixon and Ms. Morris on a day where Nasheim Dixon took screen captures from a news article that was talking about one of the defendants in this case, Mr. Quincino Waide.

When his detention -- after his detention hearing where he was detained, the opinion of the Court was released, and there was a news article, and Mr. Dixon took some screen captures of that news article.  On that same day, he appears to be discussing that matter with Ms. Morris, where they talk

*Robison - Direct*                                                    24

about that they did not agree with the charging of the case and thought that it was -- I think they used the word "lame" -- and did not understand and did not believe the case should be charged.

Q.   Did they -- did Ms. Morris discuss anyone's role during that conversation?

A.   Only that she knew that Mr. Nasheim Dixon was not involved.

Q.   Have we ever alleged that Mr. Nasheim Dixon was involved?

A.   No.

Q.   Is Nasheim Dixon a member of the Hot Boyz?

A.   Yes.   Mr. Dixon has a tattoo across his chest that says Hot Boyz.

Q.   I want to briefly talk about the first detention hearing that we had in this case.   Ms. Hall was present in the gallery during that hearing, correct?

A.   That is correct.

Q.   Do you recall Ms. Hall making any commentary during your testimony?

A.   I do recall when we brought up Mr. Justin Ison that Ms. Hall did have an audible response to my testimony.

Q.   Was anyone else in the -- on the investigative team present in the courtroom that day?

A.   Yes.

Q.   Who was that?

*Robison - Direct*                                                    25

A.   Detective Anthony George.

Q.   What, if anything, did Detective George tell you about Ms. Hall's comments?

A.   Detective George mentioned that he also heard an audible response when we brought up Mr. Kelvin Alexander.

Q.   And did either you or Detective George hear what Ms. Hall was saying when you were discussing either -- discussing either Justin Ison or Kelvin Alexander?

A.   It appeared that she did not agree or believe the testimony that we were providing.

Q.   All right.  Special Agent Robison, bear with me a little bit through the next bit because I don't actually have this prepared, but I want to talk about a few items that we provided in our objection that was filed earlier this week.

Starting with the item that was marked Government Exhibit 6 to that objection.  I'm sorry, I don't have an extra copy of those.

THE COURT:  Ms. Melton, if you want, there is an Elmo, a digital Elmo, if you want to pull it out.  Ms. Howard can turn it on for you, and that will display on all the monitors.  Yeah, it pops all the way -- yep.  Ms. Howard can turn it on.

MS. MELTON:  Is it on?  Okay.

THE COURT:  Feel free to place -- and there's a mechanism out there, the wheel at the top of the Elmo.  There

*Robison - Direct*                                                          26

you go.  Give it a second to adjust.  There you go, ma'am.

BY MS. MELTON:

Q.   Is that big enough for you to read, Special Agent Robison?

A.   Yes, I can read that.

Q.   Okay.  Do you recognize these messages?

A.   Yes.

Q.   Where did they come from?

A.   I believe these came from Ms. Morris's phone.

Q.   The bubble that is in blue there, was that message sent from Ms. Morris's phone?

A.   Yes.

Q.   And what does that message say?

A.   It says, "Look, MFS been trying to get you to do the affidavit due to the facts you caused, bro.  PD, everything you said off top is recorded.  MFS not trying to charge you for him, but if his PD used that CPS and everything get involved, just file the affidavit and drop the EPO.  You can't get in trouble.  You ignoring calls ain't helping.  You know how he is, so you all can deal when he touch."

Q.   And then tell us about some of these responses from the person who received that message?

A.   The person initially says that they do not know who this is from, and then said, "Everything was fine between us until he decided to get a gun on my son.  Fuck, don't" -- "who don't

*Robison - Direct*                                                        27

agree.  I did everything for Philip for a whole year, stood by him, let him in my home, and made him comfortable.  And his PO came to do a home check, and I told him not to have no guns in my house.  He did anyway.  That's on him.  And he got people calling my daughter's phone, she is in 7th grade, and she is scared."

Q.   Do we know what this message exchange is about?

A.   No.

Q.   But fair to say, whatever case this is about, someone using Ms. Morris's phone, whether it be her or another person, told this individual to file the affidavit and drop the EPO; is that right?

A.   That is correct.

        MS. MELTON:  Your Honor, do you want me to re-admit the items that I already attached to the written brief -- pleading?  I'm happy to do that, I just want to make sure that I am checking that box if I need to.

        THE COURT:  It's up to you.  We can just reference them in the docket where they are.  I've got it here in front of me.  If you want to cite to the docket entry and page number and we can put that in the transcript, or if you would like to go ahead and enter them separately today, it depends on how you want to have them in the record.  Just make sure you reference one way or the other.  That's all I'll insist.

        MS. MELTON:  I'll just reference them as they are.

*Robison - Direct*                                                          28

THE COURT:  Okay.  Yeah.  This is Exhibit 6, Docket Entry 180-1, page 1207.  Got it.

BY MS. MELTON:

Q.   Special Agent Robison, I also want to talk to you about Government Exhibit 7 that was attached to our pleading file earlier this week.  It's still a little fuzzy.  Are you able to read that?

A.   Yes, I think so.

Q.   And since I'm springing this on you, I'll give you a second to glance through it before we talk about it.

A.   Okay.

Q.   Where did these messages come from?

A.   From Ms. Morris's phone.

Q.   And who is she talking to here?

A.   I believe she is speaking with Aretha Fisher.

Q.   What are the dates of these messages?

A.   It is hard for me to see the date on there.  I believe it says -- is that May of 2024?  I can't --

THE COURT:  May 21st, 2024.

BY MS. MELTON:

Q.   What, if anything, is significant about May 21st, 2024?

A.   This was when Ms. Morris had contact by myself and Detective Anthony George concerning our interview of her.

Q.   And walk us through what Ms. Fisher and Ms. Morris are talking about here?

*Robison - Direct*                                                29

A.   Ms. Fisher tells Ms. Morris, "I hope you didn't say anything over the phone with him," referencing conversations that she had with Mr. Bellomy while he was incarcerated.  She says, "Those calls are recorded, and I don't want you saying anything to incriminate you, him, or anyone else."

And Ms. Morris says, "No, all I told him was who came, and that was all.  He wants me to call him lawyer and talk to him."  "Okay."  She says -- Ms. Fisher says, "Okay, yes.  What are you doing Friday?"  Ms. Morris says, "Nothing, but I'll have Tans Friday.  Thursday is the last day of school."  And Ms. Fisher says, "That's fine.  She can come up with you, and I'll see if we can go see his lawyer then.  Send me a picture of that card."

Q.   So, in essence, Ms. Morris told both Desmond Bellomy and Ms. Fisher about her interaction with you and Detective George, correct?

A.   That is correct.

Q.   And then it looks like they are making plans to further discuss that in person?

A.   Yes.

Q.   Ms. Fisher is not in custody, correct?

A.   She is not.

Q.   Has Ms. Fisher or any of the other mothers of the other co-defendants passed along messages between the other co-defendants during the course of this investigation?

*Robison - Direct*                                                          30

A.   Yes.

Q.   When you all interviewed Ms. Morris on May 21st, 2024, what did she say about those firearms that were found in the Cadillac in Shelby County?

A.   Myself and Detective George interviewed Ms. Morris about the firearms that were found in the Cadillac when Mr. Bellomy was arrested, because initially Ms. Morris had provided an affidavit that I found a picture of located on Mr. Dixon's phone.

In the affidavit, Ms. Morris claimed possession of -- or claimed that both of those firearms belonged to her.  But then, when myself and Detective George interviewed her, we showed her pictures of the firearms that were recovered from the vehicle, and she stated that she did not recognize the one with the red trigger.

Q.   Did she say anything about her knowledge of Mr. Bellomy's status as a felon?

A.   I believe she told us that she knew that he was a felon and could not possess firearms.

Q.   All right.  I'm going to show you what was Government Exhibit 10 from our pleading earlier this week.  Do you recognize that?

A.   Yes, I do.

Q.   What is it?

A.   The messages from Ms. Morris's phone.

*Robison - Direct*                                                           31

Q.   And who are these messages to?

A.   I believe they are to her friend, Alysann.

Q.   And what does Ms. Morris tell Alysann here?

A.   The messages are dated September 15th, 2023, which is just two weeks prior to the murder of Kristopher Lewis, and Ms. Morris says, "Desmond is wanting to come with me to your house tomorrow so he can shoot his gun.  Would that be okay with you?"

And Alysann responds, "Yes, LOL, and, yeah, but I might not be here."

Q.   Was this the only instance that Ms. Morris communicated with Alysann about Desmond Bellomy shooting a gun at her house?

A.   No.

MS. MELTON:  Your Honor, on the screen, I've got Government Exhibit 11 from the pleading earlier this week.

BY MS. MELTON:

Q.   These are with Alysann again, correct?

A.   That is correct.

Q.   Can you read us the first message there?

A.   I believe that says, September 26, 2023.  Again, this would be three days before the murder of Kristopher Lewis, and the message from Ms. Morris to Alysann says, "Desmond is still wanting to come shoot his gun.  Do you think it would be okay one day this week?"

*Robison - Direct*                                                      32

Q.   Is there any evidence that Ms. Morris has purchased Mr. Bellomy guns or allowed him to use her guns in the past?

A.   Based off of messages between Ms. Morris and Mr. Bellomy or other messages that Ms. Morris had on her phone, yes, I believe that she purchased guns or allowed Mr. Bellomy to use her guns.

Q.   So I want to talk about some of those messages that you just referenced.  This was attached as Government Exhibit 12. What are the dates of these messages?

A.   September 27th, 2023.

Q.   I want to draw your attention to the message at 1:41:03. Who is that message from?

A.   These are messages, again, that I believe were deleted from Ms. Morris's phone.  It says "sent" and "read," so I believe that would mean that it was sent by Ms. Morris.

Q.   And what does she say about giving Mr. Bellomy money there?

A.   In the message she says, "I def ain't giving him no more money unless the day ever comes that he steps behind me the way I do him.  He ain't getting none of that from me."

Q.   And then how about the message at 1:43:11?

A.   The message at 1:43:11 again, "sent" and "read," so meaning from Ms. Morris says, "Plus, as far as IK," or I know, "he don't need that loan no more 'cause he asked me to get him another gun.  Like, okay, you must have money then.  No need

*Robison - Direct*                                                      33

for a loan."

Q.   And the following message?

A.   The following message, she also says, "He ain't brought that back up either, getting another gun."

Q.   So, Ms. Morris says that Bellomy asked her to get him, quote, another gun; is that right?

A.   That is correct.

Q.   And then, in the next message she says he is getting another gun; is that correct?

A.   That is correct.

Q.   These messages were attached as Government Exhibit 13 on the pleading earlier this week.  I want to talk about the messages that are near the bottom there.  What are the dates of these messages?

A.   The date or the timestamp on these messages is October 1st, 2023.

Q.   And starting with the message second from the bottom, can you tell us which direction that message was going and what the message says?

A.   The information that we have for this message, again, these were messages that were deleted from a phone.  It says "received" and "read," so this would be a message that was received on the phone, and it says, "You going to order the piece, darling?"

Q.   And then what was Ms. Morris's response to that?

*Robison - Direct*                                                    34

A.   Ms. Morris's response was, "I'll call you.  We will talk about it."

Q.   What do you understand "piece" to mean?

A.   I believe that to be slang for a firearm.

Q.   I'm putting up Government Exhibit 14 on your screen now.  Do you recognize these messages?

A.   Yes.

Q.   Were these also located on Ms. Morris's phone?

A.   They were.

Q.   So this is February 27th, 2024, correct?

A.   Yes.

Q.   Do you recall what was going on at this time between Ms. Morris and Mr. Bellomy?

A.   I believe that they were arguing again, but I do not recall the exact context of their arguments at this point.

Q.   So, can you walk us through these messages?  The messages in blue are from Ms. Morris, correct?

A.   That is correct.

Q.   Okay.  Can you read those for us?

A.   The first message, it says was sent at 2:11 p.m., it says, from Ms. Morris, "Just talked to his aunt, she's going to contact him."  And she continues, "I'll give her 'til 3:00, if she doesn't get in contact with him and reach back out to me by then, I'll contact his mother.  If she doesn't reach back out or have him contact me by 4:00, I'm calling it in.

*Robison - Direct*                                                    35

I'm not playing with him no more."

And continues, "I'll hand this gun over to him, too, that he stole from somebody."  And then the response is, "I think that's a good idea.  All of it."  And then Ms. Morris's response is, "Period.  And then I'll contact his lawyer and tell him take my letter and shred it because I'm not helping him."

Q.   And by "letter," she's referencing that affidavit that you already told us about, correct?

A.   I believe she's referencing the affidavit that she wrote for Mr. Bellomy's firearm case.

Q.   Since the previous detention hearing, have we confirmed whether that affidavit was provided to the Commonwealth to be used in that case?

A.   It was.

Q.   Prior to Ms. Morris allowing Mr. Bellomy to use her car on September 27th, did she know that Mr. Bellomy had used her car for other illegal activity in the past?

A.   Yes, I believe so.

Q.   Tell us about that.

A.   I believe, in general, from the conversations and the context of text messages, she generally knew what Mr. Bellomy and his friends did with her car.

MR. METZGER:  I object to this, Your Honor.  There's no specific information being made; he's just making a surmise

*Robison - Direct*                                                  36

of what somebody else might have known.  There's no probative value or relevance to that.

MS. MELTON:  I'm just laying foundation for the exhibits that I'm about to show, Your Honor.

THE COURT:  As long as we get there, that's fine. Overruled.

BY MS. MELTON:

Q.   Special Agent Robison, I'm showing you what's -- what was attached as Government Exhibit 15 to the pleading earlier this week.  Where did these messages come from?

A.   Again, I believe these came from Ms. Morris's cellphone.

Q.   And who is she talking to here?

A.   The contact is Dale.  As you referenced earlier, that is the contact for Mr. Ison.

Q.   What's the date and time of these messages?

A.   January 30th, 2023.

Q.   So starting with this second message, Dale says, "I can't believe he's took it as far as he has."  Do you know what Mr. Ison is referencing there?

A.   I do not.

Q.   Okay.  And then the message at 9:17:49 a.m., or excuse me, 9:17:26 a.m., Mr. Ison asks, "Does he have a job?"  Is that right?

A.   Yes, he says, "Does he not have a job?"

Q.   And then what is Ms. Morris's response to that?

*Robison - Direct*                                                    37

A.   Ms. Morris's response is, "No, he was working at Framebridge 'til they all" -- "'til they let all the temp people go."

Q.   Did Mr. Bellomy work at Framebridge?

A.   I believe so.

Q.   And then Mr. Ison says, "Has he given you any sort of reason to be gone as long as he has?"  At 9:19:28 a.m., correct?

A.   That is correct.

Q.   And what is Ms. Morris's response there?

A.   Ms. Morris's response is, "Friday night he said police was hot and he didn't want to leave.  Saturday night he said he started drinking and didn't want to drive.  And then last night he said he'd be here late 'cause he was going to take his sister to work.  This morning he said he will be after he wakes up."

Q.   I'm also going to show you Government Exhibit 16 that was attached to the pleading earlier this week.  These are also text messages, correct?

A.   Yes.

Q.   Where did these come from?

A.   Ms. Morris's phone.

Q.   Can you walk us through these?

A.   Yes.  The top message from Ms. Morris says, "Okay.  Are you about to be on your way?"  She continues, "Make sure you

*Robison - Direct*                                                    38

bring my AirTag and the box."  The response is, "What box?" "Yes, I'm about to."  And continues, "Baby, I might come back to Lexington TN," tonight, "it might be some money on the floor, but I'm definitely coming back."

And then it says, "My n bro," and then corrected, "me n bro."  And then Ms. Morris said, "Charger box.  And okay, I can take you back up there after Alysann's."

Q.   What does "money on the floor" mean?

A.   Typically, I believe that to mean an opportunity to make money.

Q.   Lawfully?

A.   No.

Q.   I want to talk a little more about that home invasion that occurred in Richmond, but it looks like I don't have access to those exhibits without my Internet access.

MS. MELTON:  Your Honor, I may need a brief recess to get connected and --

THE COURT:  Understood.

Mr. Metzger?

MR. METZGER:  I don't have a problem with that.

THE COURT:  How long do you think it will take, Ms. Melton?

MS. MELTON:  Five or ten minutes.

THE COURT:  Could I squeeze in another hearing in the interim?

*Robison - Direct*                                                      39

MS. MELTON:  Absolutely.

THE COURT:  I'm sorry.  It's one of those days where I've just got them lined up.  I've got a rearraignment at 10:00 that should only take about 30 minutes.  Would that work?

MS. MELTON:  Sure.

MR. METZGER:  I'm here as long as you need me for the day, Your Honor.

THE COURT:  I appreciate that, Mr. Metzger, and I appreciate everyone's patience as we try to work through this. So let's take a recess, and I will try to turn to the rearraignment, Mr. Kazee, and then Mr. Boone is handling it for Ms. Mattingly, and we will address that one, and we'll return right back to this hearing.

All right.  So we'll take a recess here, and I'll be ready to go at 10:00 as soon as everybody else is ready.

(A recess was taken at 10:00 a.m. until 10:57 a.m.)

THE COURT:  Back on the record.  Appreciate counsel allowing me to conduct that hearing and get that out of the way, and we are free to proceed.

Agent Robison, if you want to take your seat back, I want to remind you you're still under oath, sir.

Ms. Melton, if you would like to resume your direct examination.

///

*Robison - Direct*                                                            40

BY MS. MELTON:

Q.   Agent Robison, do you recall testifying about the July 2023 home invasion in Richmond during the first detention hearing?

A.   Yes.

Q.   But we did not show any video or exhibits relating to that incident, correct?

A.   That is correct.

Q.   Is there any body-worn camera video relating to that incident?

A.   Yes, there is.

Q.   Was Ms. Morris's interview that we discussed captured on body cam?

A.   Yes, it was.

Q.   Let me see if I can get that moved over to our screen. There we go.  So I've got a still up on your screen; do you recognize that?

A.   Yes, I do.

Q.   What is it?

A.   That is one of the body-worn cameras from the night of the home invasion from one of the officers that responded to interview Ms. Morris.

Q.   Had Ms. Morris been interviewed earlier in the day as well?

A.   Yes.

*Robison - Direct*                                                        41

Q.   Was it a male officer or a female officer that
interviewed her earlier in the day?

A.   A female officer, Officer Knight.

Q.   And then, during this evening interview, was it a female
officer or a male officer?

A.   There was a female officer, Officer Knight, once again,
and a male officer, Officer Hacker.

Q.   And is this portion of the video the portion relating to
Casey Morris's interview?

A.   Yes.

MS. MELTON:  Your Honor, for this proceeding, I think
we're on Government Exhibit 6, and I would like to move to
admit this as Government Exhibit 6.

THE COURT:  Any objection, Mr. Metzger?

MR. METZGER:  I haven't seen it, but no objection.

THE COURT:  All right.  We'll proceed cautiously
then, but it's admitted.

And, Mr. Metzger, if you've got a problem or see an issue
as this is played, please let me know, and I'm happy to
reconsider that admittance.

You can pull that out and up; it's awkward.  Ms. Melton,
I think you have to pull it towards you first, the actual
screen.

MS. MELTON:  Let's see.

THE COURT:  Yeah, sorry.

*Robison - Direct*                                                    42

MS. MELTON: One moment. It may be stuck, or it may be operator error.

THE COURT: Ms. Howard is coming to help you out here. It's odd the way it --

(Playing audio.)

MS. MELTON: I'm stopping this clip at 2:48 on the playback bar.

BY MS. MELTON:

Q. Special Agent Robison, at the beginning of that interview, prior to being confronted about the surveillance footage, where did Ms. Morris say the vehicle was parked?

A. Near the mailboxes on the nearside of the street.

Q. When did she say she saw the vehicle?

A. When Shylah got to her house.

Q. I believe she said she seen it when she got here, and that was the last time she saw it, right?

A. That is correct.

Q. How did that change after Ms. Morris was confronted with the surveillance footage?

A. She then said that she thought she saw it when Shylah arrived, but then she said she didn't actually step outside the door, and so she assumed that she -- that her car was there because she didn't think she just walked there.

Q. And there was some discussion about her relationship with Ms. Lyvers, correct?

*Robison - Direct*                                                          43

A.   Yes.

Q.   What did she say that relationship was?

A.   She stated that Ms. Lyvers is her cousin.

Q.   In the text messages that you just testified to during the previous hearing between Ms. Morris and her sister, did Ms. Morris's sister seem to know who Shylah Lyvers was?

A.   No.

Q.   She referred to her as what?

A.   The girl that was at her house, that reported the car stolen.

Q.   Ms. Morris was also asked about Lyvers' boyfriend; what did she say about that?

A.   That she didn't know his name.

Q.   Is that true?

A.   At bare minimum, she knew his nickname or his street name.

Q.   I want to talk about a couple of the exhibits that we attached to the pleading earlier this week.  I'll switch over to the Elmo.  What's the date of these messages?

A.   July 29, 2023.

Q.   And remind us, when was the home invasion?

A.   July 27, 2023, two days prior to these messages.

Q.   Was Richmond Police Department still investigating the home invasion and stolen vehicle on September 29, 2023?

A.   Yes, they were.

*Robison - Direct*                                                    44

Q.   Can you walk us through the -- first, where did these messages come from?

A.   These are messages that were taken from Ms. Morris's phone.  They had been deleted.

Q.   And can you walk us through these messages?

A.   Yes, the messages on the far right indicate if it was received to the phone or sent from the phone.  The first message at 2:33 p.m. was received, and it says, "Okay.  Ride slow, the police is there."  And then also says, "Yes?"  "Unless you need to hurry up and call me."  And then Ms. Morris says, "Okay.  I love you."

Do you want me to continue through all the messages?

Q.   Please.

A.   The next message was received, and it says, "I love you, baby."  And the response by Ms. Morris is, "I want to snuggle."  And the response then is, "IK" or I know.  And then the next message was sent from Ms. Morris, and it says, "IK," or I know, "she just passed me in traffic."

And then it just responds that she loved a previous message.  And then the next message that she received is -- says "Who."  And then it continues, "The cop."  And Ms. Morris responds, "Yeah."

Q.   And it was a female officer, you said, that interviewed Ms. Morris about the stolen vehicle initially, correct?

A.   Yes, Officer Knight interviewed Ms. Morris initially and

*Robison - Direct*                                                          45

was there in the clip that we watched.

Q.   And the female officer, as you said, interviewed her that evening along with Detective Hacker, correct?

A.   That's correct.

Q.   Based off the references to the snuggling and so forth, who do you believe this string of messages was exchanged with?

A.   I believe these to be messages with Desmond Bellomy.

Q.   I'm going to show you Government Exhibit 21.  Where did these messages come from?

A.   I believe these messages came from William Dixon's phone.

Q.   And so these messages have 859-661-1576 at the top, indicating that is the person who sent that message, correct?

A.   Yes, I believe so.

Q.   Can you read these messages for us?

A.   Yes, the messages say, quote, Niggas need to get they wrap together, though, and then continues, "Dem," and then, "Police is dumb hot."

Q.   What does "getting their wrap together" mean?

A.   I believe that to be slang for get their stories straight.

Q.   And then there was a reference to the police being hot, correct?

A.   Yes, I believe that to mean that the police were very active.

Q.   So it looks like these are UTC plus zero in terms of the

*Robison - Direct*                                                    46

time.  Can you adjust that for us and tell us the date and time of these messages?

A.   I believe at that point, UTC would be five hours before, if I'm not mistaken.  And so the messages would have been on July 28th.  The first message would have been at 10:00 p.m.

Q.   And the phone number that is listed here, that's not Casey Morris's most recent telephone number, but that is one of her previous telephone numbers, correct?

A.   That is correct.

Q.   Last time we also discussed Casey Morris asking her sister and brother-in-law for information about the home invasion.  Have you reviewed those text messages between Casey Morris and her sister?

A.   Yes.

Q.   Who was the first person to introduce the names of the victims?

A.   Casey.

Q.   And she happened to mention those two people living in that area, and those were the very two people that were the victims of the home invasion, correct?

A.   That is correct.

Q.   What other information did she offer to her sister and brother-in-law about the victims?

A.   Ms. Morris also told her sister that she knew that the male victim had been a drug dealer.

*Robison - Direct* 47

Q. And I believe you told us last time that law enforcement believes that that particular robbery was a drug rip, correct?

A. That is correct.

Q. Circling back to your interview with Ms. Morris on May 21st, 2024, do you recall showing Ms. Morris pictures of the Hot Boyz that day?

A. Yes, I did.

Q. What did she say when you showed her those pictures?

A. That she didn't recognize the individuals there outside of, obviously, Mr. Bellomy, and then she said that she recognized one of the others but did not know his name.

Q. Do you believe that to be true based off of your review of her phone and her co-defendants' telephone?

A. No, I do not believe that to be true.

Q. I want to briefly circle back to the NCIC report for Ms. Hall that you told us about earlier. Did you also pull Ms. Hall's operator's license?

A. Yes, I did.

Q. Was the social security number on that Kentucky operator's license consistent with the social security number on the NCIC report containing the arrest?

A. Yes, it was.

Q. What about the date of birth?

A. The date of birth matched as well, as well as a known alias to be the last name Stone.

*Robison - Cross*                                                    48

MS. MELTON:  Okay.  That's all I have, Your Honor.

THE COURT:  Thank you, Ms. Melton.

Cross-examination, Mr. Metzger.

CROSS-EXAMINATION

BY MR. METZGER:

Q.   Agent Robison, I want to start where Ms. Melton started with your initial interaction with Ms. Hall.  So you told us that Ms. Morris was taken to the FBI office after her arrest, right?

A.   That is correct.

Q.   And you heard the entire conversation between her and her mother on speaker phone?

A.   That is correct.

Q.   And during the course of that conversation, her mother asked her what she had been charged with?

A.   Yes.

Q.   Okay.  And Ms. Morris declined to answer that question, saying she wanted to wait until she talked to a lawyer, right?

A.   That is correct.

Q.   And then when you entered the conversation, she also asked you what she had been charged with, right?

A.   That is correct.

Q.   Okay.  And you declined to tell her what Ms. Morris had been charged with as well?

A.   Yes.

*Robison - Cross*          49

Q.   And you told her, "She's an adult; she can handle this herself," right, and that's when she got upset with you?

A.   Yes, she was already very agitated at that point.

Q.   And then you said that she used some obscenities with you?

A.   Yes.

Q.   Have you ever used any obscenities?

A.   I try not to, no.

Q.   You've never used any obscenities in your life?

A.   If I'm quoting, I do, but I try not to use obscenities.

Q.   And is it your position that somebody that uses obscenities is not fit to be a third-party custodian?

A.   I don't believe I ever said that.

Q.   So that's not your position?

A.   No, sir.

Q.   You also testified to Ms. Hall's interactions with the Woodford County jailer, Ms. Rankin.  Do you recall that?

A.   Yes.

Q.   And what exactly was it that Ms. Rankin told you about her interactions with Ms. Hall?

A.   I believe Ms. Rankin's exact words were that Ms. Hall contacted her multiple times and cussed her out, I believe was the phrase she used.

Q.   Did she tell you that Ms. Hall was trying to find out when Ms. Morris's court date was?

*Robison - Cross*                                                50

A.   No.

Q.   Didn't say one way or the other about that?

A.   No, she did not.

Q.   And would it surprise you if people are upset when their loved ones get arrested?

A.   No, it does not surprise me, but normally, people do not act in that manner when they speak with me.

Q.   But you've seen people get upset when their loved ones get arrested before, correct?

A.   Correct.

Q.   And based on your interactions with Ms. Hall, as well as your conversations with the jailer, you're not aware of anybody telling Ms. Hall what the charges were, correct?

A.   Not to my knowledge.

Q.   There were some discussions about conversations that Ms. Morris had with people while she was locked up discussing her mother's mental state.  Do you recall that?

A.   Yes, sir.

Q.   And they used terms like, "nuts," "crazy," "nut case," "looney tunes," "basket case," "lost her marbles."  Do you recall all that?

A.   Yes, sir.

Q.   Okay.  You've testified that she first spoke with someone named Tayden Morris.  Who is that?

A.   I do not know the relation of that person to Ms. Morris.

*Robison - Cross*                                                        51

I assume that he is a family member, but I do not know the exact nature of the relationship.

Q.   Fair enough.   And she also spoke with someone named Josh. Do you know who that is?

A.   I believe, based on the conversation, Josh is her brother.

Q.   Her brother by her father, not by her mother, correct?

A.   That is my understanding.

Q.   Let's talk about the NCIC printout that was admitted, which we objected to.  Are we able to pull that up? Exhibit 3?  Thank you.  Do you all have that up?

MS. MELTON:  I'm sorry, my computer is always slow when people are waiting on it.

COURTROOM DEPUTY:  It's not picking your computer up.

THE COURT:  There we go.

BY MR. METZGER:

Q.   Do you have Government's Exhibit 3 in front of you, sir?

A.   Yes, I do.

Q.   So you testified just a moment ago that you confirmed Ms. Hall's date of birth when verifying this NCIC record?

A.   Yes, sir.

Q.   So in November of 1987, she would have been 17 years old, correct?

A.   I do not have her date of birth in front of me, so I'm not positive on that.

*Robison - Cross*                                                      52

Q.   Do you have any reason to dispute that?

A.   I mean, I don't have her date of birth in front of me; I don't recall her date of birth.

Q.   All right.  And then this NCI record says that there is no disposition available, right?

A.   Yes.

Q.   Were you ever able to find any information about how this alleged charge was resolved?

A.   No, I did not.

Q.   So you don't have any data to indicate that Ms. Hall was ever convicted of any sort of felony offense for theft by unlawful taking, or excuse me, theft by unlawful taking or shoplifting?

A.   All I did was run her NCIC based on her name, date of birth, and social security number, and was provided this information.

Q.   And my question is, you don't have any information to indicate she was ever convicted of a felony offense for theft by unlawful taking or shoplifting?

A.   I do not have any additional information.

Q.   There were some text messages that you were shown by the United States that were allegedly from Casey Morris's phone regarding purchasing marijuana for her mother; do you recall that?

A.   Yes, sir.

*Robison - Cross*                                                    53

Q.   And there are no such communications in her phone since February of 2024; is that right?

A.   Of her purchasing marijuana on behalf of her mother?

Q.   Right.

A.   I do not recall at this time if there were any after that date.

Q.   But the ones you presented today with the United States end in February of 2024, correct?

A.   Yes, sir.

Q.   So nothing that you recall in the last two years, give or take?

A.   Not that I recall off the top of my head.

Q.   I want to look now at what was marked as Exhibit, I think it was 5-A, it was the jail communications from Fayette County Detention Center.  Do you recall this document?

A.   Yes, sir.

Q.   I think it was 5-A through 5-C.  Specifically, I want to focus on 5-C.  So the message that was received from Nasheim Dixon said, "Happy Thanksgiving, my dog.  Was just thinking about you," right?

A.   That is correct.

Q.   Do you have any indication, based on what you've reviewed, that Ms. Morris ever responded to this message?

A.   Based on my review, I do not believe she responded.

Q.   Did she look at any other new messages while logged on to

*Robison - Cross*                                                    54

this system on November 28th?

A.   Not to my knowledge, but I did not -- not that I know of.

Q.   And I believe you testified to previous conversations before she was arrested that she had had with Nasheim Dixon, correct?

A.   Yes, sir.

Q.   To your knowledge, has she discussed the case at all with Nasheim Dixon since her arrest?

A.   Not to my knowledge.

Q.   You testified that at the previous detention hearing, you heard an audible response from Ms. Hall when discussing Mr. Ison and Mr. Alexander.  Do you recall that?

A.   Yes.

Q.   In your belief, was it that Ms. Hall did not believe the testimony that you were providing, correct?

A.   Yes, sir.

Q.   Is it your belief that Ms. Hall needs to agree with the government's case theory as a prerequisite to being a third-party custodian?

A.   No.

Q.   You were shown an Exhibit 7 that discussed speaking with somebody named Fisher, a female named Fisher.  Do you recall that?

A.   Aretha Fisher.

Q.   Aretha Fisher, thank you, regarding Mr. Bellomy's arrest

*Robison - Cross*                                                                55

in 2024. At that point, Ms. Morris had not been charged with anything, right?

A. That is correct.

Q. Are you suggesting that there is something wrong with her discussing that case?

A. My suggestion was that Ms. Fisher reached out to Ms. Morris to ask what exactly she told police because that was just after myself and Detective George had interviewed Ms. Morris. And so by her communicating with Mr. Dixon's mother, she wanted to know what information potentially Ms. Morris had shared with us.

Q. And would you find that unusual that somebody that's charged with a crime would want to know what potential witnesses had told law enforcement?

A. I would prefer witnesses do not share information that they receive from law enforcement.

Q. I suspect that's true, but do you find it unusual that people charged with a crime would want to know what witnesses had told law enforcement?

A. Unfortunately, I don't think it is unusual.

Q. You were shown -- excuse me. You testified to texts which I believe you said were Mr. Bellomy at some point in reference to him asking Ms. Morris to get him a gun; do you recall that?

A. Yes.

*Robison - Cross*                                                56

Q.   Was there anywhere in those texts where she agreed to get him a gun?

A.   No, but I do believe the text message was, get another gun, indicating that she had previously done that for him.

Q.   So you're saying that your read of those text messages is that she had done it in the past versus he had just had another gun in the past and now he wanted her to get him another one?

A.   Yes, the way that I interpreted those text messages is that that was something she had done previously for him.

Q.   Would you agree that it's also a fair reading to say that he had a gun in the past, and he asked her to get him another gun because he no longer had the previous gun?

A.   I guess that could be an interpretation.

Q.   There was also a message that I believe you testified was from Mr. Bellomy that said, "Order the piece."  Do you recall that?

A.   Yes.

Q.   Now, law enforcement has records that are accessible to determine when people have purchased firearms lawfully, correct?

A.   Yes.

Q.   Did you check any of those records to see if Ms. Morris purchased a firearm after Mr. Bellomy said, "order the piece," on October 1st of 2023?

*Robison - Redirect*                                                57

A.   I do not recall at this time if there was a purchase after that.

MR. METZGER:  I don't have any other questions. Thank you.

MS. MELTON:  Your Honor, I'm going to object and/or note for the record that one cannot query gun purchases by name of the purchaser.  It does show up once a trace has been run on a firearm, but you can't go into that system and type in someone's name and see every gun that they have ever purchased.  That's just not a thing.

THE COURT:  Understood. Redirect, Ms. Melton.

MS. MELTON:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. MELTON:

Q.   Special Agent Robison, in addition to Mr. Dixon being involved in that affidavit business, Ms. Fisher was involved in both procuring and providing Mr. Bellomy's attorney a copy of that false affidavit, correct?

A.   That is correct.

Q.   And Ms. Fisher was there on scene in Shelby County the evening of Mr. Bellomy's homicide -- or not homicide, firearm offense, so she was familiar with the facts, correct?

A.   She was.  She arrived on scene.

Q.   She also would have known when she purchased that Cadillac, correct?

58

A.   Yes, her name was on the paperwork.

Q.   And we established last time that that Cadillac was purchased after Ms. Morris had been dropped off at Enterprise?

A.   Yes, that's correct.

MS. MELTON:  That's all I have.

THE COURT:  All right.  Thank you, Special Agent Robison.  You can step down.

Ms. Melton, additional proffer of fact or witnesses here on the issue of detention?

MS. MELTON:  No, Your Honor.

THE COURT:  Mr. Metzger, proffer of fact or witness on the issue of Ms. Morris's release?

MR. METZGER:  Yes, Your Honor.  I do have -- I have three documents, but now two, one of them was already introduced by the government --

THE COURT:  Certainly.

MR. METZGER:  -- that I would like to present for the Court's consideration.  Both have already been given to Ms. Melton.  What I've marked as Exhibit A is a report that was prepared by our mitigation team.  They did a fairly thorough interview with Ms. Hall earlier this week to give the Court some background information about the living situation.

If I may approach with this one.

THE COURT:  Certainly.  What's the other exhibit if you want to do both of them together?

59

MR. METZGER:  I'm sorry.  The other is information pertaining to the Fayette County Detention Center email account that was referenced in Agent Robison's testimony. It's marked as Exhibit C, which I was previously going to use as the account communication that they were talking about, I've marked as Exhibit B, it's Government Exhibit 5, so I won't duplicate the efforts.

THE COURT:  Any objection, Ms. Melton, to A and C being admitted?

MS. MELTON:  I have a copy of C.  I don't really know when this was done.  I mean, I assume you're going to talk about that.  Okay.  Gotcha.

MR. METZGER:  Yeah.  Exhibit C was reflecting that yesterday, Ms. Morris and I worked together to close her account with the Fayette County Detention Center.  The Court -- that was the most concerning thing to me that came up of the objection that the government filed.

Mr. Morris -- excuse me, Mr. Nasheim Dixon is not a defendant in the case.

THE COURT:  Right.

MR. METZGER:  To my knowledge, he's not a witness in the case, but I still don't think it's a good idea for her to be having contact with anybody who's incarcerated.  We talked about that yesterday.  She and I agreed to close the account. So as soon as that was brought to her attention that this

60

could be an issue, she very readily agreed to close that account out.

We have not gotten the confirmation back from whoever this third-party provider is that handles the jail communications that the account is closed, but we have submitted the request to have it closed.

So I would like to proffer on the basis of these two documents, and also, to point out that the reason that Ms. Morris accessed that account is because there were communications that were referenced in the initial detention hearing alleging that she was relaying messages between Mr. Dixon and Mr. Fisher and so she was logging on to the account to see what sort of messages were allegedly relayed.

And I think that she's within her right to do that, to try to investigate the allegations that the government has made. I don't think that that was precluded by the Court's order. I don't think that the -- reviewing the message from Mr. Dixon was precluded by the Court order, but it does certainly toe that line, and so we agree that that's not wise to do, and that's why she's agreed to deactivate that account.

There was no response sent to that message. It is an innocuous message. It's my understanding that there are previews that could potentially be shown to you that say, yeah, this is what the message is so I think she understood that this was not a message that was anything nefarious -- I

61

guess is the best way to put it -- but still not wise to do it, and we acknowledge that, and that's why we've taken the steps to close the account.

I do have additional information to present Your Honor by way of a proffer. Obviously, Ms. Hall is Ms. Morris's mother. She is already taking her daughter to and from school every day. Their initial plan after the last time we were here was to change the daughter's schools so that she could live with Ms. Morris at the Alexander residence, but this has kind of -- this situation that we're proposing now would really be better for her daughter. It would allow her to stay in the same school district and keep that family unit intact.

There are no firearms in the home; there are no drugs in the home. Like Mr. Alexander, Ms. Hall is willing to serve as the third-party custodian. We submitted the form with our motion where she made the same agreements that Mr. Alexander did, that she would be willing to supervise Casey; that she would be willing to use every effort to assure her appearance at court proceedings; and to notify the Court immediately if she violates a condition of her release or is no longer in custody.

And she is the one that brought her here today, so I think that's a good indication that she would certainly make sure that she appears for court, and that she take those responsibilities seriously.

62

Again, we've got the report from the mitigation team discussing what the living arrangements would be like there and finding that to be a suitable environment.

We are not asking for any change to the previously imposed condition of home incarceration.  She's still willing to abide by that and to continue to be incarcerated in the apartment of Ms. Hall.

We're also not asking for a change to the Court's requirement of employment.  The Court specified with that condition the last time we were here that it was instructing her to continue the babysitting for her nephew and then for her own, you know, watching her own child as well.

In speaking with her sister, her sister is going to be able to make arrangements to have the nephew brought to her so that they can continue that supervision arrangement.

Previously, when she was locked up for two or three weeks before, maybe it was ten days, they were having to -- the Alexanders were having to take their child to somewhere in the general vicinity of Ms. Hall's home anyway for their alternate child care provider, so for them it's six of one, half a dozen of the other.  They are going to have to make the trip either way for child care for that child.

So she would be able to continue with that babysitting arrangement if the Court required that.

That may be everything, Your Honor, if I could have a

63

moment to check my notes --

THE COURT:  Certainly.

MR. METZGER:  -- as far as the factual proffer.

THE COURT:  Right.  No.  No.  I'll certainly give everybody time to do legal arguments, I just want to make sure we get everything lined up.

MR. METZGER:  We do dispute that Ms. Morris has ever bought marijuana for her mother.  I know what the text messages say, but I've spoken with her mother and she disputes that that ever occurred.

We did receive an email from the probation office, and I believe that the Court may have been copied on that as well -- I know that the United States was -- advising that Ms. Hall was processed at some point, and the probation office spoke with her.  That was for unpaid traffic tickets.  There was no sort of formal charge associated with that that she can recall.

There's -- the tickets were in the process of being paid, but she hadn't paid them all off, and that's why, when she was picked up for another traffic violation, she was fingerprinted.

And then, the allegation that Mr. -- or that Agent Robison spoke to, as far as this 1987 charge, I do have information on that.  She was never charged with felony shoplifting.  She was charged with misdemeanor shoplifting for

64

taking a stick of lipstick from a Walmart when she was still a child.  She was 17 years old.  There was no formal conviction entered in that case.

And I'll try to refrain from argument on it, but that is the facts of what happened in that case.  As a juvenile, she took a stick of lipstick.  And that is everything we have in the way of factual proffer.  Thank you.

THE COURT:  Understood.  With that, then, I'll turn to legal arguments.  And again, counsel, you can assume safely I still recall all the things.  I'm more interested in kind of what has changed or what is new that was brought out today from the last analysis, but you can certainly emphasize whatever you like.

Ms. Melton, the floor is yours, ma'am.

MS. MELTON:  Your Honor, in addition to the arguments that I made last time, as well as the arguments in our objection, focusing on Ms. Hall, the information that we heard today about Ms. Hall being nuts, being a basket case, those are the words of people who know her, including Casey Morris, and including Casey Morris's paternal brother, who said that Ms. Hall was previously a basket case, and this has made it worse.  As well as one of other -- one of Ms. Morris's other family members.

And those statements were made without knowing that Ms. Hall would ever be in this situation, and so there really

65

was not any motive at that point to lie about her mental state, and those were the statements that they made.

I think it's also telling that during the first detention hearing there were a couple of outbursts.  Within five minutes of Mr. -- or Special Agent Robison being on the stand today, there was an outburst.

So I think there's a real temperament problem here, and Ms. Hall's interactions with Michelle Rankin and Special Agent Robison further show that.  And I don't think that that is Michelle Rankin or Special Agent Robison exaggerating, because, again, Ms. Morris, in her own words, talked about her mother cussing out that fed, and told her sister that her mom needed to stop being nasty with Woodford County Detention Center because it was only going to make things worse.

And I bring up the issue with Ms. Hall and marijuana -- which there are many other examples of that by the way, those were just a couple -- not because I think that someone who uses marijuana can never be reliable, I mean, it is legal recreationally just one state from here.

I raise it because Ms. Morris needs to not be anywhere close to illegal activity, and we still have street dealers in Kentucky because it's not legal here.  So I think that's a problem.

Also, one of Ms. Hall's outbursts during the first hearing related to Justin Ison's drug trafficking activities,

66

and you know, she was disputing what was being said about that, despite knowing that Mr. Ison is her dealer.  So I think Ms. Hall has an integrity problem as well.

And I think the interactions with the probation office further suggest that.  Whatever processing that occurred allegedly for traffic tickets is nowhere on that NCIC report. There is a single entry, it's from 1987, it's for shoplifting.

And that was a long time ago, and I didn't even plan to raise it until there was this discrepancy about what the arrest was about.  But if someone has been arrested 15 times in their life, I can believe that they may not remember what the arrest was for.  When someone has been arrested a single time in their life, I find it very difficult to believe that they forgot the reason why.

And so, Ms. Hall told the probation office it was for traffic tickets, didn't mention the tube of lipstick, but, you know, now that it has come out, there's this entry on her NCIC report, now she volunteers the information about the lipstick.

I fear that it is going to be like this moving forward, that there is not going to be initial, up-front candor with the United States Probation Office, it's only going to be after they have found something out, and they need to follow up with her about it.

We also offered some additional information today that we didn't offer up in the first hearing.  Ms. Morris's affidavit

67

relating to that firearm, which is false, was, in fact, submitted to the Commonwealth.

THE COURT:  Ms. Melton, if I could just pause you there because I have a couple questions about Ms. Morris's mother, and then I certainly want to hear your arguments about some of the new information you had about Ms. Morris specifically.

You mentioned the marijuana use, I think Mr. Metzger asked Agent Robison about, I think those messages were almost two years old.  Is there any more recent information that you have that you're going to argue about the marijuana?  Because I agree with the characterization about the marijuana use, I'm just asking, is there any more recent information that you have about it?

MS. MELTON:  The phone in which that information was found was seized in May 2024.

THE COURT:  Okay.

MS. MELTON:  So we just don't have available information.  And initially, when law enforcement was looking through that phone, they were not looking for evidence of drug trafficking.  They came across it in plain view because Ms. Morris spells "gunna," g-u-n-n-a, so when looking for information about guns, there's all this information that comes up about drug trafficking because she misspells gunna or going to with g-u-n.

68

Now that law enforcement has gone back and gotten a warrant for drug trafficking for that phone, there are several instances in which Ms. Morris talks to Mr. Ison both about receiving deliveries for him, as well as getting marijuana for her mother.

Law enforcement did seize Ms. Morris's phone recently. The warrant has not been done on that yet, so we just don't have more recent information about that.

THE COURT:  And then, again, just playing devil's advocate because I know Mr. Metzger is going to come up here and argue this in a second, relevant to Ms. Morris's conduct -- not Ms. Morris, excuse me, her mother's conduct, I mean, not to make light of the situation, but if my mother ever got a hold of my text messages between my siblings, the words nuts would be in there several times.

Is that not just kind of par for the course relevant to siblings, as well as her reaction being negative to her mother or her daughter getting arrested?  I imagine that's been a pretty surprising moment and pretty intense reaction.

Are both of those moments kind of excusable, or are we trying to blow those up a little too much?

I'm just trying to give you a devil's advocate position, Mr. Metzger, and letting you respond.

MS. MELTON:  Sure.  So in addition to those two things, again, we've had several outbursts here in court,

69

which does happen occasionally, but it certainly does not happen in every single case. Special Agent Robison testified that it is -- this is the only time that he's ever been cussed out by a defendant's family member. And Michelle Rankin also said it was out of the norm.

When I spoke to Michelle Rankin, she said that she actually had to tell Ms. Hall to stop threatening her and to stop screaming at her. And apparently, she screamed at multiple individuals at Woodford County Detention Center. And the reason is kind of irrelevant, and apparently, Ms. Rankin told her, I don't have your daughter's court date information. That's not something that I have available right now because I guess it just had not been set yet. But Michelle, again, made it sound like it was pretty outside the norm for that to be happening.

Furthermore, on these characterizations of someone being crazy, you know, when you're talking to your siblings and you say that your mother is crazy, you don't usually say it over and over and over again, saying you'll understand when you go talk to Tayden, hear what he has to say. She's lost her marbles, et cetera.

And the brother even says she was a basket case before this, and this has made it worse. Also, when I talked to -- or called my mother crazy, and again, in addition to it not being repeated and persistent, neither me nor my siblings ask

70

if she's on Xanax because of her erratic behavior or repeating herself multiple times.

And I think Tayden Morris said she'll be screaming and crying one second and laughing the next second. And again, those are their words. And I forget what the Court's next question was.

THE COURT: No, you've addressed everything. Those are all fair responses, and I appreciate you addressing them specifically. I think you were about to transition into some of the new information or additional information you have about Ms. Morris in terms of just her general danger as to her, I think is what you were about to transition into next before I cut you off, and I apologize for that.

MS. MELTON: That's okay, Your Honor. So in addition to the information that we submitted last time, which included Ms. Morris deleting information from her phone relevant to this specific case, which is obstructive activity; her passing along messages from Nasheim Dixon to Stephan Fisher; and her false statements about Shylah Lyvers' car to the extent that it wasn't clear in the first hearing through Special Agent Robison's testimony, the video is quite clear that Ms. Morris says, It was parked over there specifically on the nearside, and I saw it when Shylah arrived. And only after being confronted by law enforcement did she change that information.

And if someone was an innocent bystander in this whole

71

saga, it's unusual that in the next two days that they are texting other co-conspirators about the location of police and people needing to get their stories straight.

And, you know, if we're going to claim that Ms. Morris was mistaken about seeing the car, which seems dubious to me, she claims that she didn't know of the name of Shylah Lyvers' boyfriend, she claimed that Shylah Lyvers is her cousin, even though her sister literally refers to her as "that girl."

But Morris again repeats some of those same lies in May 2024 when shown a picture of the Hot Boyz.  She claims that she doesn't know William Dixon's name, but he is programmed in her phone.  There are text messages with William Dixon in William Dixon's phone; they've actually been deleted from Casey Morris's phone, but they're in William Dixon's phone.

And, I mean, there have just been multiple lies to police.  Actual obstruction in terms of providing an affidavit to a prosecuting authority in an ongoing case, text messages to someone from her phone, whether she sent them or not, they're from her phone.  We don't have any reason to think she didn't send them.

Telling someone to file an affidavit and drop the EPO, and in many of the -- or in one of the multiple responses to that, someone is talking about how this situation has made their 7th grader scared.

Ms. Morris has a long history of interfering with

72

investigations and court cases, and we think that we've documented that pretty well.  And not only that history, she has literally done it in this case.  So I'm not sure what would constitute a danger of obstruction if Ms. Morris is not a danger of obstruction, Your Honor.

THE COURT:  Mr. Metzger.

MR. METZGER:  May I use the podium, Your Honor?

THE COURT:  Certainly.  Either one, as long as you're in front of a microphone.

MR. METZGER:  I feel more comfortable taking that step.

THE COURT:  Certainly.

MR. METZGER:  Thank you.  I think we need to make sure not to lose the forest through the trees.  The forest here is risk of flight and danger to the community.

THE COURT:  Um-hmm.

MR. METZGER:  Risk of flight, I think nobody is really arguing today.

THE COURT:  Sure.

MR. METZGER:  She showed up here for court.  I think that's great evidence she's going to show up for court.

THE COURT:  Yeah.  I think the focus is danger and more specifically obstructive.

MR. METZGER:  Correct.  Correct.  And the Court has already found on one occasion that, despite concerns with

73

potentially obstructive behavior, that there are conditions that can be crafted that would mitigate any danger to the community, and I haven't heard anything from the United States today that changes that conclusion.

As far as the obstructive behavior that's been alleged, the only thing that raised a concern for me, and as we already pointed out, was logging on to that jail account. Again, I don't think that was something that is specifically precluded by the Court's order, but it came close enough that it made me uncomfortable, and that's why I discussed with Ms. Morris the need to just close that account, and we've taken that step.

Everything else that the government has focused on today has been focused on Ms. Hall. We've got a case ultimately that involves, you know, witness assassination, and then today's proceeding has been about character assassination. And that's what last week or two weeks ago was about as well, attacking Mr. Alexander and his fitness, and now it's attacking Ms. Hall and her fitness.

As the Court has already anticipated, I would argue, it's natural for someone to be upset when a loved one gets locked up, especially when that person is getting no information at all about what the charges are or what is going on.

Ms. Morris wisely, in my opinion, advised her mother she wasn't going to talk about her case without her lawyer. I'm glad she did that. Agent Robison truthfully told her that he

74

didn't have to provide her with any information.  But I understand her mother getting upset about that.

My daughter is arrested, I don't know why.  I don't know when I can expect her back, if I can expect her back.  She's got an eight-year-old daughter who's going to have questions and wonder about what's going on.  I understand somebody getting upset about that.

There was the allegations that she screamed at the jail staff.  If that's what Michelle Rankin told the United States, I believe that happened.  I believe -- in my interactions with Jailer Rankin, I believe that she's truthful and trustworthy. If she said that, I believe that it happened.

THE COURT:  Right.

MR. METZGER:  But she described this as something that was outside the norm for someone to get upset with her. I think we see a lot of people in the criminal context who are what we call frequent flyers.  They have been in jail before, they go to jail again.  I think there is less angst among their loved ones when that happens because it's old hat.  They know what to expect.

That wasn't the case with Ms. Hall.  She couldn't get information from her daughter as to why she had been arrested; she couldn't get information from the case agent as to why she had been arrested.  She's trying to find out when Ms. Morris's next court appearance was -- court appearance was so that she

75

could find out what was going on with the case.  And that was alluded to in Ms. Melton's presentation by the response from Jailer Rankin.  I don't know when your next court appearance is.

This is a parent whose child, to her knowledge, had not been in trouble before.  This was a jarring experience for her.

We've got the messages both from Ms. Morris and the folks that she was speaking to while she was locked up, in various ways describing her mom as crazy.  As the Court has pointed out, I think most people at some point have described one or both of their parents as crazy based on things that they've done, based on things that they've said.

Ms. Melton described the folks that she was talking to as people that knew Ms. Hall well.  That's not the case.  I pointed out with Agent Robison when he was testifying, Casey Morris was talking to her brother by her father.  It's not her mother's child, it's her father's child.  Her mother and her father have been split up for a long, long time.

And we've all seen cases in the past where when people have a split, it's not an amicable split.  So I would suspect that her brother does not have a lot of nice things to say about her mother.  He's going to side with dad, not with mom. Dad's perception of mom is going to be brother's perception of mom.

76

Same thing with Tayden, I think the last name is Morris, that was the cousin that they were talking to. That's also a cousin on dad's side. These are not people that have a blood relationship to Ms. Hall. They are linked only because of the union that did not last between Ms. Hall and Ms. Morris's father. So I think that is important context of who these conversations are occurring with.

In my practice, we've got a lot of folks that we represent that are going through divorces. Very rarely do they have kind things to say about the other side or their family.

There was a reference that Ms. Melton brought up about, you know, is your mom taking Xanax or something like that, and she said, That's not how I would describe my parent as crazy.

And that's all well and good, but the issue is not how the United States would describe their relatives; it's how does Ms. Morris describe hers?

And we see that this is just a repeated pattern of finding different ways to say crazy. You know, I don't approve of this behavior, I don't approve of what she said or what she did.

There was some sort of suggestion that Ms. Hall was not being forthcoming with the probation office by saying, I was stopped for traffic tickets 20 or 25 years ago, that's got to be what this is. The United States spins that as she's not

77

being honest about a shoplifting charge from almost 40 years ago.

I offer an alternative is that she couldn't remember any other prior charge other than getting pulled over for unpaid traffic tickets. Truthfully told the United States probation officer about unpaid traffic tickets and getting pulled over for it, and did not recall an incident that happened 40 years ago that didn't result in a conviction.

Again, the 1987 charge that is being referenced is shoplifting from Walmart for taking a stick of lipstick. The Court will recall I jumped up and down as soon as they tried to introduce that exhibit because there was not a felony shoplifting, there is a misdemeanor shoplifting that was not ultimately something that resulted in a conviction.

And respectfully, Your Honor, I really don't find it appropriate to suggest that someone is not a fit third-party custodian because of taking a stick of lipstick when they were a child 40 years ago. Those two things don't have anything to do with each other. If it gets any consideration in the analysis, it is of so little weight that it does not move the scale at all.

We have already talked about the login to the Fayette County Detention Center. Agent Robison testified there was no responses given to that message from Nasheim Dixon. It was a happy Thanksgiving message. We've taken the steps to

78

deactivate the account.  There shouldn't be any concern there about any communications that could be nefarious in any way. She didn't respond to it.

He's not somebody that is a party to the case.  It's not a violation of the Court's order.  We're taking steps to make sure that nothing even comes close to that again.

Ultimately, the Court previously found that she's not a risk of flight and that any danger to the community can be mitigated with conditions.  She has not violated any conditions.  I checked with the probation office before we started today.

So we've got an extra data point that we did not have the last time that she was here, and that is, can she comply?  And the Court now has about two weeks of data that she can comply, that she's doing what she's supposed to do.

Even when this happened and she found out that she needed to move out of the Alexander's residence, she didn't just leave.  The first thing she did was contact her lawyer and make sure that a motion was filed to get before the Court so the Court could make the decision as to what to do.  That's great evidence that she is doing everything that she can to try to comply with the conditions that the Court has imposed.

She didn't set foot outside that residence.  It's certainly an uncomfortable situation for her and Mr. Alexander based on the conversation that he had with his office or with

79

his police chief, but she's doing what the Court would expect her to do.

She's coming back before the Court, explaining the issue that has arisen, and otherwise is doing everything else that the Court has asked.  That is the best evidence that the Court has that she is going to abide by the conditions of release if these new changes are made that we've asked for.

There's no better evidence of future compliance than past compliance.  And so we would ask, Your Honor, that the Court just amend the prior order setting conditions of release to change the third-party custodian from Mr. Alexander to Ms. Hall, and change the home incarceration from Mr. Alexander's residence to Ms. Hall's residence, and leave everything else the same.  Thank you.

THE COURT:  Mr. Metzger, a couple questions for you.

MR. METZGER:  Yes, sir.

THE COURT:  Sorry.  One is -- well, two questions. Both relate to what I thought were some additional evidence that Ms. Melton has raised relative to the issue of danger or obstruction generally.

The first being is that last time when we talked about the burglary and Ms. Lyvers' situation, there was the suggestion last time that maybe, possibly, that Ms. Morris played an obstructive role, but now we've seen the police footage.

80

It appears, by I think the most objective standard, that Ms. Morris was not truthful with law enforcement there, and it's hard to believe she was truthful in that conversation.

Any response to that particular piece of evidence?  I know we looked at a lot of situations where Ms. Morris hadn't been honest with police or law enforcement.  Your thoughts on that one?

MR. METZGER:  I think there are a couple different things that come up in that video, Your Honor.  One of them was Agent Robison talked about asking, Do you know who her boyfriend is?  And the United States presented evidence that she at least knew his nickname -- right? -- and she said, I don't know his name.

Is that truthful?  Is that false?  She may not have known his name, she knew his nickname, she didn't give his nickname -- right? -- and she could have done that with law enforcement.

As far as the vehicle itself, you know, when she was confronted and said -- and the officers told her, we've reviewed the footage, and we've seen no vehicle there that matches this, she says, I thought I saw it.  I guess I didn't see it.  I guess I didn't see it.

THE COURT:  And then we have a photograph -- right? -- where she -- they were shown pictures of the Hot Boyz and she indicated she only knew --

81

MR. METZGER:  Right.  And very clearly, she at least knew Desmond Bellomy, and she at least knew -- if not knew William Dixon's name, knew his nickname and knew who he was.  She had to have known that.

THE COURT:  Certainly.  I will concede the point that it appears Ms. Morris, when she's interacting with law enforcement, has not been as forthcoming or as accurate as anyone would want her to be.

Let me ask you another message [sic] that Ms. Melton raised today was the firearm text of the issue of buying another firearm.  And I understand you contested what that meant or didn't mean.  But obviously, there was a suggestion at minimum that Ms. Morris was willing to buy a firearm for one of the defendants in this case, which is concerning.

Your thoughts in that regard?  I know last time we had the issue relevant to Dixon and Bellomy's other federal case, she had possibly tendered up or drafted an affidavit suggesting that she would take ownership.  This goes even a step further, suggesting that at some point she's willing to buy a firearm.  Your thoughts there.

MR. METZGER:  Yeah.  So I don't read the text that way, Your Honor.  I read it as she reported to other people that he had asked her to do it.  I didn't see anything in those texts where she actually agreed to do it.

THE COURT:  Okay.

82

MR. METZGER:  She agreed to discuss it with him, which is concerning, but it's not the same as agreeing to do it.  And she reported to other people that he had asked her to buy him another firearm.  And again, I don't read those texts as saying that she bought him a firearm in the first place.  I read that as saying he had a firearm at one time, and for whatever reason, either didn't have it or wanted a second one or whatever, and asked her to get it for him.

But I don't think that there is anything in the evidence that was presented to the Court today or at the last hearing that indicates that she did purchase one for him, or that she was even willing to.  All we know is that she was willing to discuss it.  And again, a lot of the danger that is -- that would even be conceivable under that situation is mitigated by the fact that Mr. Bellomy is in custody.

You know, this is not somebody that she would be able to go and purchase a firearm for today, even if she wanted to. So I think that is something that would at least explain those texts.  And the weight that the Court should place on them is the fact that there is no agreement in those texts to actually get him the firearm, and he's currently locked up.

THE COURT:  Understood.  Appreciate that, Mr. Metzger.

Ms. Melton, back over to you.

MS. MELTON:  Yes, Your Honor, I just want to clarify

83

a couple of things.  I'm not great at math, but based off of Ms. Hall's date of birth, which is April 1969, she would have been 18 years old in November of 1987, minor point, but she was not a child.

I'll start with the gun because it's the most recent thing in my head.  So, Ms. Morris starts by telling Lyvers that Bellomy asked her to get another gun.  And the very next message, she said, "Get him another gun."  Which sounds to me like she's going to do it.

Moreover, we saw messages from October 1st where Bellomy said, "You gonna order that piece, darling?"  And the response was not a no.  If I remember correctly, which I can't get my hands on the document quickly, she said, We'll talk about it.

And then, in February of 2024, she indicates to her best friend, Alysann, that she has been holding a stolen firearm for Desmond Bellomy.  Not to mention her taking Bellomy over to Alysann's house to go shoot a gun, knowing that he was a felon.  And one of the requests was three days before the homicide.

I suppose my biggest point that I want to make that I overlooked the first time is that the real -- the most significant danger of obstruction here is what we've seen Ms. Morris do in the past, which is communicate with people to either intimidate or collude.  And so that FCDC login shows how easy it is to do that, even with a third-party custodian.

84

I don't know if Ms. Morris's third-party custodian knew that she logged into that system on November 28th.  I'm going to guess that he didn't.  However, you know, with Ms. Hall working and not being home with Ms. Morris 24/7, Ms. Morris has a laptop that is Internet-capable.  She uses it for school.  She used it to log on to the FCDC website.

How is Ms. Hall going to ensure that Ms. Morris does not directly or indirectly communicate with any witnesses, victims, or co-defendants in this case?

Mr. Alexander clearly could not keep an eye on her 24/7 with the FCDC login.  I also really question this notion that the login was to find out what we had been alleging in the first detention hearing.  I mean, surely she remembers copying and pasting messages from one to the other.  But the login was four days after she was released and only one day after Nasheim Dixon sent her a message.

So it certainly looks like, based on the timeline, that she logged in to read the message.  Nasheim Dixon is related to Desmond Bellomy and William Dixon.  She's discussed Lewis's murder with Nasheim Dixon in the past.  And there is a danger, and no, it didn't happen then, but he is an example of someone who could pass messages from one person to the other.  And that is something that has occurred in this case already.

Aretha Fisher has passed messages between people; Daquis Sharp's mother has passed messages between people.  They also

85

have cousins and sisters who not only pass messages but actually facilitate three-way calls so that one of them can actually talk directly to another.

And so, those are the other people that are out in the free world with Ms. Morris that she could easily email, Skype, whatever, and we would have absolutely no way of knowing about it. And because her third-party custodian isn't home 24/7, she wouldn't have any way of knowing about it either.

THE COURT: Understood. I appreciate that, Ms. Melton.

Where to go from here. Let me do one quick thing I want to do, if we are proposing Ms. Hall as a third-party custodian, which, correct, Mr. Metzger, you are?

MR. METZGER: Yes, Your Honor.

THE COURT: All right. Then, Ms. Hall, I do have some questions for you. If you would like to come forward, the courtroom deputy will swear you in. We'll put you on the stand. I just have a few questions for you.

DEANIA HALL, DEFENSE WITNESS, SWORN

THE COURT: Thank you, ma'am. Right up here. Ms. Hall, would you state your name for the record?

THE WITNESS: Deania Hall.

THE COURT: Ms. Hall, could you describe generally your relationship with your daughter?

THE WITNESS: I have a very close relationship with

86

both of my daughters.

THE COURT:  Certainly.  The other daughter's name is --

THE WITNESS:  The other one?

THE COURT:  Yes.

THE WITNESS:  Is Genna.

THE COURT:  Genna?  Thank you.  I just want to make sure I got that right.

When was the last time your daughter lived with you?

THE WITNESS:  Casey?

THE COURT:  Casey, yes.  Sorry.  When I refer to "daughter" now, I'm going to refer to just Casey.

THE WITNESS:  It's been, oh, my goodness, I don't know exactly, but it's been -- I would say maybe -- I can't think, maybe four or five -- maybe five years ago.

THE COURT:  Sure.  How often are you in contact with her?

THE WITNESS:  With Casey?

THE COURT:  Texts, phone?

THE WITNESS:  Every day.

THE COURT:  Every day with Ms. Morris?

THE WITNESS:  I speak to both of my daughters every day.

THE COURT:  Okay.  There's been references here to a possible shoplifting charge, whether you forgot about it or

87

whatever the case may be.  Can you tell me kind of what you remember about that issue?

THE WITNESS:  It was a shoplifting charge, and I didn't think that it was even -- well, it's never been on my record, so I just thought it was gone.  I had no idea that it was even there.  I have had multiple background checks over the years and that has never, never shown up.

THE COURT:  Understood.

THE WITNESS:  So I had no idea.

THE COURT:  There's also been some suggestions of possible marijuana use.  When was the last time you used?

THE WITNESS:  It's been quite some time.  And as a matter of fact, I went and did a drug test yesterday, because I knew this problem was going to arise, and they sent it to the lab, and my results will be here tomorrow, likely.  But I can promise you, I'm clean.

THE COURT:  Understood.

THE WITNESS:  I do not use marijuana.

THE COURT:  Understood.

THE WITNESS:  Or any other drug.

THE COURT:  There's also been some suggestion, how often are you away from the home during the day?

THE WITNESS:  I work.  I work my own hours.  I do deliveries for Walmart.

THE COURT:  Okay.

88

THE WITNESS:  I can work when I want to work.  I usually work -- I usually take Monday and Tuesday off and try to work Wednesday, Thursday, Friday, Saturday, Sunday.  I'm in and out of my house.  I'll be gone for maybe two hours, and then I'll be back home and take a break.

And then I'll go back out for maybe two hours, come home, and take a break.  So I'm in and out during the time -- the time that I am working.

THE COURT:  Understood.  And then, last line of questioning here is just there's obviously been this discussion about your reaction when Ms. Morris was arrested.

THE WITNESS:  I was devastated.

THE COURT:  Sure.  You want to explain, though, some of the -- obviously, there's been some reference to some comments and some statements you made to Agent Robison as well as Jailer Rankin.  You can make -- give me some context and your perspective on that?

THE WITNESS:  Yes, I would love to discuss it with you.  First of all, neither one of my daughters have ever, ever been in trouble.  The police has never called me.  So, the day that I got a phone call, you can imagine how devastated I was.

So my daughter called me, and I asked her -- I think I was even crying, I'm not sure, but I asked her, I said, What is going on, Casey?  And she said, Mom, I'm not going to say

89

anything without my lawyer.  And I said, Casey, I need to know what's going on for Tansy's sake.  That's her daughter.

THE COURT:  Her daughter, right.

THE WITNESS:  And the next thing I know, I believe it was him, got on the phone, and he screamed at me and said, Ma'am, I do not have to tell you anything related to your daughter.  She is an adult.

And yes, it upset me, and yes, I did say to him -- he didn't finish telling you what I said -- I said to him, You better fucking hope that you have something because you're holding her from her daughter.  That's what I said to him.

THE COURT:  Understood.

THE WITNESS:  And then the other thing, I'm not so sure the Rankin woman --

THE COURT:  Jailer Rankin.

THE WITNESS:  I'm not so sure that there was any kind of cussing going on there, but what the problem was, is it was my daughter's court date day, and it was early in the morning, and I was trying to find out what time the court hearing was.

So I called once and a man answered, and he told me to call back at 9:00.  So then I called back at 9:00, and another woman answered, and she told me she didn't know.  Then -- and I was told to call back.

So I called back again, or it might have been when I was talking to her, that this other lady gets on the phone, they

90

wouldn't tell me when her court date was.  They kept saying that they had no idea.  And, Your Honor, all they had to say to me was, if you need to know her court time, you can call the federal courthouse.  Not one time did they say that.  All they did was tell me they don't know.  They had no idea.  And her court was supposed to be that day.

And yes, it upset me because I wanted to be here.  And I felt like they were lying to me because they wouldn't tell me what time to be here.  And if that woman, the Rankin woman --

THE COURT:  Jailer Rankin.

THE WITNESS:  -- if all she would have said is, Lady, Miss, whatever, if you want to know the court date -- and I know she knew to say that -- if you want to know the time, you have to call the federal courthouse.  Not one time did she say that to me.  She just kept telling me she did not know.  They wouldn't tell me what time to be here, and it upset me.

THE COURT:  Understood.

Counsel, I'll let you ask any questions as long as we're very clear here; it needs to be within the scope of the questions I asked.  This is not a free-for-all by any means. Let's keep this limited and targeted.

Ms. Melton, any questions you would like to ask Ms. Hall?

EXAMINATION

BY MS. MELTON:

Q.   Ms. Hall, do you have Internet at your house?

91

A.   I don't today, but if my daughter comes to my home, I will have to get Internet because my daughter is in college and she takes her classes online.

Q.   So while you're away from the home, how do you plan to ensure that your daughter is not doing anything that she is not supposed to online?

A.   If I need to, I'll check her computer.  I know how to do that.

Q.   Do you know how to find out when people have deleted things from the computer?

A.   No, not really, but I know my daughter is not going to do that.

Q.   You do have to work for a living, correct?

A.   I guess I could quit.  I have a husband; he works.  I mean, I don't necessarily have to, but yeah, I work.

Q.   And you do plan to continue working, correct?

A.   Yes.  Yes.

          MS. MELTON:  That's all I have.

          THE COURT:  Mr. Metzger, anything you'd like to ask?

          MR. METZGER:  I don't have any questions for Ms. Hall, Your Honor.

          THE COURT:  All right.  Then, Ms. Hall, you can step down.  You're excused.  Thank you, ma'am.

          THE WITNESS:  Okay.  Thank you.

          THE COURT:  Counsel, here's what I'm going to do.  I

appreciate this is a lot of information.  I would like to take a recess just to get my notes straight, think about this, and come back and talk about what the next steps are and what my decision may be.

So if we could, I would like to take a recess for 15 minutes, and then I'll come back, all right?  But with that, we'll stand in recess.

(A recess was taken at 12:15 until 12:32 p.m.)

THE COURT:  [Indiscernible] is having a heart attack over Ms. Morris's ankle monitor.

Mr. Metzger, can I ask you a question?  How much longer can she stay at Mr. Alexander's residence?  How much grace period do we have with that?

THE DEFENDANT:  I don't know.

MR. METZGER:  I don't know that we know the answer to that, Your Honor.

COURTROOM DEPUTY:  Judge, can she tap her ankle monitor twice?  Glenn said that would work.

THE COURT:  Can you tap your ankle monitor twice, Ms. Morris?  I have --

THE DEFENDANT:  I don't know if that does anything.

COURTROOM DEPUTY:  That's the instruction I was given from the USP that maybe that would stop it.

THE COURT:  It doesn't bother me if it makes noises.

I think where I am is I certainly think the United States

93

has provided more information, which I certainly think moves the needle closer to the issue of clear and convincing evidence as to danger.  I don't know if they are all the way there.  I would like to take this under advisement.

And I promise counsel that I will get an opinion out one way or the other, as fast as we can humanly write it, but -- Ms. Melton.

MS. MELTON:  I now have the chief's contact information, and I can report back if the Court needs a few days for her to remain at Mr. Alexander's.

THE COURT:  If that's possible.  If that's not, I can deal with that and try to address the issue, and maybe she can go to Ms. Hall's for a day or two while we try to -- I don't want to be rushed into making a decision and getting it wrong, and then Judge Van Tatenhove is like, why?  Why was this this way?  I want to get it accurate for everyone.

And so I'm going to take it under advisement, and all I can promise is we will get it out as fast as we can write it, but I want to be considerate of all the volume of information previously, as well as all the information that Ms. Melton has offered up today; the information from Ms. Hall; everything Mr. Metzger has argued.  I want to make sure that we're considering it and we're careful about what we're doing here and that we reach a fulsome opinion that I feel very confident in.

94

But in the interim, I'll keep Ms. Morris at Mr. Alexander's.  If there is a problem relative to that, Mr. Metzger, please let me know, or Ms. Melton, let me know. I'm not trying to cause an issue with the Richmond Police Department or Mr. Alexander's job; that's the last thing I want to do.  But I'll just keep it at the status quo until we're able to reach a decision, and again, we will try to do that as quickly as we can.

And then the parties are free from that to do whatever they want in terms of appealing the decision, or whatever the case may be.  And so that's where we're going to go.

Ms. Melton, anything else from the United States as to this matter?

MS. MELTON:  No, Your Honor.

THE COURT:  Counsel, I appreciate your cooperation and patience with me so much today.

Mr. Metzger, anything else?

MR. METZGER:  Your Honor, just a note for the record, I provided the Court with a copy of our Exhibit A.  It has not been redacted, so I'm going to substitute what I've given the Court.  I'll get a redacted copy to the clerk's office.

COURTROOM DEPUTY:  Can I just redact this?

THE COURT:  Any objection or concern with that, Ms. Melton?

MS. MELTON:  No, Your Honor, and similarly, I'm glad

95

you said that because I'm in the same boat.  I need to submit my exhibits after the hearing.  I'll drop a disk off later today.

THE COURT:  Sure.  I appreciate that, and I appreciate the caution there to make sure that that information is protected.

With that, we will stand in recess as to this case. Thank you so much.

(Proceedings concluded at 12:35 p.m.)

- - -

C E R T I F I C A T E

I, ELAINE S. HABERER, RPR, FCRR, certify that the foregoing is a correct transcript from the electronic recording proceedings in the above-entitled matter, transcribed to the best of my ability to hear and understand said recording.


_\s\ Elaine S. Haberer___                    January 10, 2026_
ELAINE S. HABERER, RPR, FCRR                 Date of Certification
Official Court Reporter

96

INDEX

**GOVERNMENT'S WITNESSES**

ISAACC ROBISON
Direct Examination............................... Page 8
Cross-Examination................................. Page 48
Redirect Examination............................. Page 57


**DEFENSE WITNESSES**

DEANIA HALL
Examination...................................... Page 90


- - -

**GOVERNMENT'S EXHIBITS**

| Exhibit | Description | Identified | Admitted |
|---------|-------------|------------|----------|
| 1-A | Text Messages | 11 | 11 |
| 1-B | Text Messages | 11 | 11 |
| 1-C | Text Messages | 11 | 11 |
| 2 | Text Messages | 13 | 14 |
| 3 | NCIC Report | 16 | -- |
| 4 | Text messages | 18 | 19 |
| 5-A | Screenshots from FCDC Jail Communications website | 21 | 22 |
| 5-B | Screenshots from FCDC Jail Communications website | 21 | 22 |
| 5-C | Screenshots from FCDC Jail Communications website | 21 | 22 |
| Docket Entry 180, Exhibit 6 | Text Messages | 25 | -- |
| 7 | Text Messages | 28 | -- |

97

INDEX CONTINUED

**GOVERNMENT'S EXHIBITS**

| Exhibit | Description | Identified | Admitted |
|---|---|---|---|
| 10 | Text Messages | 30 | -- |
| 11 | Text Messages | 31 | -- |
| 12 | Text Messages | 32 | -- |
| 13 | Text Messages | 33 | -- |
| 14 | Text Messages | 34 | -- |
| 15 | Text Messages | 36 | -- |
| 16 | Text Messages | 37 | -- |
| 6 | Audio Clip of Ms. Morris's interview | 41 | -- |
| 21 | Text Messages | 45 | -- |

**DEFENSE EXHIBITS**

| Exhibit | Description | Identified | Admitted |
|---|---|---|---|
| A | Ms. Hall's Interview | 58 | -- |
| C | FCDC Email | 59 | -- |

- - -