UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON
CRIMINAL NO. 25-CR-00127-GFVT

UNITED STATES OF AMERICA                                          PLAINTIFF

v.          **MEMORANUDM IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS FOR VINDICTIVE PROSECUTION**

QUINCINO LAMONT WAIDE, JR.                                        DEFENDANT

---

Comes the defendant, Quincino Lamont Waide, Jr., and submits the foregoing memorandum in support of his Motion to Dismiss for Vindictive Prosecution. In support of this motion, the defendant states as follows:

**INTRODUCTION**

The foregoing criminal matter was initiated by an indictment returned on October 2, 2025, naming six defendants – William Quejohn Dixon ("Dixon"), Rollie Deshawn Lamar ("Lamar"), Daquis Damarr Sharp ("Sharp"), Desmond Elijah Bellomy ("Bellomy"), Jatiece Alvin Parks ("Parks"), and Deangelo Montavis Boone ("Boone") – in the murder of Kristopher Lewis ("Lewis"). The government alleges that the defendants were hired to murder Lewis to prevent his anticipated testimony against Lamar in his federal trial for narcotics trafficking and money laundering charges. On September 29, 2023, it is alleged that Dixon, Sharp, Bellomy, and Parks acted in concert to carry out the hit.

A superseding indictment was returned on November 6, 2025, which named two additional defendants, Casey Allison Morris ("Morris") and the defendant, Quincino Lamont Waide, Jr. ("Mr. Waide" or "Quincino"). Morris was named in Count 3 of the indictment, charging her with aiding

and abetting in the murder for hire of Lewis; Count 4, conspiring in the murder for hire; and Count 5, conspiring in the use of a firearm in relation to a crime of violence. Mr. Waide was named as the sole defendant in the added offense of Accessory after the Fact, in violation of 18 U.S.C. § 3. As a basis for this charge, the government alleges that he facilitated access to an alternative getaway vehicle for Sharp, Dixon, Parks, and Bellomy after committing the murder.

The defendant requests that this matter be set for a hearing.

## STATEMENT OF FACTS

The immediate charge stemmed from a lengthy investigation, during which law enforcement attempted to engage with or contact Mr. Waide on multiple occasions, seeking his cooperation and willingness to testify against the named co-defendants.

### A. August 14, 2024 Interview

Mr. Waide was interviewed by law enforcement on August 14, 2024, a meeting which was facilitated by Quincino's probation officer – unbeknownst to him[1]. During this interview, he was informed that he had been identified as a suspect in the Lewis murder based on his "involvement with" the co-defendants on the day in question and communication exchanged "that came up with [his] name, [his] phone number, some text messages and phone calls." When asked about the September 2023 incident, Quincino conveyed his unfamiliarity with Lewis and the events of that day. He stated that his connection with the named defendants was a result of the friendship amongst their parents, who had known each other for years. As such, he knew them as "family friends," but did not associate with them directly.

---

[1] A copy of this interview has been submitted for conventional filing, identified as "Interview, Aug. 14, 2024," with such notice being mailed on the date of this filing.

2

Law enforcement went on to claim that, for several suspects, indictments would be pursued "next month," insinuating that Quincino's case was to be presented to the grand jury, as he was "named as one of the suspects." However, the interview had been arranged as a  "way for [Mr. Waide] to help eliminate [himself]" from the possibility of indictment, by telling the officer "why [he] came up in this." Quincino was being given this opportunity, as the officer "did not think [Mr. Waide] killed anybody" but believed he "may have played a part in it," making him "complicit to murder because [he] was paid for his involvement" – alluding to the payment Quincino allegedly received from Dixon on the day of the murder. Recognizing the severity of the allegations being made, Quincino asked to speak with counsel and provided no other statements. The interview concluded with law enforcement confirming his current address.

**B.  Target Letter**

On September 30, 2024, a target letter was hand-delivered to Mr. Waide, a copy of which is attached hereto as Exhibit A, stating that he was a "target of an ongoing federal investigation" of a "homicide that occurred in Lexington, Kentucky in Fall 2023." He was identified as a suspect due to, again, the alleged "financial compensation" he received "for [his] assistance with the homicide." The letter also claimed that "[t]he grand jury will soon meet to determine whether, and if so which, federal charges will be brought against" him. The letter served, however,  as an "invitation. . . to meet with federal prosecutors to discuss a potential pre-indictment resolution of the potential charges against you." The government also stated its willingness to hold a "proffer" session with Quincino, during which he could "explain his role in the incident[.]" Mr. Waide did not meet with the government or attend a "proffer" session.

3

**C.** *USA v. Quincino Lamont Waide, Jr.*, **No. 5:25-mj-05253 (E.D. Ky. Sept. 19, 2025)**

      *i.*          *Preliminary and Detention Hearing*

On September 19, 2025, a criminal complaint was filed, initiating the matter of *United States v. Quincino Lamont Waide, Jr.*, No. 5:25-mj-05253 (E.D. Ky. Sept. 19, 2025) ("previous matter"). Quincino was charged with the sole offense of possession of a firearm or ammunition after having been convicted of a misdemeanor crime of violence, in violation of 18 U.S.C. § 922(g)(9). The charge originated from the execution of a search warrant for Mr. Waide's cell phone on April 24, 2025. Through the contemporaneous search of the residence of his girlfriend, Sierra Lang ("Lang"), a Glock 21 .45 caliber handgun was found in an HVAC vent in the bedroom of one of Lang's children. Law enforcement also found ammunition in various locations throughout the residence. In the affidavit filed, Lang was reported as telling officers that the firearm belonged to her and that she had "hid the firearm well." Aff. in Supp. of Crim. Complaint, *Waide*, 5:25-mj-05253, ECF No. 1-1, p. 4[2]. Further investigation showed the firearm to have been purchased by Lang on October 11, 2021. Tr. of Detention Hearing, 5:25-mj-05253, ECF No. 21, p. 32[3].

After execution of the search warrant, Mr. Waide was taken into custody and interrogated at the Richmond Police Department[4]. The interrogation began with law enforcement referencing the target letter sent to Mr. Waide, stating they wanted to again "come to [Quincino] to give [him] an opportunity" to speak, claiming that they "had gotten more evidence and pretty much completed [the] investigation." Interrogation, April 24, 2025, 15:53:28. They conveyed that the "U.S. Attorney's office is going to be seeking the death penalty in this case" and, therefore, he was

---

[2] A copy of the affidavit is attached hereto as Exhibit B.

[3] A copy of the preliminary hearing and detention transcript is attached hereto as Exhibit C.

[4] The recording of this interrogation was submitted for conventional filing simultaneous to the filing of this motion.

"looking at life in prison or something higher if [he is] convicted of it." Interrogation, 15:54:25. They then went on to show Mr. Waide the evidence obtained, purportedly proving his involvement in the Lewis murder, which consisted of his phone locations and his activity the morning of September 29, 2023; the text messages exchanged between Dixon and Sharp regarding payment to him; and alleged proof that Quincino met with Dixon later that evening to receive a payment of $1,000.00. Interrogation, 15:54:40. To conclude the interrogation, FBI Special Agent Isaac Robison ("Agent Robison"), reiterated the strength of the evidence against Mr. Waide, that an indictment was imminent, and that the intended charges were death penalty eligible. Mr. Waide made no statements, instead requesting counsel. Interrogation, 15:56:19.

Agent Robison subsequently testified at the joint detention and preliminary hearing held on May 27, 2025. His testimony concentrated on the investigation of the Lexington gang known as the "Hot Boyz," who had "been involved in numerous acts of violence" including "shootings, homicides, robberies, things of that nature, over the last several years." Exh. C, p. 5. Agent Robison testified specifically to the murder of Lewis, who was killed in the parking lot of his employment, Koch Air, upon arriving at work at 8:15 a.m. on September 29, 2023. Law enforcement contends that Sharp, Dixon, Bellomy, and Parks were directly involved in the shooting, as they were seen leaving the scene in a black Acura TL, a vehicle known to be driven by Sharp. Exh. C, p. 35-36. The government alleges that Mr. Waide assisted in the commission of the homicide by staging a black Dodge Durango at Centre Parkway for Sharp, Dixon, Bellomy and Parks "to pick up after abandoning the Acura." Exh. C, p. 46-47. Agent Robison again confirmed that this determination was made after reviewing Quincino's call detail records showing his movements on the morning of September 29, 2023, a text exchange between Sharp and Dixon on the night of September 29, 2023, and Mr. Waide's alleged meet up with Dixon to receive the payment owed.

5

According to Agent Robison, Quincino was "very active in the early morning of September 29," with call records showing his movements to be as follows:

- Around 1:00 a.m., records show Mr. Waide to be in the Glen Arvin area. Tyrone Moss ("Moss"), who was believed to own the Dodge Durango at that time, was alleged to have lived at 409 Glen Arvin Avenue.

- At 4:11 a.m., Moss called Quincino briefly.

- Mr. Waide continued to the area of Centre Parkway and was there for a short period of time.

- He then travelled to the Warwick Avenue area where Bellomy and Dixon were alleged to have been residing at the time.

- Mr. Waide returned to the Glen Arvin area for a brief time before driving to the "Athens-Boonesboro area in Lexington where he stayed for the remainder of the day until late afternoon." Exh. C, p. 47.

At 11:25 p.m. on the night of September 29, Sharp and Dixon exchanged text messages regarding payment owed to "Fred," Quincino's nickname, which law enforcement suggests was in exchange for his assistance in staging the Dodge Durango, *to wit*:

| | |
|---|---|
| Sharp: | We gonna give Fred prob 100 each |
| Dixon: | Yup an Doja said give him 5 |
| Sharp: | Bet cause he was talkin bou a band but either way it was 250 each from the 4 of us |
| Dixon: | Yeah it don't matter to me , he just got in the car an said y'all just give me 5 but Watchu wanna give em $1000 |
| Dixon: | ? |
| Sharp: | It dnt matter bru it's just 250 each but it's yo call on this one |

6

> Dixon:    We can give em the band since ETs wat we said in da first place gang
>
> Sharp:    Bet

Text Messages, Sept. 29, 2023[5]. Agent Robison testified that the "he" who had just entered the vehicle was Mr. Waide and, therefore, he was the one who said that "they could give him a thousand." Exh. C, p. 44.

## D.  Requested Cooperation of Waide

From the day of the initial appearance on the filed criminal complaint until Mr. Waide's guilty plea, the government repeatedly requested Mr. Waide's cooperation in the investigation of the named co-defendants. Such requests were made verbally as well as in writing, with the last request being made via email on August 21, 2025, *to wit*:

> You may also want to remind Waide about the proffer opportunity.
>
> As I am preparing charges for the Lewis homicide (and continuing our investigation into the Hot Boyz' many racketeering activities), I do not think that we actually need Waide to testify against anyone in the Lewis case. [Our evidence was already strong but was strengthened even more recently from the discovery of relevant text messages.] If Waide never testifies, there is a good chance no one will ever know that he spoke to us.
>
> However, Waide's best chance at avoiding charges in the Lewis homicide or any future Hot Boyz case would be to sit down with us and tell us exactly what he was asked to do. If he can credibly persuade us that he did not know what he was assisting with (preferably with some corroboration), we would likely not charge him in the Lewis case.
>
> I cannot say that he would *never* be charged. If one of the other Hot Boyz flips and points us to *concrete evidence* that Waide knew that he abetted a murder-for-hire (or that he assisted one of the Hot Boyz' other crimes), we would have to reconsider.
>
> Given Waide's low guideline range, if he was honest with us during a proffer, I think I could likely persuade my management to recommending a time-served sentence, especially if he stays in custody on 9/8.

---

[5] A copy of this text message is attached hereto as Exhibit D.

Email, Aug. 21, 2025 (emphasis original) (emphasis added)[6]. Quincino declined the invitation to meet with the government, as he had done on every previous occasion.

Sentencing was held in the previous matter on January 13, 2026, at which time the government focused on Mr. Waide's "history and characteristics as it relates to his rehabilitative potential and the need for deterrence." The government continued to emphasize Mr. Waide's purported involvement in Lewis's murder, "receiv[ing] payment from Kristopher Lewis's murderers, who were his close friends, on the same day as Kristopher Lewis's murder." Tr. of Sentencing, *United States v. Waide*, 5:25-cr-00073 (E.D. Ky. June 5, 2025), ECF No. 48, p. 8[7]. After considering the calculated sentencing guideline range of ten (10) to sixteen (16 months), and hearing the arguments of counsel, the Court imposed a sentence of fifteen (15) months. *Id.* at 28.

## ARGUMENT

While the prosecution has "'broad discretion' in deciding whom to prosecute and which charges to bring, such discretion is "not unfettered." *United States v. Ladeau*, 734 F.3d 561, 566 (6th Cir. 2013) (citing *Bragan v. Poindexter*, 249 F.3d 476, 481 (6th Cir. 2001)). "At a minimum, prosecutorial discretion is restrained by the Due Process Clause, which prohibits the prosecution from punishing a defendant for exercising a protected statutory or constitutional right." *Id.* (citing *United States v. Poole*, 407 F.3d 767, 774 (6th Cir. 2005)). In proving prosecutorial vindictiveness, "a defendant may obtain a dismissal of an indictment. . . by showing 'actual vindictiveness' – that is, 'objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights.'" *Id.* (citing *United States v. Dupree*, 323 F.3d at 480, 489 (6th Cir. 2008)). However, a defendant may also obtain a dismissal by showing that "in the particular factual situation

---

[6] A copy of this email is attached hereto as Exhibit E.

[7] A copy of this transcript is attached hereto as Exhibit G.

presented, there existed a 'realistic likelihood of vindictiveness' for the prosecutor's action." *Bragan,* 249 F.3d at 481 (quoting *United States v. Andrews*, 633 F.2d 449, 455 (6th Cir. 1980)). "By allowing for a presumption of vindictiveness to be drawn" a defendant's due process rights are protected "by eliminating apprehension of prosecutorial retaliation where circumstances reasonably indicate retaliation, even if there is no direct evidence that the prosecutor was in fact improperly motivated." *Ladeau*, 734 F.3d at 566.

The Court may find there to be a "'reasonable likelihood of vindictiveness' and may presume an improper vindictive motive" if shown that "(1) the prosecutor has some stake in deterring the [defendant's] exercise of his rights and (2) the prosecutor's conduct was somehow unreasonable[.]" *Id.* (citing *Bragan*, 249 F.3d at 482)). The government then "bears the burden of rebutting the presumption with 'objective, on-the-record explanations' such as 'governmental discovery of previously unknown evidence' or 'previous legal impossibility.'" *Id.* (citing *Bragan*, 249 F.3d at 482)). In reviewing the circumstances of the immediate matter, there is a strong likelihood of prosecutorial vindictiveness in the government's decision to charge Mr. Waide in relation to the Lewis murder.

**A. The immediate charges were brought as a result of Mr. Waide's unwillingness to cooperate with the government.**

     *i.    The timeline of actions taken against Quincino presents a reasonable likelihood of vindictiveness.*

During the investigation and prosecution of Mr. Waide, law enforcement, on multiple occasions, identified the evidence which purportedly proves his involvement in the Lewis murder. The proof is and has remained the same from law enforcements' first interaction with Quincino to the present, *to wit*:

- During the August 14, 2024 interview, law enforcement stated that, while they "did not think [Mr. Waide] killed anybody," he was to "have played a part in it," making him "complicit to murder because [he] was paid for his involvement" – alluding to the payment Quincino allegedly received from Dixon on the day of the murder. Interview, Aug. 14, 2024.

- During the April 24, 2025 interrogation, officers identified the evidence that supposedly proved Mr. Waide's guilt, which again consisted of his phone locations and activity the morning of September 29, 2023; the text messages exchanged between Dixon and Sharp regarding payment to him; and alleged proof that Quincino met with Dixon later that evening to get the $1,000.00 payment.

- At the detention hearing on May 27, 2025, Agent Robison confirmed that evidence of Quincino's involvement remained limited to cell phone records showing his movement on the morning of September 29, 2023, text messages exchanged between Sharp and Dixon regarding payment, and his alleged meet up with Dixon to receive said payment.

In reviewing the discovery produced to date, the government's evidence of Mr. Waide's involvement remains the same.

The government has repeatedly attempted to obtain Quincino's cooperation from its first attempted interview on August 14, 2024 until his rearraignment in the previous matter. Mr. Waide has continually declined. He requested counsel during the August 14, 2024 interview after being made aware of the severity of the allegations. He did not respond to the target letter dated September 30, 2024. In the interrogation conducted after the April 24 search warrant, he made no

10

statements, again asking for counsel. Repeated requests were made after his indictment in the previous matter, with a final request being made via email on August 21, 2025:

> Waide's best chance at avoiding charges in the Lewis homicide or any future Hot Boyz case would be to sit down with us and tell us exactly what he was asked to do. *If he can credibly persuade us that he did not know what he was assisting with (preferably with some corroboration), we would likely not charge him in the Lewis case.*
>
> . . .
>
> Given Waide's low guideline range, if he was honest with us during a proffer, I think I could likely persuade my management to recommending a time-served sentence, especially if he stays in custody on 9/8.

Exh. E (emphasis added). Quincino, again, declined the invitation to cooperate.

As a basis for dismissing the superseding indictment returned in *Ladeau*, the Sixth Circuit found there to be "little reason to suspect that the prosecutor's view of LaDeau's case changed significantly between the two indictments, given that the government already possessed all of the relevant evidence that supported the superseding indictment well before procuring the first indictment." To the contrary, "the only substantive occurrence between the two indictments was LaDeau's successful suppression motion. The government has never suggested that any other development altered its perception of the case during the thirteen months that it was pending[.]" As such, "there is nothing to indicate that the superseding indictment compensated for unexpected changes or an incomplete initial grasp of the pertinent issues or facts." 734 F.3d at 568.

In the immediate matter, the government has held evidence of Quincino's alleged involvement in the Lewis murder prior to August 14, 2024. As repeatedly confirmed, the evidence was and remains to be (1) Quincino's cell phone locations and his activity the morning of September 29, 2023; (2) text messages exchanged between Dixon and Sharp regarding payment to him; and (3) his alleged meet up with Dixon to obtain said payment. Yet he was not charged in

11

relation to the Lewis matter until November 2, 2025 – in the *superseding* indictment. (Doc. # 86). The only "substantive occurrence" since August 14, 2024 to the present is Mr. Waide's continued refusal of the government's request to cooperate. *See* Exh. E (email from the government explicitly stating that if Mr. Waide could "credibly persuade us that he did not know what he was assisting with (preferably with some corroboration), we would likely not charge him in the Lewis case" or "any future Hot Boyz case[.]").

Moreover, the increasing severity of actions taken by law enforcement in targeting Mr. Waide, as well as actions taken post criminal complaint in the previous matter, can be seen as nothing other than coercive tactics, engaged with the intent of pressuring Quincino to cooperate. After Mr. Waide requested counsel at the August 14, 2024 interview – an interview unknowingly set up by his probation officer – a target letter was hand-delivered on September 30, 2024 by his probation officer. When there was no response from the target letter, law enforcement obtained a search warrant. On the same day the search warrant was executed, April 24, 2025, Quincino was taken into custody under the pretense of being given "an opportunity" to speak with law enforcement about the Lewis murder. Representations as to the imminency of such indictments were made, with the not so inconspicuous warnings of the government's intent "to [seek] the death penalty" and, if convicted, Mr. Waide was "looking at life in prison or something higher[.]" When Quincino denied making any statements and again requested counsel, he was federally charged on the sole offense of possessing a firearm after conviction of a misdemeanor domestic violence conviction – a rare charge to be pursued without accompanying offenses at the federal level. Now, after continuing to decline the government's repeated requests to cooperate, Mr. Waide finds himself named in the immediate indictment. *See LaDeau*, 734 F.3d at 570 ("As a general matter, a superseding indictment is potentially vindictive only if it add[s] additional charges or

substitute[s] more severe charges based on the same conduct charged less heavily in the first indictment.") (internal citations omitted).

"Refusal to cooperate is every defendant's right under the [F]ifth [A]mendment. Under our adversarial system of criminal justice, a defendant may not be made to suffer for his silence. Because there is no legitimate purpose for the statement that failure to cooperate will be reported and because its only apparent objective is to coerce, we disapprove the making of such representations." *United States v. Tingle*, 658 F.2d 1332, FN 5 (9th Cir. 1981); *see also Florida v. Bostick*, 501 U.S. 429, 437 (1991) (noting that " a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.").

As evidenced by the correspondence sent on August 21, in conjunction with his cooperation, the government expected Mr. Waide to admit guilt as to his purported involvement in the Lewis murder. Recognizing this, not only was it his Fifth Amendment right to refuse cooperation, such refusal is understandable. In response to the exercise of his constitutionally protected right, the government has, for over a year, pursued greater and more severe means of compelling Mr. Waide's cooperation. Since declining to speak during the August 14 interview, Mr. Waide has been served a formal target letter; been subjected to a search of his girlfriend's residence and subsequent interrogation; was federally indicted for possession of a firearm; and is now being charged as an accessory to the murder of Kristopher Lewis. Such actions can be seen as nothing other than vindictive, punishing Mr. Waide for refusing to cooperate with the government in the prosecution of the co-defendants. Accordingly, Count 6 of the indictment must be dismissed.

Respectfully submitted,

TRUE GUARNIERI AYER, LLP

By:    */s/ Whitney True Lawson*
        Whitney True Lawson
        124 Clinton Street
        Frankfort, Kentucky 40601
        Telephone:  (502) 605-9900
        Facsimile:  (502) 605-9901
        wlawson@truelawky.com

        *Counsel for Defendant, Quincino Waide*

## CERTIFICATE OF SERVICE

This is to certify that a true copy of the foregoing Memorandum in Support of Defendant's Motion to Dismiss for Vindictive Prosecution has been served this the 16th day of March, 2026 by filing same via the CM/ECF System, which will send electronic notice to all counsel of record.

        */s/ Whitney True Lawson*
        Whitney True Lawson