**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

**CRIMINAL CASE NO. 25-CR-127-GFVT-MAS**

**UNITED STATES OF AMERICA**                                    **PLAINTIFF**

v.          **RESPONSE TO MOTION TO DISMISS FOR VINDICTIVE**
**PROSECUTION**

**QUINCINO WAIDE, JR.**                                         **DEFENDANT**

\*   \*   \*   \*   \*

On the morning of September 29, 2023, masked assailants executed Kristopher Lewis ("Lewis"), a twenty-eight-year-old federal witness, at his workplace.[1] That night, the Defendant (also referred to herein as "Waide") received payment for his assistance to the assailants.[2] Despite the presence of historical cell site evidence demonstrating Waide's pre-murder involvement on the morning of September 29, 2023, which could make him a principal to the crime, Waide has been charged as an accessory after the fact.[3] Waide now claims vindictive prosecution.[4]

Vindictive prosecution is a discrete legal concept that forbids the government from punishing a defendant solely for the exercise of his legal rights. *See e.g., United States v. Williams,* 793 F.3d 957, 963 (8th Cir. 2015). It is not a tool to generally grieve the legitimate exercise of

---

[1] *See* R. 72: SA Robison, TR (Boone Det. Hrg.) at 317-19.

[2] *See* R. 72: SA Robison, TR (Boone Det. Hrg.) at 352-55.

[3] *See* R. 221-4: Exhibit (Tr. of Det. Hrg. in Case No. 25-CR-73) at 1708.

[4] R. 221: Motion to Dismiss for Vindictive Prosecution.

1

prosecutorial discretion; it is not a means of announcing to the world that a defendant is not a snitch; and it cannot be frivolously used to fish for the work product or *Jencks* material.

The Defendant, who claims that the United States vindictively prosecuted him for refusing to cooperate,[5] has failed to make a *prima facie* showing of vindictiveness. Many courts have held that a defendant has no protected right to refuse cooperation. *See United States v. Young*, 231 F. Supp. 3d 33, 122-23 (M.D. La. 2017) (collecting cases). Courts that have acknowledged a right to refuse cooperation have found that, as part of the ordinary plea negotiation process, "a prosecutor may pressure a defendant to waive that right by threatening a more severe indictment." *See United States v. Williams*, 47 F3d 658, 662 (4th Cir. 1995). Such give-and-take bargaining—involving the defendant's rights, on one hand, and some mutual benefit to the parties, on the other hand—is "an attribute of any legitimate system which tolerates and encourages the negotiation of pleas." *See Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S. Ct. 663, 668 (1978).

The Defendant's attempts to factually establish vindictiveness only prove the reasonableness of the government's actions—demonstrating that the government's charging decision was not exclusively cooperation driven,[6] the offers for cooperation were made during plea bargaining,[7] probable cause existed for the charged offense,[8] the government lacked a prosecutorial

---

[5] R. 221-1: Memorandum in Support at 1688 ("Such actions can be seen as nothing other than vindictive, punishing Mr. Waide for refusing to cooperate with the government in the prosecution of the co-defendants.").

[6] R. 221-6: Exhibit (Email, dated August 21, 2025) at 1723 ("I cannot say he would never be charged…").

[7] R. 221-6: Exhibit (Email, dated August 21, 2025) at 1723 ("Waide's best chance at avoiding charges…").

[8] R. 221-5: Exhibit (Text Messages, dated September 29, 2023) at 1721 ("We gonna five Fred [Waide prob 100 each…he was talkin bou a band but either way it was 250 each from the 4 of us.").

stake in the Defendant's cooperation,[9] and the Defendant did not assert a protected right in the time period between the Indictment and Superseding Indictment.[10]

Because Waide's motion is facially insufficient, the United States is not obligated to explain the catalyst for the Superseding Indictment. Allowing a glimpse into protected work product or *Jencks* materials after such an empty showing would encourage frivolous vindictive prosecution motions in future cases and, worse, would endanger the government's witnesses in this case. *See e.g., United States v. Heidecke,* 900 F.2d 1155, 1159 (7th Cir.1990) (discussing use of vindictive prosecution claims as an abusive discovery tactic).

Having failed to make a prima facie showing of vindictiveness, the Defendant is certainly not entitled to dismissal.

## **RELEVANT FACTS AND PROCEDURAL HISTORY**

Kristopher Lewis died by homicide on September 29, 2023.[11] As discussed in greater detail elsewhere in the record, a joint investigation by Lexington Police Department ("LPD") and FBI indicates that Rollie Lamar ("Lamar") paid William Dixon ("Dixon"), Daquis Sharp ("Sharp"), Jatiece Parks ("Parks"), and Desmond Bellomy ("Bellomy")—each members of the Hot Boyz gang—to murder Lewis to prevent his testimony at Lamar's trial;[12] Deangalo Boone ("Boone") acted as a communication and payment intermediary; Casey Morris ("Morris") provided assistance

---

[9] R. 221-6: Exhibit (Email, dated August 21, 2025) at 1723 ("I do not think that we actually need Waide to testify against anyone in the Lewis case.").

[10] The Defendant's motion fails to discuss any pertinent facts that occurred between October 2, 2025, and November 6, 2025. As discussed in greater detail below, the Defendant, through counsel, and the United States did not communicate at all during that time period regarding this case.

[11] *See* R. 72: SA Robison, TR (Boone Det. Hrg.) at 317-19.

[12] *See e.g., Id.* at 300.

to the Hot Boyz assailants by allowing them to use her vehicle for surveillance;[13] and Waide, who also goes by "Freddy," helped the Hot Boyz assailants dump the murder vehicle and transfer into a "clean" vehicle.[14] Historical cell site information places Waide near the assailants in the early morning hours of September 29, 2023, as well as near the dump site for the murder vehicle.[15] Text messages show that the shooters paid Waide after the murder.[16]

On August 14, 2024, an LPD detective interviewed Waide.[17] Following a rights advisement,[18] Waide agreed to talk.[19] The detective advised Waide that his name came up in the investigation of Lewis's murder because of his involvement with the suspects.[20] The detective said: "I'm hoping you can just explain why there was communication with them and we can eliminate you."[21] Waide denied involvement with the Hot Boyz, despite recent pictures of Waide with the other Hot Boyz in which they held up gang signs, claiming that the Hot Boyz were merely his family.[22] After discussing the likelihood of federal charges,[23] the detective said: "I don't think that you killed anybody, but you may have played a part in it, and the only way for you to help eliminate

---

[13] *See e.g., Id.* at 342-45.

[14] *See e.g.,* R. 221-4: Exhibit (Tr. of Det. Hrg. in Case No. 25-CR-73) at 1708; R. 221-5: Exhibit (Text Messages, dated September 29, 2023) at 1721.

[15] *See* R. 221-4: Exhibit (Tr. of Det. Hrg. in Case No. 25-CR-73) at 1708.

[16] R. 221-5: Exhibit (Text Messages, September 29, 2023) at 1721.

[17] R. 224: Conventional Filing (Interview, August 14, 2024).

[18] *Id.* at 9:32:24 – 9:32:41 (time displayed at upper righthand corner of video, not time displayed on playback bar).

[19] *Id.* at 9:32:40.

[20] *Id.* at 9:32:48 – 9:33:14.

[21] *Id.* at 9:33:08 – 9:33:14.

[22] *Id.* at 9:33:40 – 9:34:27.

[23] *Id.* at 9:34:56 – 9:35:05; 9:34:47 – 9:34:52. *See also See* R. 221-4: Exhibit (Tr. of Det. Hrg. in Case No. 25-CR-73) at 1698-99 (discussing hand signs displayed in pictures discussed during interview).

4

yourself is to tell me why you came up in this."[24] LPD eventually told Waide that text messages showed that Waide received payment from the shooters on the day of the murder and that payment for his involvement made him complicit to murder.[25] Waide then asked for an attorney.[26] The detective encouraged Waide to speak to his attorney prior to being indicted.[27]

In September 2024, the United States sent Waide a target letter, stating: "FBI is investigating allegations that you assisted in a homicide that occurred in Lexington, Kentucky in Fall 2023 and that you received financial compensation for your assistance with the homicide."[28] The letter continues: "[t]he grand jury will soon meet to determine whether, and if so which, federal charges will be brought against you,"[29] and "[t]his letter constitutes an invitation to obtain an attorney and to meet with federal prosecutors to discuss a potential pre-indictment resolution of the potential charges against you…"[30] Waide failed to respond.

In April 2025, LPD obtained a search warrant for Waide's phone seeking evidence relating to Lewis's homicide as well as a shooting that occurred in October 2024.[31] While attempting to execute the warrant, LPD and RPD encountered Waide outside of his residence, an apartment located on Willow Drive in Richmond, Kentucky.[32] An RPD detective approached Waide and

---

[24] *Id.* at 9:35:09 – 9:35:17.

[25] *Id.* at 9:35:18 – 9:36:14.

[26] *Id.* at 9:36:16 – 9:36:17.

[27] *Id.* at 9:36:22 – 9:36:52.

[28] R. 222-2: Exhibit (Target Ltr.) at 1690.

[29] *See Id.*

[30] *See Id.*

[31] See *United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 35 (Plea Agr.) at 226.

[32] *See Id.*

announced himself, prompting Waide to flee inside of his apartment.[33] When Waide fled, he reached for his waistband and appeared to be holding something heavy as he ran, consistent with someone carrying a firearm.[34] Law enforcement attempted to call out the occupants of the residence.[35] Waide and his girlfriend exited the residence after approximately twenty-five minutes.[36] When law enforcement later searched the residence, they located a firearm and various types of ammunition.[37] Law enforcement also located Waide's phone, which had been factory reset.[38]

Ballistics matching indicated that the firearm located at Waide's residence was one of the firearms used in the October 2024 shooting.[39] One of the vehicles involved in that incident was registered to Waide's aunt.[40] Within that vehicle, law enforcement found medical paperwork and employment paperwork with Waide's name on it.[41] The medical paperwork appeared to be historical, referencing appointments since October 8, 2024, but the employment paperwork was forward-looking, telling Waide to report to a certain location on November 4th.[42]

---

[33] *See Id.*

[34] *See Id.*

[35] *See Id.*

[36] *See Id.*

[37] *See Id.*

[38] *See Id.*

[39] *See Id.* at 226-27.

[40] *See Id.* at 227.

[41] *See Id.*

[42] *See Id.*

Local authorities initially charged Waide with fleeing/evading. Following this arrest, LPD and FBI again met with Waide.[43] Following a rights advisement,[44] law enforcement discussed Waide's connection to the Lewis murder[45] and encouraged him to respond to the target letter through his attorney prior to the government charging the Lewis homicide.[46] Law enforcement also correctly informed Waide of the penalties for murder for hire and the murder of a federal witness,[47] also correctly noting the administration's increased focus on the death penalty.[48] Law enforcement did not ask Waide any substantive questions.[49] Waide's statements were limited to nodding his head,[50] one inaudible statement about his fleeing/evading conduct,[51] and once saying that he wanted to talk to his mother.[52]

The United States later charged Waide with a violation of 18 U.S.C. § 922(g)(9), possession of a firearm by an individual with a conviction for a misdemeanor crime of domestic violence.[53]

---

[43] R. 224: Conventional Filing (April 24, 2025, Interview).

[44] *Id.* at 15:52:03 – 15:52:23.

[45] *Id.* at 15:54:58 – 15:55:49.

[46] *Id.* at 15:55:49 – 15:54:17.

[47] *Id.* at 15:54:16 – 15:54:33; 15:56:12 – 15:57:01.

[48] *Id.* at 15:56:12 – 15:57:01. *See e.g.,* Chiara Eisner, *Trump's executive order resumes executions, after Biden dialed them back*, NPR, Jan. 21, 2025, https://www.npr.org/2025/01/21/g-s1-44120/trump-executive-order-executions-resumed-immigrants ("Trump's order calls on the U.S. Attorney General to seek the death penalty in future cases 'for all crimes of a severity demanding its use.'").

[49] *See Id.* at 15:53:59 – 15:54:03.

[50] *See Id.* at 15:52:24.

[51] *See Id.* at 15:53:17 – 15:53:20.

[52] *See Id.* at 15:53:52 – 15:53:54.

[53] *See United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 1 (Complaint); R. 10 (Indictment).

The indictment charged Waide with illegally possessing the firearm from October 26, 2024, through April 24, 2025.[54] That prosecution is hereafter referred to as "the firearm case."

The Court held a detention hearing in the firearm case on May 27, 2025, in which the United States presented evidence of Waide's involvement in the homicide.[55] The United States noted in that hearing that it planned to charge Waide for his role in Lewis's homicide.[56] United States Magistrate Judge Matthew A. Stinnett ("Judge Stinnett") issued a written opinion, stating in relevant part:

> And although the United States has not proven Waide's direct involvement in the murder of Lewis, the United States proved that suspects in the Lewis murder were texting about paying Waide later that day and that Waide's cell phone was in the vicinity of the abandoned vehicle that was used as the getaway vehicle from the murder.

See *United States v. Waide*, No. 5:25-MJ-5253-MAS, 2025 U.S. Dist. LEXIS 105636, at *11 (E.D. Ky. June 4, 2025).[57]

On July 21, 2025, the United States provided a proposed plea to Waide in the firearm case.[58] On July 29, 2025, the United States tendered another proposed plea incorporating several changes requested by defense counsel.[59]

Between August 19, 2025, and August 21, 2025, counsel communicated about Waide's plans to plead guilty or proceed to trial in the firearm case.[60]

---

[54] *See United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 10 (Indictment).

[55] R. 221-4: Exhibit (Tr. of Det. Hrg. in Case No. 25-CR-73) at 1705-08.

[56] *See Id.* at 1718 ("Charges are forthcoming on that, and we haven't even charged him yet, but we're going to…").

[57] *See United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 9 (Op./Order) at 31.

[58] *See* Email, dated July 21, 2025, attached hereto as Exhibit 1.

[59] *See* Email Chain, dated July 28-29, 2025, attached hereto as Exhibit 2.

[60] *See* Email Chain, dated August 19, 2025, attached hereto as Exhibit 3.

On August 21, 2025, the United States sent defense counsel an email to "remind Waide about the proffer opportunity."[61] This email is hereafter referred to as "the August 2025 email." In the email, the undersigned said: "I do not think that we actually need Waide to testify against anyone in the Lewis case."[62]

As for Waide's liability for his role in Lewis's homicide, the undersigned then stated: "Waide's *best chance* at avoiding charges in the Lewis homicide or any future Hot Boyz case would be to sit down with us and tell us exactly what he was asked to do. *If* he can credibly persuade us that he did not know what he was assisting with (preferably with some corroboration), we would *likely* not charge him in the Lewis case."[63] The email continued: "I cannot say that he would *never* be charged. If one of the other Hot Boyz flips and points us to concrete evidence that Waide knew that he abetted a murder-for-hire (or that he assisted one of the Hot Boyz' other crimes), we would have to reconsider."[64]

As to Waide's pending firearm case, the undersigned stated: "Given Waide's low guideline range, if he was honest with us during a proffer, I think I could likely persuade my management to recommending a time-served sentence, especially if he stays in custody on 9/8."[65]

On September 3, 2025, the undersigned emailed defense counsel to request a status update on Waide's guilty plea.[66]

---

[61] R. 221-6: Exhibit (Email, dated August 21, 2025) at 1723.

[62] *See Id.*

[63] *See Id.* (emphasis added).

[64] *See Id.* (emphasis original).

[65] *See Id.*

[66] *See* Email, dated September 3, 2025, attached hereto as Exhibit 4.

On September 4, 2025, the undersigned emailed defense counsel about a message that had been conveyed to Waide to keep his mouth shut.[67] This email is hereafter referred to as the "September 2025 email." This email again confirmed that the United States did not need Waide to be a witness in the Lewis case and that the proffer was "almost exclusively to his benefit (with some time-saving benefit to [the United States] if [the government] can avoid charging him with a homicide-related offense)."[68] The undersigned learned later that day that, far from being victimized by the keep-your-mouth-shut message, Waide helped deliver a message from Daquis Sharp to Jatiece Parks and agreed to a three-way call with Sharp.[69]

On September 4, 2025, the undersigned emailed counsel these jail communications as well as other items of evidence.[70]

On September 5, 2025, Waide signed his plea agreement.[71] The factual basis described, among other things, the events that led to law enforcement finding Waide in possession of a firearm on April 24, 2025;[72] the ballistic matching of that firearm to one used in the October 2024 shooting;[73] and the evidence connecting Waide to the October 2024 shooting.[74] The Defendant admitted those facts.[75] The plea agreement contemplated credit for acceptance of responsibility

---

[67] *See* Email, dated September 4, 2025, attached hereto as Exhibit 5.

[68] *See Id.*

[69] See *United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 43: Response at 291-92 (discussing communications between Taiss Sharp and Waide); R. 43-5: Exhibit (text communications between Sharp and Waide). *See* Email, dated September 4, 2025, attached hereto as Exhibit 5.

[70] *See* Email Previews, dated September 4, 2025, attached hereto as Exhibit 6.

[71] See *United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 35: Plea Agr. at 233.

[72] *See Id.* at 226.

[73] *See Id.* at 226-27.

[74] *See Id.* at 227.

[75] *See Id.* at 226.

under USSG § 3E1.1.[76] However, the plea agreement stated that the parties had no agreement on the application of the obstruction-of-justice enhancement under USSG § 3C1.1 (relating to Waide wiping his phone).[77] On September 8, 2025, the Court accepted Waide's guilty plea.[78]

On September 19, 2025, Waide's counsel and the undersigned communicated about safety concerns regarding Waide's transfer to another detention center.[79] There was no further communication about Waide between his counsel and the United States until after the Superseding Indictment in November 2025.[80]

On October 2, 2025, a federal grand jury returned an indictment against Lamar, Dixon, Sharp, Parks, Bellomy, and Boone for violations of 18 U.S.C. § 1512(a), tampering with a witness through killing; 18 U.S.C. § 1958, murder for hire; and 18 U.S.C. § 924(o), conspiracy to use a firearm in a crime of violence.[81] The penalties for the murder-for-hire and murder-of-witness charges are death or life imprisonment.[82]

On November 6, 2025, a federal grand jury returned a superseding indictment, adding Morris to the murder-for-fire and conspiracy-to-use-a-firearm charges and adding an accessory-after-the-fact charge for Waide.[83] Between October 2, 2025—the date of the initial indictment for

---

[76] *See Id.* at 228.

[77] *See Id.*

[78] See *United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 36: Minute Entry.

[79] *See* Email Chain, dated September 19, 2025, attached hereto as Exhibit 7.

[80] *See* Email Preview, date range September 2025 through November 2025, attached hereto as Exhibit 8. The emails in October 2025 related to another case, *United States v. Josh Lee Knittel.*

[81] *See* R. 1: Indictment.

[82] *See Id.* at 100.

[83] *See* R. 86: Superseding Indictment.

Lewis's homicide—and  November 6, 2025—the date of the superseding indictment—Waide did not exercise any protected right.[84]

Waide filed a sentencing memorandum in his firearm case on January 9, 2026, describing the "defensible" nature of the case and stating "Quincino's decision to enter a plea in this matter rested on one consideration – the sentencing implications should he lose at trial."[85]

On January 12, 2026, the United States filed its own sentencing memorandum, in part reminding the Court of the information that the Defendant admitted to in his plea agreement, as well as other aggravating information.[86] Although the United States strongly contested the defense sentencing memorandum, the United States did not seek an above-guideline sentence or ask to Court to decline acceptance credit.

On January 13, 2026, the Court held a sentencing hearing on Waide's firearm case. At the hearing, counsel again walked back admissions made in Waide's plea agreement.[87] Despite this, the United States did not ask the Court to reconsider Waide's acceptance credit. The Court sentenced Waide to fifteen months, one month shy of the top of his guideline range after acceptance credit.[88]

---

[84] *See* Email Preview, date range September 2025 through November 2025, attached hereto as Exhibit 8; Firearm Case Docket Sheet, attached hereto as Exhibit 9.

[85] *See United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 40-1: Memo in Support at 259.

[86] See *United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 43: Response.

[87] See *United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 48: TR (Sentencing) at 322-23 (claiming "alleged" involvement of Waide in the October 2024 shooting, that "there's never been any proof put on for Your Honor in particular" as to that shooting, and that the instant offense was limited to Waide's possession of the firearm in April 2025);  331-32 (claiming evidence of Waide's involvement in the October 2024 shooting was limited to an eyewitness seeing a black male with dreadlocks); and 334-35 (stating that Waide only pleaded guilty to avoid a higher sentence at trial).

[88] *See United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 46 (Judgment).

## LEGAL STANDARD

Although prosecutors enjoy broad discretion in determining the extent of societal interest in a prosecution, *United States v. Goodwin*, 457 U.S. 368, 381-82 (1982), this discretion is not "unfettered." *See United States v. Ladeau*, 734 F.3d 561, 566 (6th Cir. 2013) (citing *Bragan v. Poindexter*, 249 F.3d 476, 481 (6th Cir. 2001). The Due Process Clause prohibits vindictive prosecution. *See Ladeau*, 734 F. 3d at 566. "A prosecutor vindictively prosecutes a person when he or she acts to deter the exercise of a protected right by the person prosecuted." *United States v. Anderson*, 923 F.2d 450, 453-54 (6th Cir. 1991).

"[B]ecause of the broad discretion given to prosecutors in performing their duties, the defendant's burden to show vindictive prosecution is a heavy one." *United States v. Eichorn*, No. 25-cr-117 (ECT/SGE), 2025 U.S. Dist. LEXIS 274301, at *16-17 (D. Minn. Nov. 26, 2025) (cleaned up) (quoting *United States v. Williams*, 793 F.3d 957, 963 (8th Cir. 2015)).

A defendant may establish vindictive prosecution through evidence of actual vindictiveness or through facts that establish "a realistic likelihood of vindictiveness." *Ladeau*, 734 F.3d at 566.

A defendant establishes actual vindictiveness with "objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights." *See Id.* "Stated another way, the defendant must show that (1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charge by another with animus such that the prosecutor could be considered a 'stalking horse,' and (2) the defendant would not have been prosecuted except for the animus." *United States v. Priest*, No. 10-20197, 2010 U.S. Dist. LEXIS 96804, at *9 (E.D. Mich. Sep. 16, 2010) (citing *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000)). "Attempting to show actual vindictiveness has been characterized as exceedingly difficult and an onerous burden." *United States v. Dupree*, 323 F.3d 480, 489 (6th Cir. 2003)

13

(cleaned up). *See also United States v. Lewis,* No. 3:21-cr-00021-GFVT, 2024 U.S. Dist. LEXIS 104400, at *7 (E.D. Ky. June 12, 2024).

Short of actual vindictiveness, a defendant may establish "a realistic likelihood of vindictiveness" or "presumptive vindictiveness." *See United States v. Zakhari*, 85 F.4th 367, 379 (6th Cir. 2023). *See also Williams,* 793 F.3d at 963 ("a defendant may, in *rare* instances, rely upon a presumption of vindictiveness, if he provides sufficient evidence to show a reasonable likelihood of vindictiveness exists."). Courts assess presumptive vindictiveness using a reasonable person standard, not the defendant's subjective impressions. *See Zakhari*, 85 F.4th at 379.

To assess whether a realistic likelihood of vindictiveness exists, "a court must weigh two factors: (1) the prosecutor's stake in preventing the assertion of the protected right and (2) the reasonableness of the prosecutor's actions." *See Zakhari*, 85 F.4th at 379. The first factor assumes that the defendant asserted a protected right; the absence of such an asserted right automatically bars a vindictive prosecution claim. *See Young*, 231 F. Supp. at 123.

Courts view pretrial and post-trial presumptive vindictiveness claims differently. *See Goodwin*, 457 U.S. at 381. "There is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting," because "[a]t this stage in the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized." *See Id*. Conversely, "once a trial begins -- and certainly by the time a conviction has been obtained -- it is much more likely that the State has discovered and assessed all of the information against an accused…" *See Id*. "Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision." *Id.*

Although "each situation will necessarily turn on its own facts," *Ladeau,* F.3d at 567, the "prosecutorial stake" analysis hinges on whether a prosecutor has a stake in preventing or deterring the Defendant's exercise of his rights. *See Id.* at 566. "When the prosecution is forced to do over what it thought it had already done correctly, or where duplicative expenditures of prosecutorial resources are required...the prosecution's stake in discouraging the defendant's exercise of a right may be considerable." *United States v. Baker*, Civil Action No. 6:21-CR-032-CHB, 2022 U.S. Dist. LEXIS 7538, at *9 (E.D. Ky. Jan. 14, 2022) (cleaned up) (citing *LaDeau*, 734 F. 3d at 569-70). In the pretrial context, prosecutorial stake arises when the exercise of the protected right causes more than just a "chore" for the prosecution. *See Ladeau*, 734 F.3d at 569. When the pretrial motion has the potential to deal a "mortal blow" to the government's case or causes the government to face a "much tougher trial," a plausible showing of "prosecutorial stake" may be found. *See LaDeau*, 734 F. 3d at 569 (mortal blow)*; Zakhari,* 85 F.4d at 382 (much tougher trial).

Reasonableness of the prosecutor's conduct is the "most salient factor." *See Zakhari ,*85 F.4d at 381. Not all prosecutorial action after the exercise of a protected right should be construed as vindictive. *See, e.g., Blackledge,* 417 U.S. at 27 ("the Due Process Clause is not offended by all possibilities of increased punishment upon retrial after appeal."). Indeed, scenarios arise in which prosecutors legitimately "uncover additional information that suggests a basis for further prosecution or realize that evidence has a broader significance." *See Zakhari,* 85 F.4d at 381 (cleaned up). The vindictive prosecution doctrine does not "prevent a prosecutor from bringing new charges as a result of changed or altered circumstances which properly bear on prosecutorial discretion." *United States v. Griffin*, 617 F.2d 1342, 1348 (9th Cir.).

An increase in charges following failed plea bargaining has been recognized as inherently reasonable. *See Bordenkircher v. Hayes*, 434 U.S. 357, 363-64 (1978). *See also Ladeau,* 734 F.3d

15

at 569 ("[T]he prosecution may legitimately threaten to bring harsher charges in order to induce a defendant into pleading guilty, despite the fact that the harsher charges, if brought, might appear to penalize a defendant for exercising his right to trial.").

"[N]umerous circuits have recognized that the Government may bring or increase charges when a Defendant refuses to cooperate." *Young*, 231 F. Supp. 3d at 122. Some courts reject the notion that a Defendant has a right to cooperate. *See Id.* at 122-23 (collecting cases). Meanwhile, "other courts that have rejected vindictiveness claims after a failure to cooperate have emphasized *Bordenkircher* [discussing the give-and-take of plea bargaining], the freedom of the Defendant to accept or reject the offer, and the fact that prosecutors had probable cause to pursue the charges." *See Id.* at 123.

If a defendant establishes presumptive vindictiveness, the government must rebut it with "objective, on-the-record explanations." *See Id.* However, courts need to guard against allowing claims of vindictive prosecution to mask abusive discovery tactics by defendants. *See Heidecke*, 900 F.2d at 1159. Moreover, the burden on the government at this stage is "minimal — any objective evidence justifying the prosecutor's actions will suffice." *United States v. Carey*, No. 25-251 (JEB), 2026 U.S. Dist. LEXIS 10144, at *22 (D.D.C. Jan. 20, 2026) (citing *United States v. Safavian*, 649 F.3d 688, 694 (2011)).

If a defendant cannot establish presumptive vindictiveness, or if a prosecutor rebuts the presumption, the defendant must establish actual vindictiveness in order to prevail on his motion. *See Bragan*, 248 F.3d at 482.

If a defendant prevails on his motion, the usual remedy for vindictive prosecution is dismissal of the tainted charge. *United States v. Andrews*, 633 F.2d 449, 455 (6th Cir. 1980) (citing *Blackledge*, 417 U.S. at 29).

16

## ARGUMENT

### I.    The Defendant has failed to establish actual vindictiveness.

To overcome the "exceedingly difficult and onerous burden" of establishing actual vindictiveness, the Defendant must provide "objective evidence" that "the prosecutor harbored genuine animus towards a defendant" and that "the defendant would not have been prosecuted except for the animus." *See Dupree*, 323 F.3d at 489 ("onerous burden" and "objective evidence"); *Priest* No. 10-20197, 2010 U.S. Dist. LEXIS 96804, at *9 (genuine animus serving as but-for cause for prosecution).

The factual record here demonstrates a complete absence of objective evidence that any prosecutor in the United States Attorney's Office ("USAO") harbors genuine animus towards the defendant. First, both law enforcement and the USAO provided Waide with multiple opportunities to help himself prior to indictment, which, if anything, demonstrates positive consideration towards a defendant. In one such offer to cooperate, the undersigned stated: "the [proffer] meeting is almost exclusively to his benefit…"[89] The Defendant's unwillingness to accept such benefits, leading to an outcome about which law enforcement and the USAO long warned the Defendant, fails to establish prosecutorial ill will. While that outcome may have fomented within Waide feelings of regret, displeasure on a defendant's part does not prove animus on his prosecutor's part.

Second, the undersigned expressed concern about possible intimidation of the Defendant,[90] and also responded promptly to the Defendant's safety concerns[91]—again showing care, not hatred, towards this defendant in the midst of his refusal to cooperate.

---

[89] *See* Email, dated September 4, 2025, attached hereto as Exhibit 5.

[90] *See Id.*

[91] Email Chain, dated September 19, 2025, attached hereto as Exhibit 7.

Third, the USAO exercised considerable restraint in the Defendant's firearm case. The undersigned did not pursue an arguable enhancement towards the Defendant in his firearm case, despite their being factual support for it.[92] The undersigned did not ask the Court for an above-guideline sentence in the firearm case, despite this Defendant's history being replete with aggravating factors.[93] In addition, the undersigned did not ask the Court to refuse acceptance credit in the firearm case following the Defendant's sentencing memorandum and defense counsel's allocution that retracted the Defendant's admission of relevant conduct,[94] although the application notes to USSG § 3E1.1 clearly allowed for such arguments.[95] These exercises of prosecutorial restraint each occurred during the same time period that the Defendant refused to cooperate. If the USAO wanted to punish the Defendant for his refusal to cooperate, surely it would have done so when given these opportunities to "up the ante." *See e.g., United States v. Forman,* 990 F. Supp.

---

[92] *See* Email Chain, dated, July 28-29, 2025, attached hereto as Exhibit 2 ("I think it's a close question as to whether he obstructed the instant offense. The phone warrant was, in part, based on the October 2024 shooting, and the October 2024 shooting is related to the instant offense…").

[93] *See e.g.,* R. 221-7: Exhibit (Tr. Of Stg.) at 1732. During the sentencing hearing in the firearm case, the Court stated: "[t]his is a case in which the government didn't ask for me to go above the guidelines, but it's one where I would have considered it for a lot of these contextual reasons."

[94] The impact of the Defendant's conduct on acceptance credit is not an observation made in hindsight. The United States' Sentencing Memorandum shows that the undersigned had already clocked the Defendant's reversal on accepting responsibility—for example, stating in the second sentence: "Waide's request for relief under § 3553 demonstrates a lack of accountability for wrongdoing…" See *United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 43: Response at 276. Similarly, at the beginning of the sentencing hearing, the undersigned stated: "And Mr. Waide has made the admissions as to that incident in his plea agreement. So I don't think…it's appropriate that we're walking that back now." *See United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 48: TR (Sentencing) at 323.

[95] *See e.g.,* USSG § 3E1.1 comment. (n.1) ("In determining whether a defendant qualifies under subsection (a), appropriate considerations include…truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under §1B1.3."). *See also* USSG § 3E1.1 comment. (n.3) ("Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under §1B1.3… will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a). However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.").

18

875, 891 (E.D. Mich. 1997) (holding that the government's retaliation must have "upped the ante" to establish vindictiveness).

Fourth, the Defendant's charge in this case demonstrates an exercise of prosecutorial discretion in the Defendant's favor. Historical cell site information shows the Defendant's location near Dixon's home and the murder-vehicle dumpsite *before* the murder.[96] Because there is no "accessory before the fact" charge under federal law, the evidence of this pre-murder involvement, combined with the evidence of the shooters' payment to Waide, provides probable cause that Waide acted as an abettor. Yet, the USAO chose, based on the information known at the time, to charge Waide with the less serious accessory-after-the-fact offense. Waide is the only participant who was not charged as a principal.[97] Again, if the USAO harbored genuine animus towards the Defendant, surely prosecutors would have seized the legitimate opportunity to charge Waide as a principal.

Finally, the Defendant cannot demonstrate that he would not have been charged otherwise, because there exists probable cause for Waide's role as both as principal and accessory.

**II.      The Defendant has failed to establish presumptive vindictiveness.**

The Defendant has failed to establish that he asserted a protected right; that the United States had a stake in his decision not to cooperate; and that the USAO acted unreasonably.

**A. The Defendant did not assert a protected right.**

   **1.   There is no freestanding right not to cooperate; and, until his request for dismissal, the Defendant never based his refusal to cooperate on his Fifth Amendment privilege.**

---

[96] *See* R. 221-4: Exhibit (Tr. of Det. Hrg. in Case No. 25-CR-73) at 1708.

[97] *See* R. 86: Superseding Indictment.

The Defendant claims that he has been vindictively prosecuted for refusing to cooperate. However, "several cases have held that a defendant has no legal right not to cooperate." *See Young*, 231 F. Supp. 3d at 122-23 (collecting cases).

In *Roberts v. United States*, 445 U.S. 552 (1980), the Supreme Court determined that a court may consider a defendant's refusal to cooperate at sentencing. "The Court found that, far from having a right not to cooperate, every citizen has a *duty* to cooperate and report criminal activity, a duty grounded in the responsibilities of community life." *United States v. Long*, 823 F.2d 1209, 1211 (7th Cir. 1987) (citing *Roberts*, 445 U.S. at 558).

In *United States v. Long,* the Seventh Circuit applied Roberts to a vindictive prosecution claim, noting: "*Roberts* says that the government may penalize such a refusal [to cooperate], and so under *Goodwin* and *Bordenkircher* there is no due process violation." *Long*, 823 F.2d at 1211.

The Ninth Circuit has similarly held that "[t]here is no constitutional right not to 'snitch.'" *See United States v. Paguio*, 114 F.3d 928, 930 (9th Cir. 1997).

In *United States v. Goff*, 400 F. App'x 1 (6th Cir. 2010), the defendant refused to cooperate or testify before the grand jury. The Sixth Circuit held that "Goff's vindictive-prosecution claim fails because he cannot demonstrate that he was exercising a protected right by refusing to testify before the grand jury." *See Goff*, 400 F. App'x at 23. To the extent the right to refuse cooperation was grounded in the Fifth Amendment privilege, Goff had been granted immunity, so his refusal to testify was not protected by the Fifth Amendment.[98] *See Id.* However, Goff also asserted "a

---

[98] A proffer would have provided the Defendant direct-use immunity for his non-compelled statements. Because "[t]he Fifth Amendment privilege against self-incrimination is grounded on a reasonable fear of danger of prosecution," and because direct-use immunity prevents the government from using a defendant's words against him, the voluntary proffer opportunity presented a diminished danger of prosecution. *See e.g., Goff*, 400 F. App'x at 24.

constitutional right not to testify against others, but provided no legal basis for such a right." *Goff*, 400 F. App'x at 24 (cleaned up). The court explicitly rejected that the government acted vindictively by prosecuting the defendant based on his general refusal to cooperate with authorities. *See Id.*

The two cases cited by the Defendant are not controlling and wholly inapposite to vindictive prosecution. *Florida v. Bostick*, 501 U.S. 429 (1991), was limited to the use of a refusal to cooperate as the sole basis for probable cause for the seizure of one's person. *See Bostik*, 501 U.S. at 437. The Ninth Circuit's opinion in *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981), relating to a confession coerced by a false statement that the defendant would lose her child if she did not cooperate, contained dicta in a footnote, stating that "refusal to cooperate is every defendant's right." *See Tingle*, 658 F.2d at 1336 n.5. Since then, however, the Ninth Circuit has stated that there is no constitutional right to not snitch. *See Paguio*, 114 F.3d at 930.

In *Ellis v. Hartsuck,* the Arizona District Court was forced to square *Tingle*'s dicta to the Supreme Court's ruling in *Roberts*, stating that there was no Supreme Court authority recognizing a freestanding right to refuse cooperation and that "*Roberts* clearly requires the invocation of the right to remain silent before a suspect may assert a right to refuse to cooperate with government officials." *Ellis v. Hartsuck*, No. CV-11-0297-PHX-JAT (JFM), 2012 U.S. Dist. LEXIS 86609, at *32 (D. Ariz. Apr. 6, 2012).

*Roberts* suggests that any "right not to cooperate" is limited to the Fifth Amendment privilege. *See Roberts*, 445 U.S. at 558 ("Unless [a defendant's] silence is protected by the privilege against self-incrimination…the criminal defendant no less than any other citizen is obliged to assist the authorities."). *See also United States v. Bullard,* 37 F.3d 765, 769 (1st Cir. 1994) (holding that the constitutional right to silence does not cover other refusals to cooperate).

21

The *Roberts* court held that the Fifth Amendment privilege is not self-executing; rather, it must be asserted. *See Roberts*, 445 U.S. at 559. *See also Salinas v. Texas,* 570 U.S. 178, 181 (2013) ("Although no ritualistic formula is necessary in order to invoke the privilege…a witness does not do so by simply standing mute.").

Until his Motion to Dismiss, Waide never asserted his Fifth Amendment privilege as the basis for his non-cooperation. When law enforcement first interviewed Waide in August 2024, he agreed to speak following a rights advisement;[99] lied;[100] and then asked for an attorney.[101] When law enforcement interviewed Waide in April 2025, he nodded that he understood his rights;[102] he provided an inaudible response about running inside his apartment;[103] and said that he wanted to talk to his mother when asked about the target letter.[104]

When the USAO proposed cooperation to the Defendant, he never claimed that he was refusing to cooperate based on his Fifth Amendment privilege. The only consideration articulated against cooperation has been danger (discussed verbally between counsel following the detention hearing and rearraignment in the firearm case).[105] However, an assertion of fear does not equate to the assertion of a protected right that can create a presumption of vindictiveness. *See e.g., Roberts,* (discussing separately the Fifth Amendment privilege and fears of physical safety, discounting

---

[99] R. 224: Conventional Filing (Interview, August 14, 2024) at 9:32:24 – 9:32:41.

[100] *See Id.* at 9:34:56 – 9:35:05; 9:34:47 – 9:34:52.

[101] *Id.* at 9:36:16 – 9:36:17.

[102] R. 224: Conventional Filing (April 24, 2025, Interview) at 15:52:24.

[103] *See Id.* at 15:53:17 – 15:53:20.

[104] *See Id.* at 15:53:52 – 15:53:54.

[105] The USAO does not have proof of these conversations. However, the August 2025 email (R. 221-6), the September 2025 email (Exhibit 5), and the email correspondence on September 19, 2025 (Exhibit 7), each allude to the danger of cooperation, corroborating the occurrence of these conversations.

both); *Williams,* 47 F.3d at 660, 665 (finding no vindictiveness when charges increased following defendant's refusal to cooperate based on fear); *Long,* 823 F.2d at 1210, 1212 (same). Moreover, because Waide has made statements about being "team us [Hot Boyz] forever"[106] and has assisted with passing messages between murder suspects,[107] Waide's refusal to cooperate is most likely rooted in a desire to protect his friends, which *Roberts* held was not a protected right.

Just like the Defendant in *Roberts*, whose Fifth Amendment concerns were discounted by the Supreme Court, this Defendant's refusal to cooperate came after an initial uncoerced waiver of rights;[108] the Defendant has been represented by counsel since May 2025,[109] and has been fully apprised of how cooperation could positively impact his outcome;[110] prior to his motion to dismiss, the Defendant nor his counsel ever asserted his Fifth Amendment rights as the basis for his refusal to cooperate;[111] the Defendant has failed to identify anything that might have impaired his free choice to cooperate (or not); and "[h]is conduct bears no resemblance to the insolubly ambiguous postarrest silence that may be induced by the assurances contained in *Miranda* warnings." *See Roberts*, 445 U.S. at 561.

---

[106] See *United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 43-3: Exhibit (Messages between Waide and Taiss Sharp) at 301 ("Yea I'm straight yall kno I can handle myself and I have been team us forever.").

[107] *See United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 43 at 291-92 (discussing communications between Taiss Sharp and Waide); R. 43-5 (text communications between Sharp and Waide).

[108] *See* R. 224: Conventional Filing (Interview, August 14, 2024).

[109] *See e.g.,* Firearm Case Docket Sheet, attached hereto as Exhibit 9.

[110] *See e.g.,* R. 221-6: Exhibit (Email, dated August 21, 2025) at 1723; Email, dated September 4, 2025, attached hereto as Exhibit 5.

[111] *See e.g.,* R. 224: Conventional Filing (Interview, August 14, 2024); R. 224: Conventional Filing (April 24, 2025, Interview); Email Previews, date range September 2025 through November 2025, attached hereto as Exhibit 8.

**2.   The Defendant did not assert a protected right during the relevant time period.**

Assuming *arguendo* that Waide's refusal to cooperate was based on his Fifth Amendment privilege, Waide did not assert this right between the Indictment returned on October 2, 2025, and the Superseding Indictment returned on November 6, 2025. Waide's motion claims that Waide had been refusing to cooperate since August 2024. If the Defendant's accessory-after-the-fact charge was solely retaliation for the refusal to cooperate, which purportedly existed since August 2024, the Defendant fails to explain why this retaliatory action failed to manifest at the time of the first indictment. *See e.g., United States v. Goff,* 400 F. App'x 1, 24 (6th Cir. 2010) ("If the Government truly was retaliating against him for refusing to testify, it seems more likely that he would have been charged in the first indictment, just months after his refusal.").

Waide also relies heavily on the undersigned's August 2025 email that reminded his counsel of the proffer opportunity. That email was not answered. Assuming that defense counsel's failure to respond to the August 2025 email, or Waide's failure to express a positive interest in cooperation at his rearraignment on September 8, 2025, could constitute Waide's exercise of a protected right, any vindictive motive by the United States existed at the time of the initial indictment.

Between October 2, 2025, and November 6, 2025, there was no communication between Waide's counsel and the United States regarding this case.[112] In addition to this silence failing to establish the assertion of Waide's Fifth Amendment privilege, this lack of communication also means that nothing changed regarding any purported assertion of rights by the Defendant within the relevant time period. The circumstances of non-cooperation that existed at the time of the Superseding Indictment were the same as those at the time of the Indictment. Yet, the Defendant

---

[112] *See* Email Previews, date range September 2025 through November 2025, attached hereto as Exhibit 8.

nonsensically claims that the Defendant's non-cooperation served as the catalyst for his charges in the Superseding Indictment.

### 3. The Defendant's Fifth Amendment privilege does not protect obstruction or criminal activity.

The Defendant's motion paints him as someone who *merely* refused to cooperate and faced undeserved consequences as a result, but the Defendant's conduct was not merely uncooperative, it was obstructive and, at times, criminal. The United States knew about this activity in advance of the Indictment, limiting its relevance to the timing of Waide's charge. However, this obstructive activity, like his other criminal activity, contradicts the Defendant's portrayal that he innocently cloaked himself with the protection of the Constitution beginning in August 2024, doing nothing else to attract the attention of law enforcement.

The Defendant complains about receiving a target letter, having his phone be the subject of a search warrant, receiving a federal firearm charge, and being charged in this case.[113] Yet, all of these actions were supported by evidence that Waide violated the law. First, the target letter reasonably noted that FBI had been investigating Waide's assistance to a homicide;[114] the search warrant, which was not challenged by Waide in his firearm case, laid out probable cause based on Waide's involvement in Lewis's homicide as well as the October 2024 shooting;[115] Waide admitted

---

[113] *See* R. 221-1: Memorandum in Support at 1688 ("Since declining to speak during the August 14 interview, Mr. Waide has been served a formal target letter; been subjected to a search of his girlfriend's residence and subsequent interrogation; was federally indicted for possession of a firearm; and is now being charged as an accessory to the murder of Kristopher Lewis.")

[114] R. 222-2: Exhibit (Target Ltr.) at 1690. The letter invited the Defendant to obtain an attorney and to proffer with the government prior to a grand jury's decision, imposing no deprivation of life, liberty, or property.

[115] Waide obstructed this search effort by wiping his phone. *See e.g., United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 35 (Plea Agr.) at 233 ("On April 24, 2025, Lexington Police Department ("LPD'") with the assistance of Richmond Police Department ("RPD") sought to serve a search warrant for the cell phone of Quincino Waide, Jr. ("Waide" or "Defendant") relating to Waide's suspected involvement in a shooting in October 2024 ("the October 2024 shooting") and a homicide that occurred in September 2023….Waide fled… Law enforcement also located Waide's phone, which had been factory reset.").

to the firearm charge;[116] and, as described in greater detail below, Waide's charge here is supported by ample probable cause.[117]

### B. The USAO did not have a prosecutorial stake in the Defendant's decision not to cooperate.

The pretrial exercise of a right must be more than a "chore" for the prosecution to create an inference of prosecutorial stake. *See LaDeau*, 734 F. 3d at 569. Rather, prosecutorial stake exists where the exercise of the right has the potential to inflict a "mortal blow" on the prosecution's case or creates "duplicative expenditures of prosecutorial resources." *See Id.* at 569-70.

Correspondence from the United States twice states that Waide's testimony in the Lewis case would not be required.[118] One of those two emails stated that a proffer was "almost exclusively to [Waide's] benefit (with some time-saving benefit to [the United States] if [the government] can avoid charging [Waide] with a homicide-related offense)."[119]

The fact that the United States indicted six defendants for Lewis's murder despite Waide's lack of cooperation corroborates Waide's lack of importance as a prospective cooperator.[120] Likewise, the large volume of evidence described elsewhere in the record[121]—evidence that in no way depends on Waide's cooperation—demonstrates that these emailed statements were not posturing; the government does not need Waide as witness.[122]

---

[116] See *United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 35 (Plea Agr.).

[117] *See* Section C.1 *infra*.

[118] R. 221-6: Exhibit (Email, dated August 21, 2025) at 1723; Email, dated September 4, 2025, attached hereto as Exhibit 5.

[119] *See* Email, dated September 4, 2025, attached hereto as Exhibit 5.

[120] *See* R. 1: Indictment.

[121] *See e.g.,* R. 72: TR (Boone Det. Hrg.); R. 160: TR (Morris Det. Hrg.); R. 196: TR (Morris Det. Hrg.)

[122] The discovery produced to date exceeds 40,000 pages according to the United States' bates stamps, further demonstrating that this is not a thin case without Waide's cooperation.

Because Waide's refusal to cooperate had no impact on the government's ability to prove Lewis's homicide, the only "burden" to the government was adding charges against one additional defendant (Waide) in a case that already charged six defendants with capital offenses—an outcome that the government advised could happen regardless of cooperation. This "chore" of preparing a charging document and litigating against a defendant occurs in literally every criminal prosecution—so perfunctory and elemental that its avoidance cannot reasonably be said to cause the government to punish a defendant.[123]

### C. The USAO's actions were reasonable.

Reasonableness is the "most salient factor" in the analysis of presumed vindictiveness. *See Zakhari,* 85 F.4d at 381. The USAO's actions both here and in the firearm case have been reasonable.

### 1. The Defendant's charge is supported by probable cause.

"[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher*, 434 U.S. at 364. *See also United States v. Suarez*, 263 F.3d 468, 481 (6th Cir. 2001) (affirming that *Bordenkircher* remains the standard for prosecutorial discretion); *United States v. Paguio,* 114 F.3d 928, 930 (9th Cir. 1997) ("The government may indict, even if its motive is to get cooperation in another case…where the government has probable cause."). "[D]iscretion is properly exercised so long as there is probable cause to believe that the defendant has committed a federal offense, and so long as the decision is not improperly 'based on a defendant's race, sex, religion, or exercise of

---

[123] Charging a defendant as punishment for being required, by virtue of the defendant's non-cooperation, to charge him is also circular and absurd.

a statutory or constitutional right.'" *United States v. Gray*, 382 F. Supp. 2d 898, 906 (E.D. Mich. 2005) (citing *United States v. Allen*, 954 F.2d 1160, 1166 (6th Cir. 1992)).

In *United States v. Boss* 652 F.2d 36 (10th Cir. 1981)*,* the Tenth Circuit considered a vindictive prosecution claim predicated on the defendant's refusal to cooperate. In addition to emphasizing the defendant's free choice to reject the government's bargain, the court addressed the presence of probable cause, holding:

> Boss apparently wanted more here than the prosecution was willing to offer for his testimony. No evidence is presented to show that Boss was not given a free choice in accepting or rejecting the prosecution's offer; *nor is there any suggestion that the prosecutor lacked probable cause to believe Boss had committed the charged crime.*
>
> What happened in this case is no different from most situations in which prosecutors seek information to convict principals in crime by offering coconspirators immunity or leniency in return for testimony. When the party refuses to cooperate, prosecution, *based upon probable cause to believe the defendant committed the crime charged*, does not present the likelihood of vindictiveness found in *Perry* and related cases.

*Id.* at 38 (emphasis added).

Prior to Waide being charged in this case, Judge Stinnett's detention opinion in the firearm case alluded to probable cause, stating: "the United States proved that suspects in the Lewis murder were texting about paying Waide later that day and that Waide's cell phone was in the vicinity of the abandoned vehicle that was used as the getaway vehicle from the murder."[124]

In November 2025, a grand jury returned an indictment against Waide,[125] providing a presumption that the charge was supported by probable cause. *See Suarez*, 263 F.3d at 481 ("Since the indictment was returned, these charges are presumed to have rested on probable cause, and thus their further prosecution is within prosecutorial discretion, absent a retaliatory motive.")

---

[124] *See United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 9 (Op./Order) at 31.

[125] *See* R. 86: Superseding Indictment.

28

In discussing Special Agent Robison's testimony and attaching the text messages showing payment to Waide,[126] Waide's motion only highlights the presence of probable cause.

Because the Defendant is "plainly subject to prosecution," *see Bordenkircher,* 434 U.S. at 365, it was not unreasonable for the United States to bring charges against him.

### 2. The USAO and Defendant engaged in failed plea bargaining; the USAO's conduct during and after plea bargaining was reasonable.

Our judicial system tolerates and encourages the negotiation of pleas, thus accepting "as constitutionally legitimate" that a "prosecutor's interest at the bargaining table is to persuade a defendant to forgo his right to plead not guilty." *See Bordenkircher*, 434 U.S. at 364. Accordingly, it is not vindictive for a prosecutor to present the defendant "with the unpleasant alternatives of forgoing trial or facing [additional] charges on which he was plainly subject to prosecution." *See Id.* at 365. *See also Ladeau,* 734 F.3d at 569 ("the prosecution may legitimately threaten to bring harsher charges in order to induce a defendant into pleading guilty"). In turn, "the Due Process Clause of the Fourteenth Amendment does not prohibit a prosecutor from carrying out a threat, made during plea negotiations…" *See Goodwin,* 457 U.S. at 377 (cleaned up). *See also Long*, 823 F.2d at 1211 (holding that it is constitutionally permissible for a defendant to suffer some relative disadvantage because he exercises a right).

"Plea bargaining rewards a defendant for waiving his right to put the prosecution to its proof; accordingly, it disadvantages (relative to the reward he could have received) a defendant who exercises his right and refuses to plea bargain." *See Id.* "[O]nly if the refusal causes the defendant to be treated worse than he would have been if no plea bargain had been offered would the result raise constitutional concerns." *See Id.*

---

[126] *See* R. 221-4: Exhibit (Tr. of Det. Hrg. in Case No. 25-CR-73); 221-5: Exhibit (Text Messages, dated September 29, 2023).

29

"[I]n the give-and-take of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." *Boss*, 652 F.2d at 38 (cleaned up).

"The right not to cooperate is certainly no more important than the right of an accused to a trial, and yet the Supreme Court has allowed prosecutors, during plea negotiations, to use the threat of a harsher indictment to pressure a defendant to plead guilty and thus waive his right to trial." *United States v. Williams*, 47 F.3d 658, 662 (4th Cir. 1995). "It follows from *Bordenkircher* and *Goodwin* that a prosecutor, in the context of plea negotiations, may threaten a defendant with a more severe prosecution and carry out those threats if the defendant refuses to cooperate..." *See Id. See also Goff*, 400 F. App'x at 24 (affirming reasonableness of additional charges following the defendant's refusal of an offer to cooperate); *Boss,* 652 F.2d at 37-38 (same); *United States v. Gardner,* 611 F.2d 770, 773 (9th Cir. 1980) (holding that the government could lawfully induce Gardener's cooperation in plea bargaining).

There is no prosecutorial vindictiveness when a defendant is fully informed of the consequences of his choices, freely decides not to cooperate, and is later indicted. *United States v. Oliver*, 787 F.2d 124, 126 (3d Cir. 1986).

The timing of the plea bargaining, before or after indictment, is irrelevant to the question of whether a prosecutor may bring or increase charges following a refusal to cooperate. *See Williams*, 47 F.3d at 663-64) (finding no vindictiveness where a prosecutor originally brought charges under state law and brought more severe federal charges following the defendant's refusal to cooperate).

30

Here, the target letter—referencing "a potential pre-indictment resolution of the potential charges"[127]—and the August 2025 email—discussing Waide's "best chance at avoiding charges"[128]—clearly connote plea bargaining.[129] As part of plea bargaining, the United States was constitutionally permitted to request Waide's cooperation, even if such cooperation entailed the waiver of a protected right. *See e.g., Williams* at 662 ("A defendant's cooperation with the police is a legitimate concession for a prosecutor to seek during plea negotiations."); *Long*, 823 F.2d at 1211 ("Plea bargaining rewards a defendant for waiving his right…[and] it disadvantages (relative to the reward he could have received) a defendant who exercises his right.").

Following Waide's failure to accept the offer to cooperate, the United States was permitted under the due process clause to carry out the threats made during plea bargaining and, as forewarned, to bring charges against Waide. *See Goodwin,* 457 U.S. at 377. *See also Williams* ("Just as a prosecutor may forego legitimate charges in an effort to obtain the defendant's cooperation, a prosecutor may seek a more severe indictment if an initial expectation that the defendant would cooperate proves unfounded.").

By the time that the purported retaliation against Waide occurred in November 2025, there is no question that, having been represented by counsel for months and being repeatedly advised of the possibility of charges, he was fully informed of the pros and cons of the offer of cooperation. *See Oliver*, 787 F.2d at 126 (finding a defendant represented by counsel to be fully informed and capable of freely deciding whether to cooperate).

---

[127] R. 222-2: Exhibit (Target Ltr.) at 1690.

[128] R. 221-6: Exhibit (Email, dated August 21, 2025) at 1723.

[129] The Defendant contends that the Defendant's refusal to cooperate—and, in turn, the government's retaliation for that refusal—began in August 2024. *See* R. 221-1: Memorandum in Support at 1688 (Since declining to speak during the August 14 interview…"). However, "as a general rule, the conduct of investigators is not imputed on the prosecutors." *See Young*, 231 F. Supp. 3d at 120.

There is also no credible allegation that Waide was unable to freely accept or reject the government's offer. While Waide cites purported coercion to cooperate from August 2024 through the Superseding Indictment, Waide's choice to refuse cooperation in the face of that purported coercion demonstrates that he maintained his freedom of choice. It is constitutionally permissible for him to now live with the consequences of that choice. *See e.g., Goodwin,* 457 U.S. at 377 (holding that the government carrying out threats fails to offend due process).

The Defendant also cannot demonstrate that he is worse off than if there had not been any bargaining. In law enforcement's first interaction with Waide, which occurred prior to plea bargaining and prior to the defendant's refusal to cooperate, the LPD detective advised Waide that law enforcement suspected his assistance to the murder, making him "complicit."[130] Law enforcement also advised Waide that "federal indictments for murder" were coming.[131] Based on the information known at the time of the Superseding Indictment, Waide was charged as an accessory-after-the-fact, not a principal. Because Waide was advised of principal liability prior to the onset of plea bargaining, could have been charged as principal, and was, in fact, charged with a less serious offense, he cannot credibly claim that he is worse off than he would have been otherwise.

### 3. The USAO's offer of cooperation is consistent with other constitutionally permissible practices.

The provision of rewards for cooperation is baked into federal sentencing. *See e.g., Roberts*, 445 U.S. at 557-58; 28 U.S.C. § 994(n); USSG § 3E1.1; USSG 5K1.1. Under that constitutionally permissible sentencing scheme, a defendant who does not cooperate receives a

---

[130] R. 224: Conventional Filing (Interview, August 14, 2024) at 9:35:18 – 9:36:14.

[131] *See Id.* at 9:34:56 – 9:35:05.

higher punishment than a defendant who cooperates. The absence of a carrot for the uncooperative defendant does not offend due process. *See, e.g. United States v. Knight*, 96 F.3d 307, 310 (8th Cir. 1996) ("[T]he district court did not penalize Knight for refusing to volunteer self-incriminating information, but instead did not give Knight a benefit extended to defendants who accept responsibility for their wrongs.").

Likewise, Waide's refusal to accept a carrot, resulting in the same treatment that he would have otherwise received, fails to offend due process. *See Long*, 823 F.2d at 1211-12 (finding that absence of a reward fails to establish worse treatment).

### 4.   The timing of the Superseding Indictment was reasonable.

Case law acknowledges that factual developments or realizations that lead to new charges may occur as late as trial preparation. *United States v. McCreary-Redd*, 628 F. Supp. 2d 764, 783 (E.D. Tenn. 2007) ("it is not unusual or unreasonable for a prosecutor to 'uncover additional information' that suggests a basis for further prosecution or realize that information possessed by the government has a 'broader significance' justifying additional charges when the prosecutor is preparing the case for trial…") (citing *Goodwin*, 457 U.S. at 381). If evidentiary realizations reasonably arise on the eve of trial, such realizations undoubtedly occur in the infancy of a complex case. Here, the government superseded a mere five weeks following the initial indictment.

### 5.   Communications from the USAO demonstrate that, though relevant, cooperation would not determine charges.

The August 2025 email shows that the government advised Waide that he could be charged regardless of cooperation, stating: "I cannot say that he would *never* be charged. If one of the other Hot Boyz flips and points us to concrete evidence that Waide knew that he abetted a murder-for-

hire (or that he assisted one of the Hot Boyz' other crimes), we would have to reconsider."[132] This email shows that cooperation (or non-cooperation) would not be the primary or exclusive basis for the USAO's charging decision. Reasonably, the evidence would be the primary consideration. If charges were possible with the benefit of cooperation, Waide cannot credibly claim that he was charged *only* because he refused cooperation.

### 6. The USAO has exercised prosecutorial restraint.

As discussed in the above section regarding actual vindictiveness, the USAO's conduct with this Defendant has been courteous and its approach to penalizing him has been conservative—demonstrating the overall reasonableness of the government's approach to prosecuting this Defendant.

### CONCLUSION

The Defendant's argument for dismissal is pregnant with absurdity. The Defendant's motion suggests that the government acts vindictively by using standard tools like suspect interviews and plea bargaining to investigate and prosecute a heinous crime. For example, according to the Defendant, it is vindictive for investigators to seek information from a suspect if they also honestly disclose to the suspect the penalties of his crime and the benefits of early cooperation. The Defendant further suggests that prosecutors should cease extending olive branches to defendants, because a prosecutor is automatically presumed vindictive if a defendant rejects an olive branch and the case then proceeds accordingly. By Waide's logic, if a defendant ever refuses to cooperate, any government action that follows, regardless of whether supported by facts and law, is presumed vindictive, meaning that any defendant can taint a prosecution merely by asserting a right. Ultimately, the Defendant complains about a prevailing practice in both

---

[132] R. 221-6: Exhibit (Email, dated August 21, 2025) at 1723.

charging and sentencing—the extension of a benefit to defendants who accept a carrot and the maintenance of the status quo for defendants who do not.

However, refusal to cooperate (via the vindictive prosecution doctrine) is not a get-out-of-jail-free card that cloaks a defendant with immunity for all past and future crimes.

To the extent that refusal to cooperate is even a right under the Fifth Amendment, that right is not self-executing; it must be explicitly asserted. The actual assertion of the right, however, still is not enough to establish vindictiveness. A defendant must show actual vindictiveness—that is, prosecutorial animus towards the defendant serving as the but-for cause for his charge—or presumed vindictiveness—established through proof of a prosecutorial stake in the assertion of the defendant's right and *unreasonable* action by the prosecutor.

Here, the Defendant failed to demonstrate that he asserted his Fifth Amendment privilege as the basis for his non-cooperation; failed to establish prosecutorial animus; failed to prove a prosecutorial stake in his non-cooperation; and failed to prove any unreasonableness associated with the government's charging decision.

"What happened in this case is no different from most situations in which prosecutors seek information to convict principals in crime by offering coconspirators immunity or leniency in return for testimony." *Boss,* 652 F.2d at 38. "When the party refuses to cooperate, prosecution, based upon probable cause to believe the defendant committed the crime charged, does not present the likelihood of vindictiveness…" *Id.*

This Defendant has failed to establish actual or presumed vindictiveness and is therefore not entitled to on-the-record explanations for his charge, discovery into work product or *Jencks* material, or dismissal. His motion should be denied.

Respectfully submitted,

JASON D. PARMAN
FIRST ASSISTANT U.S. ATTORNEY

By:    s/ Mary L. Melton
        Assistant United States Attorney
        260 W. Vine Street, Suite 300
        Lexington, Kentucky 40507-1612
        (859) 685-49802
        Mary.Melton@usdoj.gov

CERTIFICATE OF SERVICE

On March 30, 2026, I electronically filed this document through the CM/ECF system, which will send the notice of electronic filing to counsel of record.

s/Mary L. Melton
Assistant United States Attorney

36