UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION LEXINGTON

UNITED STATES OF AMERICA,

Plaintiff,

VS.

Docket No. 5:25-CR-127
At Frankfort, Kentucky
Wednesday, May 6, 2026
1:35 p.m.

QUINCINO LAMONT WAIDE, JR.,

Defendant.

\- - -

TRANSCRIPT OF MOTION HEARING PROCEEDINGS
BEFORE U.S. DISTRICT JUDGE GREGORY F. VAN TATENHOVE

\- - -

APPEARANCES:

For the United States:
MARY LAUREN MELTON
Assistant United States Attorney
260 West Vine Street
Suite 300
Lexington, Kentucky 40507-1612
(859) 685-4802

For the Defendant:
WHITNEY TRUE LAWSON
True Guarnieri Ayer, LLP
124 Clinton Street
Frankfort, Kentucky 40601
(502) 605-9900

Court Reporter:
SANDRA L. WILDER, RMR, CRR
Official Court Reporter
313 John C. Watts Federal Building
330 West Broadway, Suite 327
Frankfort, Kentucky 40601
(859) 516-4114

*Proceedings recorded by mechanical stenography, transcript produced by certified court reporter.*

*(Proceedings commenced at 1:35 p.m. in open court.)*

THE COURT: Thank you, sir.

Good afternoon, ladies and gentlemen.

Madam Clerk, would you call the pending case, please.

COURTROOM DEPUTY: Yes, Your Honor.

Lexington Criminal Action 25-CR-127, United States of America versus Quincino Lamont Waide. This matter being called for a motion hearing, Your Honor.

THE COURT: Thank you.

Counsel, state your appearances, please.

MS. MELTON: Yes, Your Honor. Good afternoon. Mary Melton on behalf of the United States.

THE COURT: Ms. Melton.

MS. LAWSON: Your Honor, Whitney Lawson on behalf of the defendant Quincino Waide, who's present and seated to my right.

THE COURT: Ms. Lawson.

Good to have you both in federal court this afternoon.

This matter is called on my docket to conduct a hearing. There's a pending motion to dismiss the indictment that has been filed by the defendant. And as is my practice, I've come into court with a few questions. Let me begin with those questions.

Both sides, I'm sure, are prepared to bring to my

attention certain points that have been made in the briefing, which from the perspective of chambers, was just really well done on both sides. We appreciate such good briefing.

So, Ms. Lawson, let me begin with you. And, you know, the Supreme Court seems to have pretty consistently upheld that in the context of plea negotiations, a prosecutor can, you know, put before the defendant a more severe prosecution, and then carry out that possibility if that bargaining is ultimately unsuccessful.

So taken to the extreme, wouldn't your position basically refute that and prevent the government from adding charges when plea bargaining's unsuccessful?

MS. LAWSON: Well, Your Honor, this is a unique factual circumstance that I, quite frankly, didn't find any case law that could be of guidance to me or Your Honor in terms of how to view this situation.

THE COURT: Making new case law's one of my favorite things.

MS. LAWSON: I love it, too, 'cause it's -- we really can't get it wrong, can we, unless they tell us we do.

THE COURT: Well, the Sixth Circuit is clear that I can get it wrong.

MS. LAWSON: Yeah, but it's always good to bring

something new to their attention.

But in the circumstance that you're talking about, Your Honor, we have -- it's clearly delineated. There has been a indictment with those defendants that have been brought, an occurrence happened in terms of the defendants -- well, sorry. An indictment has been brought -- this is your typical situation -- an indictment has been brought, the government says if you -- if your client will agree to this, we won't supersede, indict and add these charges. Right? I mean, that's the typical situation that we've seen.

You know, if your client doesn't take the plea, you let 'em know that they've taken the risk of having charges added in a superseding indictment. And the case law's very clear that the government's permitted to do that.

This circumstance is quite different because this all begins outside of the context of any charges being brought.

THE COURT: Why is that different though? I've thought about that, and that -- I'm just wondering what -- kind of what's the policy reason that would make that so different?

MS. LAWSON: Well, for one, Your Honor, the whole circumstance with Mr. Waide started without the presence of a prosecutor completely. Started without a prosecutor at all.

The first two -- we have him being interviewed by law

enforcement on August 14, 2024, where they -- he was, quite frankly, surprised by the probation officer essentially setting up that meeting with Mr. Waide during one of the times he was reporting to his probation officer. That was the first time that they interviewed him, or attempted to interview him.

Obviously, he did not have counsel there, hence, why the interview stopped, and he asked for counsel. The prosecutor was not there, just, just law enforcement.

The target letter is the first time that you see a prosecutor get somewhat involved in this, but certainly no charges were pending at that time. Threat of charges, yes, but there were no charges pending at that time. And in fact, that target letter was sent as a hope that Mr. Waide would cooperate with the government.

Then we have another interrogation that was attempted after search warrant was executed on his girlfriend Ms. Lang's residence in April 2025. Again, the prosecutor was not present there.

It wasn't until he was brought in on the complaint in the previous case that we see any type of interaction between -- with -- not only -- or involvement, not only with a prosecutor, but interaction between the prosecutor and defense counsel.

I think it would be concerning to state that

individuals who are meeting with law enforcement without counsel and without the presence of a prosecutor for the purpose of eliciting inculpatory statements. I mean, these interviews were had -- it's very clear that they expected him to convey or to relay what his involvement was --

THE COURT: Right.

MS. LAWSON: -- in it. To say that that is plea negotiations, I think that is very much a stretch as to what a plea negotiation is. And we --

THE COURT: Okay.

MS. LAWSON: -- we often use a completely different term for those, right? It's called a -- it's part of the investigation.

THE COURT: Right. Okay.

Well, so your argument is you concede everything, that the plea negotiations can break down. The government's kind of --

MS. LAWSON: Sure.

THE COURT: -- response to that is that, well, all right. We're going to go ahead and we're going to supersede and add charges. You're less sure that the case law supports adding a new defendant to a case, right, its bringing charges for the first time. And then in this case factually, your sense is that maybe it's really not plea negotiations that's taken place.

So let me have Ms. Melton respond to that first.

MS. MELTON: Your Honor, this timeline in which defense counsel is stating the prosecutor was not involved here, the prosecutor was not involved there, this is an investigation, that directly cuts against those actions being vindictive prosecution.

There is case law, namely cited in United States -- or, excuse me, yes, *United States V. Young* that states that "Law enforcement's actions cannot be imputed to the prosecutor for the purposes of vindictive prosecution."

And in fact, there is case law regarding these pre-indictment plea negotiations. In fact, *United States V. William*, the Fourth Circuit, tells us it really doesn't matter whether it's pre-indictment or post-indictment plea negotiations.

The fact pattern in that case when they approached the defendant to cooperate, he had not been federally indicted yet. And in fact, multiple cases that we have cited in our response include situations where a defendant was first approached prior to even being charged, and refused to cooperate, and was then charged.

So I think it is quite clear that regardless of whether it's pre- or post-indictment, we are allowed to carry out our threats that are made during plea negotiations.

And yes, my first entry into the interactions with

Mr. Waide was the target letter. That target letter directly references plea bargaining.

THE COURT: Okay. Anything kind of final on that? I think I understand your position on that.

MS. LAWSON: No, Your Honor.

THE COURT: Then there's this interesting issue of whether there's a prosecutorial stake in Waide's cooperation, right? Is there some -- you know, how does his cooperation benefit the government as they're relating to prosecuting the co-defendants in the case? That makes sense; that's always the case in these kinds of discussions. But is there a prosecutorial stake that the government has as relates to Mr. Waide's case?

MS. LAWSON: Well, I think, Your Honor, they've got prosecutorial stake, and I think you have to look at it in the whole in terms of what is the stake. I don't think that we can parse out Mr. Waide from the co-defendants in this case 'cause they're all indicted together.

The stake that they had in this case, Your Honor, is, in reality -- and I appreciate that they're in these circumstances -- but they are struggling to find the witnesses against these individuals.

Understandably, these individuals have been indicted on murdering a federal witness to keep him from testifying. That just in and of itself is going to create issues for the

government in finding witnesses against these individuals. That's the stake that they have in it. And I don't think that they can disclaim that to be the case.

Candidly, Your Honor, I think that this might be a little bit more of a struggle for me in terms of is it vindictive prosecution if we had not had the complaint filed in between the target letter and this indictment.

THE COURT: Right.

MS. LAWSON: That is what I think is the crux here, is that you have a completely separate federal matter wholly separate and apart from what's been alleged in this case that was taken by the government which included plea negotiations, numerous talks, repeated requests for him to come in and proffer. And when he didn't, now we're here.

I think that that's a very -- I think that's a very big point in terms of looking at -- I guess this goes back into what we were talking about before -- but looking into whether these constitute plea negotiations, what happened before constituting plea negotiations and the stake that they've got in the case.

I mean, they have taken -- I quite frankly in my practice have never seen this happen before honestly where I've represented a client in one case, to turn around and represent him in another where it's very clear from the first one what was -- where the government was going in

terms of bringing that initial charge against him. I do not think that they can claim that they don't have a stake if they've taken those steps.

THE COURT: Ms. Melton, this is kind of an interesting predicate here. We've got one case which is separate and apart from this superseding indictment.

Let me let you respond to that argument.

MS. MELTON: Sure.

Your Honor, *Zakhari* and many of the cases that were cited by *Zakhari* talk about what a prosecutorial stake means. It means more than just a chore for the government. It's the duplication of resources. It's something that could land a mortal blow potentially to the government's case.

Here, there's not even a chore that has resulted from Mr. Waide's lack of cooperation. There certainly is not the potential for a mortal blow.

After he refused to cooperate, we indicted several people based off of the evidence that we have. We have a robust factual record in this case already that in no way depends on Mr. Waide. We have over 40,000 Bates stamped items in discovery that in no way depend on Mr. Waide's cooperation.

And at the time of the -- some of the emails in which I invited Mr. Waide to participate in a voluntary proffer, I

said in those emails, "We do not need him to testify."

Back at that time, I had no idea that there was going to be this allegation of professional misconduct, so I didn't have an incentive to document my emails in that way.

I truly, and still don't, need Mr. Waide to testify, and I think this state of our case at this time demonstrates that.

And to the extent that there was some sort of prosecutorial stay or prosecutorial animus that existed based off of frankly, a lack of response to those invitations to cooperate, that existed at the time of the October 2, 2025 indictment. Absolutely nothing changed with respect to Mr. Waide's purported exercise of any right, between October 2, and the superseding indictment in November 2025.

As for the firearm case, Mr. Waide pleaded guilty in that case. So not only is there probable cause to think that he committed that offense, he has in fact pleaded guilty to that offense.

So it's difficult for me to wrap my brain around how that has somehow contributed to prosecutorial vindictiveness.

THE COURT: My guess is -- and I've kind of referenced this -- that this kind of right to not cooperate, I don't -- the government doesn't seem to concede that

that's a -- exists certainly in this Circuit; maybe in the Ninth, but is that -- talk about that a little bit.

MS. MELTON: Well, even in the Ninth Circuit, Your Honor, the case that was cited by defense counsel was dicta in a footnote.

Subsequent case law from the Ninth Circuit states that there is no right to not be a snitch. And there are several cases, including the SCOTUS case *Roberts* that holds that there is no free-standing right to not cooperate. Any right not to cooperate really must be under the umbrella of the Fifth Amendment privilege for silence and against self-incrimination. And SCOTUS again tells us that that Fifth Amendment privilege is not self-executing. Mutinous will not satisfy it.

So Mr. Waide's failure to assert that right, the unanswered emails regarding the proffer opportunities are not enough for him to have asserted a protected right.

However, to the extent that that sort of silence is enough to assert a protected right, again, that existed at the time of the original indictment in October.

In the reply, defense counsel states that we failed to cite any case law regarding that principle that, you know, something -- something must have changed.

I did in fact cite case law in that regard. The Sixth Circuit case in *Goff* discussed that. It says, you know, the

defendant has really failed to explain why, if there was some sort of vindictive motive that existed back at point A., why the government did not retaliate at the time of the initial indictment at point B., and instead, waited until point C.

And really, just in terms of legal causation principles. You know, we learn in law school about proximate causation, about intervening causes, superseding causes. That implies that the sequence of events is important with respect to causation. Something can be an intervening cause or a superseding cause.

But furthermore, if you study *Zakhari*, which I have, the sequence of events in that case was incredibly important to the Sixth Circuit in finding presumed vindictiveness.

THE COURT: So I want you to develop this idea just a little bit. This notion that you can -- in this case, you've kind of indicted a group of individual defendants, and then you could have indicted Mr. Waide at that time. And so it begs this question, which is kind of reflected in the case law, which is what changes, right? It seems to me in some ways the seminal question is what changed between that time and the time that you did decide to supersede and indict Mr. Waide, and is it an impermissible change, right?

So what existed at the time of the superseding

indictment for you that did not exist necessarily at that time? Or what -- maybe the better way is we are careful about kind of focusing on the investigation here in terms of the specifics, but what changed that's permissibly a foundation for superseding against Mr. Waide?

MS. MELTON: Respectfully, Your Honor, the case law tells us that if the defendant does not make a prima facie case of presumed vindictiveness, that the government is not required to put its decision-making or its work product on display, nor is it required to disclose *Jencks* material just because there has been a sort of naked allegation of prosecutorial vindictiveness.

But what we can say from this record here is nothing changed with respect to Mr. Waide. There was no new assertion of a right. There was no repeated assertion of a right. There was no escalation in the assertion of his right. Absolutely nothing changed as to him from October to November.

Also case law, including *Zakhari* and the *McCreary* case from a U.S. District Court in Tennessee talks about developments that occur throughout a case, even post-indictment. That case law discusses that, you know, if a case has already been tried and then the government ups the ante after the trial, that's looked at a little bit more suspiciously because the case has really run its course at

that point. So has the government truly discovered something -- something new, or are they trying to punish the defendant?

In the pretrial context, case law tells us that those factual developments or discoveries can occur even on the eve of trial. So they can certainly occur in the infancy of a case, and in November 2025, this case was in its infancy.

THE COURT: Ms. Lawson, it seems to me that the government could have indicted your client initially as part of an initial indictment, and then sought the cooperation of your client in exchange for leniency, right?

MS. LAWSON: Correct.

THE COURT: Nothing wrong with that?

MS. LAWSON: Nope.

THE COURT: Why is this different? Why isn't this kind of the same thing in reverse?

MS. LAWSON: Well, because it's not the same thing, I guess, Your Honor.

THE COURT: Well --

MS. LAWSON: It's not the same thing. I mean, they have clearly -- I mean -- I guess let me start maybe in responding to some of the things that you asked Ms. Melton that might help with that.

THE COURT: Please.

MS. LAWSON: So you ask her about prosecutorial

stake. Yes, it -- you look at if there's been a "mortal blow" to their case, or if it would present them with a tougher case.

Now, I know that the government has said that they really don't need his testimony to make their case. Because if that's the case, the government has to answer why they repeatedly and unrelentingly sought his cooperation. Why, unless they needed him? If they didn't need him, they would have offered it, he said no, and that would have been it.

But there have been repeated attempts -- outside of him having counsel, there were repeated attempts and requests after he'd had counsel. It is just difficult to see how that doesn't leave the impression that his testimony they deemed as important or critical to their case. I don't know. I don't know what their case is. I don't know what the totality of their theory is in this case yet. But it seems to me that if they didn't really need him, why keep asking? Why keep asking?

THE COURT: Well, I think your question seems to imply -- and I'll let Ms. Melton respond to the extent she can in the context of this hearing -- but it seems to imply that the only reason the government could seek the cooperation of the witness is that that person's an essential witness. But cooperators all the time aren't essential. You can make your case with or without them,

right, but they are perhaps helpful to the government's case.

And so, Ms. Melton, I don't -- I'm not trying to put kind of words in your mouth, but that does seem to be a distinction. I don't think there's a rule that the only time you seek cooperation is that the witness is essential --

MS. LAWSON: No.

THE COURT: -- and that the case will fail.

MS. LAWSON: Yeah. No, certainly not, Your Honor. But I think we can all agree that the reality is, is that it's most often the defense attorney that's approaching the prosecutor, right? I mean, this is a little bit of a different circumstance in which the prosecutor not only approached me, but has approached me on multiple occasions. Based on just my experience and my practice, there's weight in that act to me in terms of him being needed.

And it's not accurate that I was told that his testimony was not needed. To the contrary, Ms. Melton's email specifically says, "I do not think that we actually need Waide to testify against anyone in the Lewis case." That's not an explicit statement of, We don't need him or we're not going to call him. You know, we'll write this down. We're not going to call him as a witness. We don't need him. We just want to talk to him.

THE COURT: And that's fair. And I suspect that as things progressed, you would have nailed that down.

MS. LAWSON: Exactly.

THE COURT: Well, Ms. Melton, let me let you respond to that.

MS. MELTON: Your Honor, I think the difference between, "I think Mr. Waide will not be needed and Mr. Waide is not going to be needed" is really parsing hairs.

Furthermore, in the September 2025 email, I again reiterated that I did not believe we needed him. I said specifically, "Again, because we do not need him to testify, it is unlikely that anyone will know about the proposed meeting. The meeting is almost exclusively to his benefit".

In answering the government's question, the government -- or, excuse me, not the government's question, the Court's question -- the Court has sat through many, many, many sentencings in Your Honor's long tenure on the bench in which cooperators had received some credit for cooperation, a low amount of credit as recommended by the government for some level of cooperation, often just intelligence. But we'll take the intelligence. And often we do that to help a defendant, even though we don't need them to testify in grand jury, we don't need them to testify at a trial.

And Mr. Waide -- we have never believed Mr. Waide was a

shooter. We never believed that Mr. Waide engaged in planning for this crime for three days alongside his co-defendants. So there is a human reason to approach him about cooperating.

And Mr. Metzger is in the courtroom. I've approached his client who is also less culpable at times because this is a life-changing case, particularly if you were charged as a principal. The mandatory minimum is life or death.

So we don't always ask defendants to sit down with us for selfish reasons. In fact, sometimes those sit-downs are baked into sentencing schemes. You know, the defendant has to sit down in order to get safety valve eligibility. Most of the time we do nothing with that information.

THE COURT: Well, as I say, I think the briefing's very good here, and I appreciate your responses to these specific questions.

Ms. Melton, let me make sure you've kind of made the points you really wanted to make coming in here. I'd be pleased to hear further. I want to give Ms. Lawson kind of the final word since it's her motion.

MS. MELTON: Your Honor, I think our response really captures everything that we wanted to -- wanted the Court to understand.

I will say just with respect to the reply that was filed. I mean, on the first page it says that there's a

concession that there's no proof of actual vindictiveness, but, you know, later in the motion it says in one of the titles, "Naming Mr. Waide in the superseding indictment was unreasonable and intended to punish him for the invocation of his constitutional rights." That is an argument of actual vindictiveness.

So I would ask the Court to please consider both our arguments on actual vindictiveness and presumed vindictiveness.

THE COURT: Thank you.

And then, Ms. Lawson, I'm pleased to give you the final word.

MS. LAWSON: Judge, I just wanted to address one thing that you spoke with Ms. Melton about as well in terms of the right not to cooperate.

I think it's very important to note that in those Supreme Court cases, the Supreme Court has specifically said, "Unless a defendant's silence is protected by the privilege against self-incrimination, the criminal defendant, no less than any other citizen, is obliged to assist the authorities."

The written communications sent to defense counsel explicitly states that Mr. Waide would be required to inculpate himself in this conduct. Literally their willingness not to indict was explicitly based on their

determination, the government's determination, that he had been wholly honest about his involvement, what they believed to be his involvement and his lack of knowledge as to what he was assisting with. I cannot think of more explicit statements of requiring inculpatory statements from a defendant. There's no doubt that their cooperation was for the purpose of eliciting those inculpatory statements.

THE COURT: But isn't that in some sense often the case in negotiations regarding cooperation?

MS. LAWSON: With -- once someone's been indicted -- well, let's put it this way, Your Honor. Often when I'm talking to clients about proffering, I tell them, you know, You've asked to do this. You need to know that if you know about it, it's because you were in it, right? So you better not do anything to try to skirt the lines here in terms of keeping yourself removed from it. Right? I mean, that is often the case. But typically again, that's under the circumstance of us going to the government requesting at our client's request that we set up a proffer with them, right? That's not the case here. That's not the case here. They were asking him to come in and to say what his involvement was. And really, with the evidence that we have, you can see why they needed his statement to link two and two together.

THE COURT: Okay. Well, I think I understand the

arguments on both sides here. Thank you very much. We'll take the matter under advisement, and you can anticipate I'll resolve this issue.

But that brings me to one housekeeping matter that I want to discuss. And I would really like to get the view of the government. And, of course, Ms. Lawson, you can weigh in, but there are a lot of defense counsel in this case.

It is the case that another judge will largely preside over this matter. And so one of the things that I'm giving some thought to is the timing of referring this case to another judge.

And I want to be responsible in terms of my own judicial duties, which will continue till the middle of July, and make sure that, you know, I can, given the history I already have, that I can decide things. I know there's a motion to severe, for example, that's pending.

But I'm very amenable if the government has any particular perspective in terms of the timing as it relates to things that are pending. And, you know, I'll certainly consult with my colleagues as well as it relates to kind of at what point would it make some sense for them to begin to take over the case.

Your answer can be, Well, it's just -- you're just neutral on it. That's fine. This is not a -- I'm not going to take any offense either way on this, other than just

trying to make a good decision in terms of case management.

MS. MELTON: Thank you, Your Honor.

The short of it is probably I'm neutral, but I did want to offer some additional information to the Court on where we are so that we can ...

THE COURT: That'd be helpful.

MS. MELTON: So within probably the next six weeks, I'll make a submission to Main Justice about one or two of our less culpable death-eligible defendants, you know, recommending -- which, of course, it's not our decision -- but recommending most likely that they not be considered for death.

Those that are considered more culpable both in terms of their participation in the crime and their criminal history, I think they do need a little more time for their mitigation investigation.

It's been a couple of weeks since I talked to Pat Nash about this, and it sounds like he at least is still working really hard in that area, and I don't want to be pushy with that until I have done everything that I need to do. And we've provided all of the discovery related to the Lewis homicide itself, but there is discovery relating to the Hot Boyz as a gang generally and some of their background that really is going to be relevant to sentencing for these defendants, and I have not yet provided that.

So hopefully, as soon as we provide that final batch of discovery, we can start talking with Pat and some of the other learned counsel about scheduling the mitigation presentation for their clients.

THE COURT: I think I'm inclined to decide this issue -- decide the motion to severe issue, which has not been fully briefed, and then transfer the case.

Can you foresee any -- just kind of issues with that timing?

MS. MELTON: No, Your Honor.

THE COURT: And then, Ms. Lawson, I don't mean to put you on the spot speaking on behalf of the defense community that's involved in this case, but you have great experience and might have some perspective that could be helpful once I make this decision as well.

MS. LAWSON: I think what I would tell Your Honor is, is we filed the motion to severe for a reason, right? I just see the other co-defendants' cases taking much longer, lingering for decisions out of D.C. that do not relate to Mr. Waide whatsoever.

Plus, in the -- he's certainly being -- he's obviously being held on the sentence in the previous case, but especially if he's continued to be held in this case, expediency is of utmost importance to me and certainly to Mr. Waide. So I think really that motion to severe is what

will drive things for us.

THE COURT: So I think you'd agree that probably it would be best to try to go ahead and try and resolve that. And it's not fully briefed, so we'll --

MS. LAWSON: Yes.

THE COURT: -- wait till it's fully briefed, of course. But I think I'd be able to resolve that before the case is transferred.

MS. LAWSON: Yes. Thank you, Your Honor.

THE COURT: Thank you both counsel for excellent arguments. The matter stands submitted.

And we'll stand in recess pending the next item on my docket.

*(End of proceedings - 2:10 p.m.)*

* * * * *

***C E R T I F I C A T E***

I, SANDRA L. WILDER, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Sandra L. Wilder RMR, CRR
Official Court Reporter

Date of Certification:
May 11,2026