UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CRIMINAL CASE NO. 25-CR-127-GFVT-MAS

UNITED STATES OF AMERICA                                        PLAINTIFF

v.                          **RESPONSE TO MOTION TO SEVER**

QUINCINO WAIDE, JR.                                            DEFENDANT

*   *   *   *   *

In September 2023, Quincino Waide, Jr. ("Waide" or "Defendant") joined a murder plot to kill a federal witness for money. Others who procured, assisted, and carried out the murder stand charged alongside Waide as principals. Waide now moves to sever his trial from the proceeding against his confederates.

Waide stands not accused of a traffic ticket alongside alleged murderers. Waide served and is charged as a member of a common scheme or plan in which his conduct is "part and parcel" to the conduct of his co-defendants. *See United States v. Montgomery*, No. 2:16-cr-223, 2018 U.S. Dist. LEXIS 127674, at *8 (W.D. Pa. July 31, 2018) (holding that the murder charge against one defendant was "part and parcel" to the accessory-after-the-fact charge against another defendant).

Where joinder is proper, as here, a defendant carries the burden of proving actual prejudice to secure a separate trial—an "exacting" standard that Waide has not overcome. *See United States v. Didion Milling, Inc.*, No. 22-cr-55-jdp, 2023 U.S. Dist. LEXIS 83312, at *32 (W.D. Wis. May 11, 2023). The Defendant's Motion to Sever should be denied.

1

## FACTS

The investigation conducted by Lexington Police Department ("LPD") and FBI indicates that Lamar paid members of a violent street gang, the Hot Boyz, to murder Lewis to prevent his testimony in Lamar's federal drug trafficking case.[1] Dixon, Daquis Sharp ("Sharp"), Jatiece Parks ("Parks"), and Desmond Bellomy ("Bellomy") carried out Lewis's execution; Boone acted as a communication and payment intermediary between Lamar and the other Hot Boyz; Morris provided assistance to the Hot Boyz assailants by allowing them to use her vehicle for surveillance; and Quincino Waide, Jr. ("Waide") helped the Hot Boyz assailants transfer out of the murder vehicle.

On September 29, 2023, at approximately 8:15 AM, Lewis drove to his employment at Koch Air on Trade Street in Lexington.[2] When Lewis parked and exited his vehicle, three masked individuals exited a dark colored sedan and shot Lewis, killing him.[3] The dark-colored sedan (or "subject vehicle") then fled the scene.[4]

According to witnesses, the subject vehicle had been sitting in the parking lot for a significant time before Lewis's arrival.[5]

A commercial truck that was sitting in the parking lot captured some of the incident with its in-cab camera.[6] The in-cab camera showed Lewis's vehicle enter the parking lot. The murder itself was not captured on video, but the camera captured the sound of the gunfire. The in-cab camera then showed the subject vehicle leaving the scene immediately after the gunfire.

---

[1] *See* R. 160: SA Robison, TR (Detention Hearing) at 987-88.

[2] *See Id.* at 987.

[3] *See Id.*

[4] *See* Boone Detention Hearing Exhibits 5-6.

[5] *See* R. 72: SA Robison, TR (Boone Detention Hearing) at 320.

[6] *See* Boone Detention Hearing Exhibit 5.

Based on witness statements, law enforcement queried Flock camera data for a black sedan operating in the early morning hours, locating a black Acura that Daquis Sharp was known to operate (hereafter, "Acura").[7] The Acura was the only vehicle matching the description of the subject vehicle that was active and captured by Flock on the morning of the shooting.[8]

Law enforcement collected multiple shell casings from the scene.[9] NIBIN testing on the shell casings further corroborated the Hot Boyz' involvement with .9mm and .40 caliber shell casings from the homicide scene matching two other shootings in which Sharp's black Acura was captured on video.[10]

Law enforcement confirmed that Sharp was still using the Acura in the days leading up to the homicide by comparing his cell-site location data with Flock data.[11] However, after the homicide, the Acura was found abandoned at 1101 Centre Parkway in Lexington.[12]

Law enforcement discovered the identities and roles of each defendant through cell-site location data, cell phone, and social media searches.[13]

Dixon's cell-site location data placed him in the same area of Louisville as Lamar three days before the homicide, on September 26, 2023.[14] After the apparent meeting between Dixon

---

[7] *See* Boone Detention Hearing Exhibit 7; *See* R. 72: SA Robison, TR (Boone Detention Hearing) at 321-22.

[8] *See* R. 72: SA Robison, TR (Boone Detention Hearing) at 321-22.

[9] *See Id.* at 325-27.  *See also* Boone Detention Hearing Exhibit 9.

[10] Boone Detention Hearing Exhibits 10-11.

[11] *See* R. 72: SA Robison, TR (Boone Detention Hearing) at 324.

[12] *See Id* at 390.

[13] *See Id.* at 330.

[14] *See* R. 160: SA Robison, TR (Detention Hearing) at 988.

and Lamar, Dixon made plans with the other Hot Boyz.[15] At approximately 8:30 PM on September 26, 2023, Dixon texted Bellomy, stating: "[a]nswer the phone bitch, we got shit on da flow."[16]

At 5:37 PM on September 27, 2023, Morris received a text from Bellomy, stating: "quick serious question."[17]

At approximately 5:58 PM, Dixon sent Bellomy the following messages:

➢ Dixon: Lil [now-deceased Hot Boyz member Chance Gist] on his way we bou go get dat mu-fucka
➢ Dixon: Is it a go
➢ Dixon: I done got everybody ready[18]

At 6:01 PM, Bellomy responded to Dixon, stating "ya bet" and "she good wit it."[19] Although it appears that one or two other females knew about the plot to murder Lewis, Morris is the only female known by law enforcement to assist with the plot.[20] Based on Morris being the sole female abettor and her boyfriend (Bellomy) being the person to report "she good wit it," law enforcement believes that "she" is Morris.

At 6:03 PM, Morris texted Bellomy and said: "…I don't want it to just be sumn you doin for me."[21] Bellomy responded: "its gonna be for the both of us…"[22] The content and timing of these messages and the "quick serious question" message, all found on Morris's phone, further point to Morris being "she."

---

[15] *See Id.*

[16] *See* Morris Detention Hearing Exhibit 1; Boone Detention Hearing Exhibit 14.

[17] *See* Morris Detention Exhibit 2.

[18] *See* Morris Detention Hearing Exhibit 1.

[19] *See* Morris Detention Hearing Exhibit 1.

[20] *See* R. 160: SA Robison, TR (Detention Hearing) at 992.

[21] *See* Morris Detention Hearing Exhibit 2.

[22] *See* Morris Detention Hearing Exhibit 2.

On the evening of September 27, 2023, Dixon and the other Hot Boyz began surveilling Lewis.[23] Text messages indicate that Dixon and Bellomy had Morris's vehicle that evening.[24] However, Morris planted a Nokia C100 smart phone in her vehicle to track Bellomy's movements. Overnight on September 27, 2023, Morris saw Bellomy's location at an unpalatable location, prompting Morris to claim that she needed her car to go to the hospital.[25] Morris's spat with Bellomy continued through September 28, 2023, generating the following text messages:

> ➢ Morris: I was omw to the hospital !!
> ➢ Morris: Are you on you way ?
> ➢ Bellomy: ok well im sorry & no I'm going back to sit in this house for rn
> ➢ Morris: Why
> ➢ Bellomy: gotta learn his schedule need this money
> ➢ ["!!" emphasis placed on "gotta learn his schedule need this money."]
> ➢ Morris: I need my car
> ➢ Morris: But I don't expect you to care
> ➢ Morris: You've literally showed me time and time again that I don't mean shit to you
> ➢ Morris: Sitting in the house ain't gon learn nobody's schedule either
> ➢ ["Haha" emphasis placed on sitting in the house ain't gon learn nobody's schedule either"][26]

These messages and other evidence show that the Hot Boyz had Morris's vehicle for their surveillance activities on September 28, 2023.[27]

Dixon's cell-site location data, which contained more detailed location information than many records available to law enforcement,[28] placed him in the precise area of Lewis's home and work on September 27-28, 2023.[29] When law enforcement searched Dixon's cell phone, they

---

[23] *See* Boone Detention Hearing Exhibit 15.

[24] *See* Morris Detention Hearing Exhibit 3.

[25] *See* Morris Detention Hearing Exhibits 3-4.

[26] *See* Morris Detention Hearing Exhibit 4.

[27] *See* Morris Detention Hearing Exhibits 3-5.

[28] Dixon's records contained "timing advance" data, which provides not only a cell phone's approximate location within the sector of a tower but also the distance from the tower.

[29] *See* R. 160: SA Robison, TR (Detention Hearing) at 1004; Boone Detention Hearing Exhibit 15 and 16.

located a text from Dixon to several other Hot Boyz on September 28, 2023, that included Lewis's license plate number.[30] Dixon's cell-site location data shows him in the area of Lewis's workplace when the message was sent.[31] Lewis's timecard shows that he was at work when Dixon sent the message.[32]

Bellomy's cell-site location data also places him in the area of Lewis's home and work on September 27-28, 2023.[33] In addition to the cell-site location data, Morris, using the "find my device" service for the smartphone that she secretly placed in her car, took a screenshot of Bellomy's location, capturing Bellomy outside of Lewis's house on September 28, 2023, at 1:07 PM.[34]

After performing surveillance in Lexington on September 28, 2023, Bellomy returned to Morris's residence in Richmond that evening.[35] Still enraged about Bellomy staying at his girlfriend's house the night before, Morris decided to withdraw her consent for Bellomy to use the car, first having a romantic evening with him overnight and then revoking her consent the following morning. At 8:13 PM, Morris texted Lyvers: "[h]e out there cleaning my car rn" and "[h]e ain't usin it no more cause Ik sumn he don't know."[36] Morris later added: "he ain't takin my carrrr" and "[h]e need to find some material to build a bridge so he can get over it."[37]

---

[30] *See* R. 160: SA Robison, TR (Detention Hearing) at 1005; Boone Detention Hearing Exhibit 17.

[31] *See* R. 72: SA Robison, TR (Boone Detention Hearing) at 340-41.

[32] *See Id.*

[33] *See* R. 160: SA Robison, TR (Detention Hearing) at 1004; Boone Detention Hearing Exhibit 16.

[34] *See* R. 160: SA Robison, TR (Detention Hearing) at 1005; Boone Detention Hearing Exhibit 18.

[35] *See, e.g.,* Morris Detention Hearing Exhibit 5.

[36] *See* R. 180-3: Response, Exhibit 17 at 1230.

[37] *See Id.*

In the early morning of September 29, 2023, Morris described the evening to Lyvers, saying that she and Bellomy showered together and that he sweettalked her.[38]  However, while Bellomy slept, Morris went through his phone and texted the other girlfriend.[39] Morris then described the moment that Bellomy realized there was an issue with the car, saying "I woke him up I said des I don't think we needa do this anymore he turned over soo fast lol."[40] Morris also said: "*they* can all miss meeeee I wasn't in the wrong at all."[41]

Law enforcement believes that the Hot Boyz assailants enlisted Waide's assistance sometime after Morris revoked consent for Bellomy to use her car—either very late on September 28th or very early on September 29th.

On the morning of the homicide, in the early morning hours, Bellomy and Dixon texted one another to coordinate picking each other up and discussing the location of gloves.

Waide's cell-site location data indicated that, like the other Hot Boyz, he was very active in the early morning hours of September 29, 2023, showing him in several areas relevant to the murder and the other Hot Boyz.[42]

After the homicide, in the late afternoon/early evening, Dixon and Lamar's cell-site location data shows them in the same area of Lexington.[43] Shortly thereafter, Dixon began posing with thousands of dollars in cash on social media.[44] Parks and Bellomy also posed with large stacks of money on social media following the murder.

---

[38] *See* R. 180-3: Response, Exhibit 18 at 1231.

[39] *See Id.*

[40] *See Id.*

[41] *See Id.* (emphasis added).

[42] See *United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 21: SA Robison, TR (Hearing) at 138.

[43] *See Id.* at 118.

[44] *See Id.*

Also, on the evening of the homicide, Dixon and Sharp texted each other the following:

➢ Sharp (7:25:15 PM): We gonna give Fred [Waide] prob 100 each
➢ Dixon (7:25:50 PM): Yup an Doja [Boone] said give him 5
➢ Sharp (7:28:23 PM): Bet cause he was talkin bout a band but either way it was 250 each from the 4 of us
➢ Dixon (7:29:28 PM): Yeah it don't matter to me, he just got in the car an said y'all just give me 5 but Watchu wanna give him $1000
➢ Dixon (7:29:32 PM): ?
➢ Sharp (7:30:07 PM): It dnt matter bru it's just 250 each but its yo call on this one
➢ Dixon (7:31:05 PM): We can give em the band since ETs wat we said in da first place gang
➢ Sharp (7:31:18 PM): Bet[45]

Here, Dixon and Sharp discuss payment to Boone and Waide.[46] Not only did this conversation about payment occur on the night of the homicide, after the apparent meeting with Lamar, Sharp references "250 each from the 4 of us."[47] Again, law enforcement believes that four Hot Boyz were present on Trade Street to murder Lewis—Sharp, Dixon, Bellomy, and Parks.[48]

When Dixon said, "he just got in the car," cell records indicate that Dixon and Waide were in the same area at the time of that message.[49]

In the weeks after the murder, Dixon and Boone communicated with each other and Rollie Lamar about additional installment payments.

**LEGAL STANDARD**

"Rule 8(b) permits joinder in an indictment of defendants alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." *See United States v. Flowers*, No. 5:21-cr-584, 2022 U.S. Dist. LEXIS 116245, at *25-

---

[45] *See* R. 222-3: Response, Exhibit 3.

[46] See *United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 21: TR (Hearing) at 120-21 (Robison).

[47] *See Id.*

[48] *See Id.*

[49] See *Id.*

26 (N.D. Ohio June 30, 2022) (cleaned up) (citing *United States v. Swift*, 809 F.2d 320, 322 (6th Cir. 1987)). "A group of acts or transactions is logically interrelated, for instance, if the acts or transactions are part of a common scheme or plan." *United States v. Johnson*, 763 F.2d 773, 776 (6th Cir. 1985).

"There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). "Joint trials play a vital role in the criminal justice system," by "promot[ing] efficiency" and "avoiding the scandal and inequity of inconsistent verdicts." *See Id.*

"Once defendants have been properly joined under Federal Rule of Criminal Procedure 8(b), a strong showing of prejudice is required to justify severance." *United States v. Hessling*, 845 F.2d 617, 619 (6th Cir. 1988) (cleaned up). In joint trials involving the same series of acts, "there is a presumption that the jury will be able to sort out the evidence applicable to each defendant and render its verdict accordingly." *See United States v. Horton*, 847 F.2d 313, 317 (6th Cir. 1988). Severance is appropriate "only if there is a serious risk that joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *See Zafiro*, 506 U.S. at 539.

"[T]he defendant must show substantial, undue or compelling prejudice." *United States v. DeFranco*, 30 F.3d 664, 669-70 (6th Cir. 1994) (cleaned up). *See also United States v. Romo,* No. 14-21, 2015 U.S. Dist. LEXIS 195096, at*3 (E.D. Ky. Apr. 21, 2015) ("In order to prevail on a Rule 14 motion for severance, a defendant must show 'compelling, specific, and actual prejudice.'"). "Generic allegations of prejudice are insufficient." *United States v. Age*, No. 16-32, 2021 U.S. Dist. LEXIS 240213, at *8-9 (E.D. La. Dec. 16, 2021) (citing *United States v. Ledezma-Cepeda*, 894 F.3d 686, 690 (5th Cir. 2018)).

9

Antagonistic defenses with co-defendants, the possibility of spillover of evidence from one defendant to another, and disparities in evidence do not demand severance. *See Flowers*, 2022 U.S. Dist. LEXIS 116245, at *29-30.

Where evidence overlaps, there is a "minimal risk of prejudicial spillover." *United States v. Milburn*, No. CR 05-00167 WHA, 2008 U.S. Dist. LEXIS 144902, at *27 (N.D. Cal. June 24, 2008). *See also United States v. Basciano*, 03-CR-929, 2005 U.S. Dist. LEXIS 45737, *10-12 (declining to find spillover prejudice because the defendants had been charged with substantially similar crimes); *Didion Milling, Inc.*, 2023 U.S. Dist. LEXIS 83312, at *32-39 (finding no risk of unfair prejudice where defendants are being tried on related offenses).

In addition to establishing prejudice, a defendant must "demonstrate how less drastic measures, such as limiting instructions, would not be sufficient to cure any possible spillover prejudice." *See Flowers*, 2022 U.S. Dist. LEXIS 116245, at *30. *See also United States v. Ramos*, 346 F. Supp. 2d 567, 575 (S.D.N.Y. 2004) (noting that "limiting instructions to the jury have emerged as the preferred device for curing any prejudicial spillover that may result from a multi-defendant, multi-count trial."); *Age*, 2021 U.S. Dist. LEXIS 240213, at *8-9 ("it is generally presumed that juries follow the instructions given to them by the district court and are capable of compartmentalizing the evidence against each defendant").

"Severance under Rule 14 is an *exception*." *See Age*, 2021 U.S. Dist. LEXIS 240213, at *8-9. "A court must find specific and compelling prejudice that outweighs judicial economy." *United States v. Davis*, No. 01-282, 2003 U.S. Dist. LEXIS 6554, at *22-25 (E.D. La. Apr. 16, 2003) (citing *United States v. Krenning*, 93 F.3d 1257, 1267 (5th Cir. 1996)).

## ARGUMENT

### I.     Waide has failed to allege prejudice to a specific trial right.

10

One way for a defendant to obtain a severance is to show a serious risk of actual prejudice to a specific protected right. *See e.g., United States v. McVeigh*, 169 F.R.D. 362, 365 (D. Colo. 1996) (citing *Zafiro*, 506 U.S. at 539). For example, a severance may be appropriate if a joint trial compromised the right to confrontation or the ability to present exculpatory evidence. *See Zafiro*, 506 U.S. at 539 (citing *Bruton* v. *United States*, 391 U.S. 123 (1968); *Tifford* v. *Wainwright*, 588 F.2d 954 (CA5 1979) (*per curiam*)). Waide has failed to allege risk any risk of prejudice to a specific trial right, and his case is clearly distinguishable from cases showing compromise to such a trial right. *See e.g., McVeigh*, 169 F.R.D. at 365 (holding that "the government's intended use of testimony about statements made by Terry Nichols to FBI agents would deny Timothy McVeigh his right to confront all witnesses against him under the Sixth Amendment to the United States Constitution"); *United States v. McLaughlin*, No. 3:CR-12-0179, 2013 U.S. Dist. LEXIS 34390, at *21-27 (M.D. Pa. Mar. 13, 2013) (finding "a serious risk that a joint trial will compromise McLaughlin's Sixth Amendment rights").

### II.    Waide's spillover arguments are unpersuasive and insufficient.

A defendant may also obtain a separate trial by showing "a serious risk that a joint trial would…prevent the jury from making a reliable judgment about guilt or innocence." *See Zafiro*, 506 U.S. at 539. Such "spillover" prejudice may arise when "defendants are tried together in a complex case and they have markedly different degrees of culpability." *See Id.* However, "the fact that some evidence in the case would be irrelevant to the charges against a specific defendant is not enough to show a specific prejudice that would prevent the jury from making a reliable determination of guilt." *Didion Milling, Inc.*, 2023 U.S. Dist. LEXIS 83312, at *38. Likewise, "a defendant is not entitled to severance simply because the evidence against a codefendant is far

11

more damaging than the evidence against him." *United States v. Causey*, 834 F.2d 1277, 1288 (6th Cir. 1987).

Waide's arguments for severance relate to spillover. He claims that, "in contrast to the limited evidence of his involvement," the "plethora of evidence related to the co-defendants… is not only irrelevant to Quincino's alleged conduct, but such evidence is highly prejudicial, as it would create a grave risk of Mr. Waide's conviction, not as a result of the government's proof, but by Quincino's association with individuals shown to engage in dangerous and violent criminal conduct in both the past and present. Mr. Waide's severance from the co-defendants is required."[50]

Waide's spillover arguments relate to the volume of evidence directly relating to him versus his co-defendants; his co-defendants' criminal histories; his lesser culpability; and the fact that he is not eligible for the death penalty. In making these arguments, Waide fails to demonstrate prejudice, but he also demonstrates a fundamental misunderstanding of the nature of accessory liability and overstates the relevance of his co-defendants' criminal histories in the guilt phase of this proceeding. Ultimately, Waide's "conclusory statements regarding prejudice do not meet Rule 14(a)'s extremely difficult burden." *See United States v. Peña*, 932 F. Supp. 2d 464, 466-67 (S.D.N.Y. 2013) (cleaned up).

### a. Waide and his co-defendants are charged with related crimes.

Proper joinder occurs where defendants are "alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." *See Flowers*, 2022 U.S. Dist. LEXIS 116245, at *25. (cleaned up).

Here, every count in the superseding indictment relates to the murder of Kristopher Lewis. Regardless of whether there are different charges for different defendants, "[t]he charges all relate

---

[50] *See* R. 221-1: Memo in Support at 1741.

12

to a core of related facts," constituting more than just a "vague thematic similarity." *See Didion Milling, Inc.*, 2023 U.S. Dist. LEXIS 83312, at *31. "[T]his is not a case where defendants face an elevated risk of prejudice from trying unrelated but similar offenses." *See Id.* at *35.

Because the defendants are properly joined, the defendant must overcome the "exacting standard" of showing that a joint trial poses the risk of actual prejudice. *See Id.* at 32. When charges arise from a "common core," such as when different defendants are charged with different aspects of a single incident, it is difficult for *unfair* prejudice to arise. *See Id.* at *35.

"Participants in a single conspiracy should ordinarily be tried together for purposes of judicial efficiency and consistency, even if the evidence against one is more damaging than that against another." *See United States v. Ward*, 793 F.2d 551, 556 (3d Cir. 1986).

### b. Most of the evidence against Waide's co-defendants will be admissible against Waide.

Waide is currently charged as an accessory after the fact. "In traditional accessory cases…it is clear that the offenses—occurring as one fluid and logically connected chain of events in a brief span of time—are transactionally linked for purposes of Rule 8(b)." *United States v. Coles*, No. 1:16-CR-212, 2021 U.S. Dist. LEXIS 17041, at *49 (M.D. Pa. Jan. 29, 2021) (collecting cases).

"An individual is guilty of being an accessory after the fact when he, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment." *United States v. Boyd*, 640 F.3d 657, 662 (6th Cir. 2011) (citing 18 U.S.C. § 3). "[T]o convict a defendant of being an accessory after the fact, the Government must prove the commission of the underlying offense." *See Id.* Accordingly, evidence relating to a co-defendant's commission of the underlying offense is relevant, and is not prejudicial, to an accessory. *See Id.*

13

When a person is accused of being an accessory after the fact to murder, the murder charge is "part and parcel to the accessory after the fact charges." *Montgomery*, 2018 U.S. Dist. LEXIS 127674, at *8. *See also United States v. Jackson*, No. 86-5100, 1989 U.S. App. LEXIS 23380, at *11-12 (9th Cir. Dec. 6, 1989) (noting that separate trials for interrelated murder and obstruction charges would require duplication of evidence in each trial).

Because the United States must prove the underlying federal murder offense to prove that Waide is guilty of being an accessory after the fact, the evidence relating to the other co-defendants (e.g., "proof of specific details as to the commission of the Lewis murder; text messages and phone calls exchanged between co-defendants and their associates; numerous phone records and geo location data; reports of surveillance conducted by law enforcement; evidence of social media posts and communication through social media platforms; recorded jail calls; etc.")[51] is relevant and admissible as to Waide. Waide is therefore incorrect about the volume of evidence admissible as to him versus his co-defendants.

If Waide's trial was severed, the United Stated would be required to twice prove the Hot Boyz' commission of Lewis's for-hire murder using a firearm, requiring weeks of duplicated effort. In contrast, because evidence of the murder is directly related to Waide's liability, "no attorney [in a joint trial] will have to sit by listening to weeks of evidence that has no bearing on his client." *Didion Milling, Inc.*, 2023 U.S. Dist. LEXIS 83312, at *35.

Like *United States v. Franklin*, No. 24-CR-167-RAW, 2025 U.S. Dist. LEXIS 199983, at *4-6 (E.D. Okla. Oct. 9, 2025), where the government alleged that Batiste drove his co-defendant to the victim's house to commit a murder, the United States here is not alleging that Waide was involved in "every act taken in furtherance of the conspiracy," and "the Government will likely

---

[51] *See* R. 221-1: Memo in Support at 1743.

14

present evidence about actions taken by other co-defendants and not himself." *See Franklin*, 2025 U.S. Dist. LEXIS 199983, at *4-6. Yet, "the introduction of evidence that is more relevant to the co-defendants does not warrant severance." *See Id.* "Additionally, a disparity in the amount of evidence does not equate to prejudice and does not necessitate severance." *See Id.*

### c. Waide's lesser culpability does not demand severance.

Waide argues that "less culpability" should entitle him to a separate trial, correctly noting that his co-defendants face harsher penalties; incorrectly and inappositely noting that "the evidence of his guilt is limited at best;" and arguing with gross inaccuracy that "[e]vidence related to the conspiracies is detailed and includes a vast amount of evidence wholly unrelated to the offense with which Mr. Waide is charged."[52]

The evidence relating to Lewis's murder directly relates to Waide's liability. Waide's "concern that a jury will be unable to sift through the evidence at trial and make an individual determination of guilt as to him is a concern in virtually any multi-defendant conspiracy case where the participants have disparate levels of participation." *See United States v. Taylor*, No. 1:16-CR-145-TWT-JKL-13, 2018 U.S. Dist. LEXIS 179282, at *27-28 (N.D. Ga. Mar. 23, 2018). "[T]he general rule favoring joinder of defendants who have been indicted together applies to coconspirators, even if one defendant had a minimal level of participation in the conspiracy." *See Id.*

Moreover, "a defendant is not entitled to severance simply because the evidence against a codefendant is far more damaging than the evidence against him." *Causey*, 834 F.2d at 1288. It follows then that a defendant who assisted a murder scheme without active participation in the

---

[52] R. 221-1: Memo in Support at 1748.

murder can be tried alongside those who actively participated. *See United States v. Lazo*, 816 F. App'x 752, 758-60 (4th Cir. 2020).

The Defendant has failed to articulate how, if the occurrence of the underlying offense is an element that the United States must prove for accessory-after-the-fact liability, a severance would cure any juror confusion arising from varying levels of culpability (as evidence relating to the co-defendants' commission of the murder would be admitted against Waide in a separate trial). The Defendant has also failed to articulate why "instructions focusing the jury on the individual culpability and the consideration they must make as to each count as to each defendant would [not] sufficiently protect him." *See Lazo*, 816 F. App'x at 759. *See also See Flowers*, 2022 U.S. Dist. LEXIS 116245, at *29 (denying motion to sever where "defendants have failed to demonstrate how less drastic measures, such as limiting instructions, would not be sufficient to cure any possible spillover prejudice").

### d. Waide vastly overstates the relevance of his co-defendants' criminal history during the guilt phase of any trial.

The Defendant claims that his co-defendants' criminal history is the "most concerning" prospect of a joint trial.[53]

The Defendant appears to conflate evidence provided in discovery[54] with evidence that will be presented at trial, noting that "[d]iscovery produced also includes documentation of a litany of uncharged conduct alleged to have been committed by Sharp, Bellomy, Parks, Dixon, and Boone individually."[55] The Defendant goes on to discuss the charged and uncharged conduct of each of these individuals, also stating that "the government will seek to introduce evidence of the prolific

---

[53] R. 221-1: Memo in Support at 1743.

[54] A large portion of the evidence provided in discovery relates to sentencing rather than guilt for Lewis's homicide.

[55] R. 221-1: Memo in Support at 1743.

crime committed by member's of Sharp's family," without stating how the information could be admitted as evidence under Fed. R. Evid. 404(b).

For example, it is unclear how Boone's alleged but uncharged sexual assault could be introduced to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" as to Lewis's homicide. *See* Fed. R. Evid. 404(b). Because Lewis was not a gang member, most of the Hot Boyz' prior acts of gang-on-gang violence, including the murder of Malik Sleet, also likely have limited probative value.

Assuming the relevance of some past acts—e.g., the shootings that involved Sharp's black Acura and ballistically matched to Lewis's homicide—the Court would undoubtedly narrow the admissibility of past acts to those with some permissible use under 404(b). The United States would not request, and the Court would undoubtedly not allow, the Hot Boyz' various criminal histories to come in *cart blanche* during the guilt phase of trial.

Because the United States must prove the underlying offense to establish Waide's role as an accessory after the fact, any *res gestae* or 404(b) evidence as to the underlying offense would not be unfairly prejudicial to Waide. For example, the shootings that involved Sharp's black Acura and ballistically matched to Lewis's homicide connect the Hot Boyz to Lewis's murder, proving their commission of the underlying offense and, in turn, Waide's role as an accessory after the fact. *See e.g., Boyd*, 640 F.3d at 668 ("to convict a defendant of being an accessory after the fact, the Government must prove the commission of the underlying offense.").

To the extent there is any possibility of spillover from 404(b) evidence, the Defendant fails to explain why a limiting instruction insufficiently protects him. *See e.g., United States v. Murphy*, 2022 U.S. Dist. LEXIS 77689, at *20 (S.D.N.Y. Apr. 28, 2022) (holding that "severance is not warranted because, as courts routinely hold, a limiting instruction can suffice as an alternative");

17

*Peña*, 932 F. Supp. 2d at 466-67 (finding that "any risk of prejudice can be more than adequately addressed in a less burdensome manner by carefully crafting limiting instructions for jurors").

### e. Waide can be tried alongside capital defendants.

Waide argues that "[t]here is a significant and rare element to this matter in that the government chose to pursue the death penalty," arguing that the delays associated with the death penalty process entitle him to a separate trial.[56]

Although the government has not yet chosen to pursue the death penalty, the United States anticipates that some of Waide's co-defendants may be subject to a decision by the Department of Justice to seek the death penalty while others may not. Nevertheless, trying capital and non-capital defendants together fails to offend the Sixth Amendment. *See Davis*, 2003 U.S. Dist. LEXIS 6554, at *24 (citing *Buchanan v. Kentucky*,483 U.S. 402 (1987)). And, generally, "[t]here is no rule that defendants facing the death penalty cannot be tried alongside defendants who are not facing the death penalty." *See Franklin*, 2025 U.S. Dist. LEXIS 199983, at *6-7 (citing *United States v. Sanchez*, 75 F.3d 603 (10th Cir. 1996)). Particularly where there is overlapping evidence and minimal risk of "prejudicial spillover," a non-capital defendant's trial need not be severed from his capital-eligible co-defendants. *See Milburn*, 2008 U.S. Dist. LEXIS 144902, at *27.

Waide does not appear to dispute the complexity of this case, using the word "complex" multiple times in his motion to sever. Waide's concerns regarding pretrial detention are ultimately indistinguishable from his codefendants: he is potentially facing a lengthy period of pretrial detention for an offense that carries a lengthy period of incarceration. Under USSG § 2X3.1, Waide's offense level as an accessory after the fact is six levels lower than the underlying offense, but not more than 30. Because the offense level for murder for hire is higher than 36, Waide's base

---

[56] R. 221-1: Memo in Support at 1743.

offense level is likely 30, resulting in a prospective guideline range of 108-135 months. *See e.g., United States v. Montiel*, No. 2:25-cr-00294-MIS, 2025 LX 248493, at *18 (D.N.M. July 21, 2025) (denying a severance, in part, because "Defendant will not be approaching a time-served sentence when trial commences or when sentencing is likely to occur").

### III.    Separate trials would endanger witnesses.

Waide's motion ignores the impact that a severance would have on witness safety and, in turn, the government's ability to present evidence at later-occurring trials.

Waide's co-defendants stand accused of murdering a federal witness to prevent his testimony at trial. Not only did the Hot Boyz actually kill a witness, the Hot Boyz have made their disdain for snitches publicly known through their music[57] and on social media.[58] Since the likelihood of charges for Lewis's homicide became public, there have been efforts by the Hot Boyz and their confederates to figure out who was talking.[59] The Hot Boyz and their associates have also engaged in obstruction activity in this and other cases. All of these facts present an intolerable risk to government witnesses.

Waide himself has acknowledged the danger to witnesses, stating: "[d]oing so [testifying] not only invites significant danger to their own lives but the lives of their family and other loved ones."[60] Also, in September 2025, Waide's counsel and the undersigned communicated about safety concerns relating to Waide's transfer to a facility that housed other Hot Boyz.[61]

---

[57] For example, in one song posted to YouTube, Dixon sang: "Y'all ridin with a snitch. You one of mine an you ever tell gone fry em like a fish[.] Don't care about dying. You gon' meet that and I'm gonna put you in a ditch."

[58] *See e.g.,* Social Media Posts of Dixon and Bellomy, attached hereto as Exhibit 1.

[59] *See e.g., United States v. Waide*, 5:25-CR-73-GFVT-MAS, R. 43: Response at 291-92 (discussing communications between Taiss Sharp and Waide). In the call discussed therein, Waide himself said that he had an idea of who was working with law enforcement.

[60] R. 232: Reply at 1896-97.

[61] R. 228-7: Response, Exhibit 7 at 1856-57.

"The seriousness of the offense — the successful hired killing of a federal witness — weighs heavily against severance." *See Age*, 2021 U.S. Dist. LEXIS 240213, at *13. Even where the charged offense does not relate to the death of a witness, the membership of co-defendants in gangs that are known for violence and witness retaliation strongly disfavors severance. *See e.g., United States v. Cerritos*, 180 F. Supp. 3d 432, 441 (E.D. Va. 2016); *Milburn*, 2008 U.S. Dist. LEXIS 144902, at *11-12.

In a case involving MS-13, the *Cerritos* court acknowledged the government's valid safety concerns, holding:

> Severing and continuing Defendant's case would also effectively force the Government to put on the same trial twice, taxing the Government's resources and jeopardizing the safety of witnesses. The witnesses would still testify at the earlier trial, thereby revealing their identities, and then they would have to be called again much later for Defendant's trial.

*See Cerritos*, 180 F. Supp. 3d at 441.

In a case where defendants and their confederates posed a threat to civilian witnesses, the *Milburn* court stated that the safety of civilian witnesses "militates strongly in favor of joinder." *See Milburn*, 2008 U.S. Dist. LEXIS 144902, at *11-12.

Although the Defendant has failed to carry the "heavy burden of showing real prejudice to his case," a more robust showing would still need to be weighed against the potential loss of human life and the possibility of more culpable defendants (who would presumably be tried second) escaping justice. *See Age*, 2021 U.S. Dist. LEXIS 240213, at *13 (holding that the hired murder of a witness "weighs heavily" against severance).

**IV.    Waide's stated concerns do not outweigh concerns relating to judicial economy.**

"As a general rule, persons jointly indicted should be tried together because there is almost always common evidence against the joined defendants that allows for the economy of a single

trial." *United States v. Lopez*, 309 F.3d 966, 971 (6th Cir. 2002). *See also Swift*, 809 F.2d at 322 ("The predominate consideration is whether joinder would serve the goals of trial economy and convenience; the primary purpose of this kind of joinder is to insure that a given transaction need only be proved once."). "Severance of criminal charges is required only if the prejudice resulting from the joinder outweighs the dominant concern with judicial economy." *See Jackson*, 1989 U.S. App. LEXIS 23380, at *11-12. *See also Davis*, 2003 U.S. Dist. LEXIS 6554, at *23 ("A court must find specific and compelling prejudice that outweighs judicial economy.").

Where, as here, prejudice has been insufficiently shown by a defendant, there is nothing to balance against judicial economy. *United States v. Busch*, No. 20-1486 KG, 2021 U.S. Dist. LEXIS 116059, at *12-13 (D.N.M. June 22, 2021). On the other hand, "improper severance forces the government and courts to squander limited resources while allowing each defendant to point the finger of guilt at each other in absentia." *See Milburn*, 2008 U.S. Dist. LEXIS 144902, at *23.

As discussed above, Waide's accessory charge requires proof of the underlying offense. *See Jackson*, 1989 U.S. App. LEXIS 23380, at *11-12 (denying severance where "separate trials on these charges would require introduction of much of the same evidence"). *See also Montgomery*, 2018 U.S. Dist. LEXIS 127674, at *8 (noting "overlap of evidence that would result from separate trials").

As in *Age,* a separate trial for Waide would require the government to present its case twice, meaning that "the citizens of the district and the Government would be prejudiced by severance because the trial would have to be conducted twice" and "[m]ore people would have to serve as jurors and it would waste judicial resources." *See Age*, 2021 U.S. Dist. LEXIS 240213, at *12-13. As in *Didion Milling, Inc.*, which also involved a "newsworthy" event, a second trial creates inefficiencies because "[f]inding 14 impartial jurors to sit through a long trial will not be easy;

21

finding 28 will be doubly difficult and time-consuming." *See Didion Milling, Inc.*, 2023 U.S. Dist. LEXIS 83312, at *34.

Here, severance may result in greater inefficiency than the duplicative presentation of evidence. Waide is charged as an accessory, but the government continuously receives new information about this case. Because evidence points to Waide's pre-murder and post-murder assistance, and because it is not uncommon for at least one person in a group of eight defendants to be loose lipped or directly cooperate, the United States would not be surprised if evidence developed that placed Waide in the same category as other less culpable defendants who provided aid before the murder—e.g., Morris, who is charged as a principal. While the United States will likely object to severance at any stage of the proceeding, premature severance could result in subsequent rejoinder or the duplication of trials for equally culpable defendants—obviously undermining judicial economy.

Further, as noted above, Waide is unlikely to be the only non-capital defendant to be tried. If the Court determines that each non-capital defendant should get their own trial, this multi-week trial could re-occur multiple times over. If fourteen or twenty-eight jurors for a lengthy trial is difficult, forty-two or fifty-six jurors will be exponentially more difficult.

"Given the obvious conveniences and economies to be gained from trying this complex conspiracy in one proceeding, and the lack of any reason to believe that a curative instruction will not be sufficient to protect against any spillover prejudice," the Court should decline to exercise its discretion under Rule 14 to sever Waide from his co-defendants. *See Flowers*, 2022 U.S. Dist. LEXIS 116245, at *34.

**CONCLUSION**

. The Defendant has failed to carry the "extremely difficult" burden of showing that a joint trial would impose any actual prejudice to a trial right or any danger that the jury would provide

an unreliable verdict. In his effort to show prejudice and/or risk of unreliability, the Defendant failed to appreciate that the government must prove the underlying offense to which he is an accessory to prove his accessory liability, meaning that there is not a disparity in the volume of evidence relevant to his charge compared to his codefendants and there is little danger of *unfair* or *undue* spillover. Also, in attempting to manufacture prejudice, the Defendant largely focused on past crimes of his codefendants (and their families) that bear little relevance to the murder of Kristopher Lewis and the guilt phase of these proceedings. To the extent any of the factors cited by the Defendant pose any danger of compromise to a trial right or jury discernment, the Defendant failed to explain why a limiting instruction would not sufficiently protect him from these remote dangers.

The Defendant's lackluster showing cannot overcome the preference for joint trials, outweigh the interest of judicial economy, or balance against the need for witness safety.

As in most cases of proper joinder, Waide's charges should be tried alongside his co-defendants.

<div style="margin-left: 40%;">

Respectfully submitted,

JASON D. PARMAN
FIRST ASSISTANT U.S. ATTORNEY

By:   s/ Mary L. Melton
      Assistant United States Attorney
      260 W. Vine Street, Suite 300
      Lexington, Kentucky 40507-1612
      (859) 685-49802
      Mary.Melton@usdoj.gov

</div>

CERTIFICATE OF SERVICE

On June 9, 2026, I electronically filed this document through the CM/ECF system, which will send the notice of electronic filing to counsel of record.

s/Mary L. Melton
Assistant United States Attorney